IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MELBERT RAY FORD,

    Petitioner,

      v.

DERRICK SCHOFIELD, Warden,
Georgia Diagnostic and Classification
Center,

    Respondent.

CIVIL ACTION FILE
NO. 1:01-CV-2595-TWT

OPINION AND ORDER

This is a habeas corpus action in a state death penalty case. It is before the
Court on the Amended Petition for Writ of Habeas Corpus by a Person in State
Custody [Doc. 10]. For the reasons set forth below, the Amended Petition is
DENIED.

I. BACKGROUND

On March 11, 1986, Melbert Ray Ford was indicted by the Newton County,
Georgia, grand jury for malice murder and felony murder of Lisa Chapman, malice
murder and felony murder of Martha Chapman Matich, armed robbery, possession of
a firearm during commission of a felony, and burglary. (Resp. Ex. 2 at 10-14.) The

Supreme Court of Georgia, on direct appeal of his conviction and death sentence, set

forth the facts of the case as follows:

> After his relationship with Martha Matich broke up, Ford began harassing her by telephone. Two weeks prior to her death, Ford told a friend of his that he "was going to blow her . . . brains out." The day before her death, Ford unsuccessfully tried to convince a friend to drive him to the convenience store where Matich worked. Ford told the friend that he planned to rob the store and work revenge upon Matich by killing her.
>
> On March 6, 1986, Ford talked to several people about robbing the store. He told one that he intended to kidnap Ms. Matich, take her into the woods, make her beg, and then shoot her in the forehead. Ford tried to talk another into helping him with his robbery (Ford had no car). When this effort failed, Ford responded that "there wasn't anybody crazy around here anymore."
>
> Finally, Ford met 19-year-old Roger Turner, who was out of a job and nearly out of money. By plying him with alcohol, and promising him that they could easily acquire eight thousand dollars, Ford persuaded Turner to help him.
>
> They drove in Turner's car to Chapman's Grocery, arriving just after closing time. Ford shot away the lower half of the locked and barred glass door and entered the store. Turner, waiting in the car, heard screams and gunshots. Then Ford ran from the store to the car, carrying a bag of money.
>
> At 10:20 p.m., the store's burglar alarm sounded. A Newton County sheriff's deputy arrived at 10:27 p.m. Ms. Matich was lying dead behind the counter, shot three times. Lisa Chapman was discovered in the bathroom, shot in the head but still alive, sitting on a bucket, bleeding from the head, and having convulsions. She could answer no questions. She died later.
>
> Ford and Turner were arrested the next day. Turner confessed first and was brought into Ford's interrogation room to state to Ford that he had told the truth. Ford told him not to worry, that Turner was not involved in the murders. Afterwards, Ford told his interrogators that the shooting began after Martha Matich pushed the alarm button. He stated that, had he worn a mask, it would not have happened.

Ford claimed at trial that he was too drunk to know what was happening, and that it was Turner who entered the store and killed the victims.

Ford v. State, 257 Ga. 461, 462 (1987), cert. denied, 485 U.S. 943, reh'g denied, 485 U.S. 1030 (1988).

The state sought the death penalty.  At his trial in October, 1986, the Petitioner was found guilty of all counts.  (Resp't Ex. 2 at 119-20.)  At the sentencing phase of the bifurcated trial, the jury found statutory aggravating circumstances as to each murder.  The jury found that the malice murder of Lisa Chapman was committed while the Petitioner was engaged in the commission of another capital felony–armed robbery–and during the commission of a burglary.  The jury found that the malice murder of Martha Matich was committed while the Petitioner was engaged in the commission of the capital felonies of armed robbery and murder and during the commission of a burglary.  (Id. at 129-32.)  The jury recommended that the Petitioner be sentenced to death for the two malice murders.  (Id. at 129-32.)  In accordance with the jury's recommendation, the trial court sentenced the Petitioner to death on both malice murder counts, to run consecutively to each other; merged the two felony murder counts into the malice murder counts; and imposed a consecutive 20-year sentence for armed robbery, a consecutive five-year sentence for the firearm possession, and a consecutive 20-year sentence for burglary.  (Id. at 136-42.)  The

Petitioner's convictions and sentences were affirmed on direct appeal.  Ford v. State, 257 Ga. 461 (1987).  On March 7, 1988, the United States Supreme Court denied the Petitioner's petition for writ of certiorari.  Ford v. Georgia, 485 U.S. 943, reh'g denied, 485 U.S. 1030 (1988).

The Petitioner filed his first state habeas corpus petition in the Superior Court of Butts County on June 13, 1988, Ford v. Turpin, No. 88-V-1597 (Butts Super. Ct.) ("Ford I").  He subsequently amended the petition prior to the evidentiary hearing held on September 14, 1992.  (Resp't Exs. 15, 17.)  Over the course of four years, the case was assigned to three different visiting judges.  The first visiting judge presided at the September 14, 1992 evidentiary hearing.  The third visiting judge entered a pretrial order in February 1996, directing the parties to present additional evidence in lieu of live testimony, to identify issues remaining for consideration, and set a deadline for filing post-hearing briefs.  Ten years after the trial, in an order dated December 5, 1996, the state habeas corpus court denied relief.  (Resp't Ex. 16.)  The court acknowledged Georgia's procedural default rule of O.C.G.A. § 9-14-48(d) for original state petitions and further noted that this statutory provision contained a miscarriage of justice exception.  (Id. at 1-2.)  "Given the severity and finality of the punishment to be administered in this case, the Court has considered the validity of many issues

that are procedurally barred to insure that a miscarriage of justice has not occurred." (Id. at 2.)

The Petitioner filed a timely application for certificate of probable cause to appeal in the Supreme Court of Georgia on February 10, 1997. (Resp't Ex. 18.) On September 29, 2000, the Georgia Supreme Court denied the Petitioner's application for certificate of probable cause to appeal. (Resp't Ex. 19.) The Petitioner's motion for reconsideration was denied on October 20, 2000. The United States Supreme Court denied certiorari on June 4, 2001. Ford v. Head, 532 U.S. 1068 (2001).

On September 27, 2001, the Petitioner filed his second state habeas corpus petition, styled Ford v. Head, No. 2001-V-681 (Butts Super. Ct.) ("Ford II"). The Petitioner raised two grounds in the second state petition and, in a footnote, raised an ineffective assistance counsel claim that related to ground two. The Respondent asserted that the two substantive grounds were successive under O.C.G.A. § 9-14-51 and that the ineffective assistance claim was barred by res judicata. (Resp't Ex. 21.) On October 23, 2001, the state habeas corpus court dismissed the second petition as successive, finding grounds one and two could reasonably have been raised in Ford I and that the ineffective assistance claim had been raised in Ford I and was barred from relitigation. (Resp't Ex. 22.) The Georgia Supreme Court denied the Petitioner's application for certificate of probable cause to appeal on March 12, 2002,

Ford v. Head, No. S02E0560 (Ga. Mar. 12, 2002).  (Resp't Exs. 26, 27.)  The 10-day period in which the Petitioner could move for rehearing expired, and the 90-day period in which he could file a petition for writ of certiorari to the United States Supreme Court expired on or about June 10, 2002.

On September 28, 2001, the day after he filed his second state petition, the Petitioner filed this  federal habeas corpus action.  He subsequently amended the petition.  After a hearing, the Court granted in part the Petitioner's motion for leave to conduct discovery, allowing the Petitioner to subpoena any written or recorded statements of Roger Turner or notes of interviews with Turner by law enforcement personnel.  The Court further allowed the Petitioner to depose John Ott, the district attorney responsible for prosecuting the Petitioner.  In a March 31, 2003 Order, the Court dismissed the following claims as procedurally defaulted: the Apprendi claim set forth in Claim P of the Amended Petition; the Giglio claim in Paragraph 119 of Claim K; Footnote 4 of Claim K; and Paragraphs 236 and 246 of the ineffective assistance of counsel claim set forth in Claim S.  On April 13, 2004, the Court had an evidentiary hearing on the Petitioner's remaining Giglio claim.  Briefing on the merits of the Petition was completed on November 29, 2005.  Twenty years after Petitioner's conviction, the case is now before the Court for a ruling on the merits.

## II.  STANDARD FOR HABEAS CORPUS RELIEF

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas corpus relief for claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first step in resolving a federal habeas corpus claim is to determine the "clearly established law at the relevant time."  Neelley v. Nagle, 138 F.3d 917, 922 (11th Cir. 1998), cert. denied, 525 U.S. 1075 (1999); see Williams v. Taylor, 529 U.S. 362, 379 (2000).  To do so, a district court evaluating a habeas corpus petition under 28 U.S.C. § 2254(d)(1) "'should survey the legal landscape' at the time the State court adjudicated the petitioner's claim to determine the applicable Supreme Court authority; the law is 'clearly established' if Supreme Court precedent would have compelled a particular result in the case."  Neelley, 138 F.3d at 923.  "Clearly established Federal law" does not refer to decisions of the lower federal courts but, rather, is limited to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision."  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (quoting

Williams, 529 U.S. at 412).  The second step of the analysis is to determine whether the state court adjudication was "contrary to" or an "unreasonable application of" the clearly established Supreme Court case law.  Neelley, 138 F.3d at 923.  A state court decision is contrary to clearly established federal law when it applies a rule that contradicts the governing law as set forth in cases before the Supreme Court of the United States.  Williams, 529 U.S. at 405; Putman, 268 F.3d at 1241.  Additionally, a "contrary to" finding will result if the state court confronts materially indistinguishable facts but arrives at a result different from that of the Supreme Court. Williams, 529 U.S. at 406; Putman, 268 F.3d at 1241.  Finally, the Supreme Court has explained that the "unreasonable application" prong applies when the "'state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts' of petitioner's case."  Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).  In order to qualify as unreasonable, the state court decision must have been more than incorrect or erroneous.  Id.  Rather, the state court's application of clearly established federal law must have been "objectively unreasonable."  Id. at 521 (citing Williams, 529 U.S. at 409).

III. <u>DISCUSSION</u>

The Petitioner asserts twenty distinct and independently dispositive claims as well as an additional claim that the substantive and procedural errors, when viewed as a whole, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. It appears that counsel for the Petitioner assert what they consider to be the strongest claims first and the remaining claims in descending order. The Court will address them in the same order, with one exception – the ineffective assistance of counsel claim. The Petitioner chose not to brief a number of claims. These claims will be addressed in the order in which they appear in the Amended Petition. Because the Petitioner's ineffective assistance of counsel claim overlaps with a number of independent claims, the Court will address the ineffective assistance of counsel claim last.

A. <u>Claim K – Failure to Disclose Complete Agreement with Co-Defendant</u>

Prior to the Petitioner's trial, the State entered into a plea agreement with the Petitioner's co-defendant, Roger Turner. Pursuant to the terms of the plea agreement, Turner agreed to plead guilty to armed robbery with a recommendation by the State that he be sentenced to twenty years in prison. The State agreed to drop the murder charges provided that Turner testified truthfully and in accordance with his statements to the police. (<u>See</u> Apr. 13, 2004 Hr'g.) The Petitioner now contends that the State

made an undisclosed additional promise as part of the plea agreement.  Specifically, the Petitioner claims that the prosecutor, John Ott, promised to write a letter to the Georgia Board of Pardons and Paroles recommending that it grant  Turner parole as soon as he became eligible.  The Petitioner contends that the prosecution failed to disclose that aspect of the agreement, in violation of <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

Due process is violated when the prosecution suppresses evidence, irrespective of good or bad faith, that is favorable to the defense and material to the defendant's guilt or punishment.  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  The state's knowing failure to correct false testimony also violates due process if the false testimony was material.  <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  Because the jury's estimation of the truthfulness and reliability of witnesses may be determinative of the defendant's guilt or innocence, the disclosure requirement of <u>Brady</u> applies with equal force to evidence that affects only the credibility of a witness.  <u>Giglio</u>, 405 U.S. at 154; <u>Napue</u>, 360 U.S. at 269.  The purpose of this rule is "to insure that the jury knows the facts that might motivate a witness in giving testimony."  <u>Brown v. Wainwright</u>, 785 F.2d 1457, 1465 (11th Cir. 1986).  Accordingly, the prosecution has a duty to disclose evidence of promises made to a witness in exchange for testimony.  <u>Giglio</u>, 405 U.S. at 154-55; <u>Tarver v. Hopper</u>, 169 F.3d 710, 716 (11th Cir. 1999); <u>Moore v. Kemp</u>, 809

F.2d 702, 719 (11th Cir. 1987) (en banc).  To establish a <u>Brady/Giglio</u> violation, a petitioner must show that: (1) the prosecution suppressed evidence, either willfully or inadvertently; (2) the evidence was favorable to the accused because it was impeaching; and (3) prejudice ensued, i.e., the suppressed evidence was material. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  Evidence is considered material for purposes of a <u>Giglio</u> claim "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976); <u>Brown v. Head</u>, 272 F.3d 1308, 1317 (11th Cir. 2001).

The Petitioner did not present this claim either on direct appeal to the Georgia Supreme Court or in his state habeas corpus petitions.  The Respondent argued that the factual basis for the claim was in existence and available to the Petitioner when he litigated his two state collateral attacks and, thus, the claim is procedurally defaulted. In a previous order, this Court found that the Petitioner's appellate counsel exercised due diligence in investigating and pursuing the Petitioner's claims in state court. Therefore, the claim was not barred and the Petitioner was entitled to an evidentiary hearing on the matter.  (Order, Feb. 6, 2004.)  The evidentiary hearing on this claim was held on April 13, 2004.

At the evidentiary hearing, John Ott[1] testified that he entered into a plea agreement with Roger Turner because he was convinced that Turner did not know in advance about the murders,  and he felt that Turner's testimony would provide the State with the strongest case against the Petitioner.   Ott, however, testified emphatically that the plea agreement did not include a promise to write a letter to the Parole Board because he would not have committed himself to writing such a letter prior to trial.  (Apr. 13, 2004 Hr'g Tr. at 48.) His testimony was as follows:

> Q:    And just in this agreement that you worked out with Mr. Lombardo [Turner's counsel], did you agree to write the Parole Board on Mr. Turner's behalf or assist in some sort of clemency at a future date?
>
> A:    I want to say no.  I want to say that Mr. Lombardo might have brought that up to me about would I do so, but I would never have committed myself prior to him testifying to doing that because I just don't deal that way with defendants and how they testify.  I would never want to put myself in a position of a defendant who got up on that stand and did not make a strong witness, did not testify well, and then after the trial came to me and said, well, now you got to write me a letter to the Parole Board.
> . . .
> I would want to wait to see what the testimony was before I would ever commit to doing something like that.
> . . .
> Like I said, I would never commit myself before trial to something like that.  Now Mr. Lombardo might have wanted me to do that

---

[1]Ott served as District Attorney of the Alcovy Circuit, which includes Newton County from 1984 until August of 1990, when he became a superior court judge. (Apr. 13, 2004 Hr'g Tr. at 32-33.)

> and asked me to do that, but I would have said the deal was that he would get to plead out for the 20 years confinement.  And I don't mean to be flippant, but I've never really had much to do with the Parole Board.  They always seem to parole the people I don't want them to parole and not parole the people that I think ought to be paroled, so I just don't – I trust them about as much as I can pick them up and throw them.
>
> And like I said, I don't mean to be flippant, but that's just nothing I had control over.
>
> What I had control over was what he would plead guilty to and what sentence I could recommend to the judge that he would receive, and that's what he would have committed to prior to his testimony.

(Id. at 36-37; see also id. at 42, 47.)  According to Ott, the decision was made to write a letter to the Parole Board only *after* Turner had testified in an impressive and nonevasive manner at the Petitioner's trial.  (Id. at 39-40.)  Ott's testimony is substantiated by the letter he eventually wrote to the Parole Board, dated February 18, 1991, in which he stated, in pertinent part:

> At the time of trial, I was impressed with Mr. Thomas' [sic] acceptance of his illegal acts and strong desire to do whatever he could to rectify his wrongs, accept his punishment and then continue with his life.  After prosecuting so many defendants who refuse to accept responsibility for their acts, it was refreshing to find one who did.
>
> I told Mr. Turner, *after he had testified*, that I would do whatever I could to see that he was paroled when the time came.

(Id., Pet'r Ex. 5) (emphasis added).   Additionally, Turner corroborated Ott's recollection of the plea agreement, testifying that although he and his attorney

discussed trying to get Ott to help with the Parole Board, his plea agreement with the State did not include a promise of assistance from Ott with the Parole Board.  (Id. at 54-55, 58.) The Petitioner has offered no reason for Ott to withhold disclosure of an agreement to write a letter to the Parole Board if that had been part of the plea bargain.

The Petitioner contends, however, that the testimony of Barry Lombardo, Turner's counsel, and a number of letters written by Turner establish that the promise of a letter to the Parole Board was in fact part of the plea agreement.  Lombardo testified that he requested and that Ott agreed to write a letter on Turner's behalf when Turner became eligible for parole.  (Apr. 13, 2004 Hr'g Tr. at 14-15.)  According to Lombardo, this agreement was reached and communicated to Turner prior to the Petitioner's trial.  (Id. at 15.)  However, Lombardo later admitted that the agreement was "very informal" and that he did not have a clear memory of when the discussions regarding assistance with the Parole Board actually took place, acknowledging that they could have occurred after Turner testified.  (Id. at 24-25, 29.)

In addition to Lombardo's testimony, the Petitioner relies to a great extent on three letters written to Lombardo by Turner during the time that they were putting together materials for Turner's parole petition.  In each of these letters, dated August through December of 1990, Turner referenced the fact that Ott had given "his word"

to help Turner, presumably with the Parole Board.  (Apr. 13, 2004 Hr'g, Pet'r Exs. 6-8.)  According to the Petitioner, the fact that Ott gave "his word" indicates that the parties had an "actual deal," not a gratuitous promise, for which Ott would have expected something in return.  He claims that the only possible consideration that Turner could offer was his testimony.  The Petitioner, however, makes too much of Turner's word choice, assuming that Turner must have been referring to an enforceable contract with bargained-for consideration.  This argument is without merit.  Turner's letters establish little more than that Ott had agreed to act on Turner's behalf, a fact about which there is no dispute.  Nevertheless, the Petitioner argues that a quote contained in one letter, which Turner attributed to Ott, indicates that the agreement was made in August of 1986, approximately two months prior to the Petitioner's trial.  Specifically, Turner wrote:

> Have you talked to Ott yet?  I'm very anxious to hear just to what extent he plans to help.  Would he go so far as to go back and ask the judge for a reduction from 20 to 15 years (which would let me go in 5) or say "time served?"  Could he not entertain a "motion of mitigation" and call the case back up and reduce the sentence?  *I mean, I'm hoping his (hopefully, face-to-face, but in the least "official") word of recommendation will be enough to move the board, but if not how far will he go to "help [me] out when the time comes" (Quoted from Ott 8-86)?*

(Id., Pet'r Ex. 6) (emphasis added).   When questioned about this quote, Turner testified that he had not been quoting from any document and could not recall specifically to what he had been referring.

The Petitioner has presented insufficient evidence to establish the existence of a pretrial deal under which Ott would write a letter to the Parole Board in exchange for Turner's testimony.   Turner's letters contain ambiguous references to Ott's promise and the mere possibility that Turner indicated, four years later, that the agreement to help was made in August of 1986, is insufficient evidence of a pretrial deal.  Ott testified unequivocally that he would not have entered into an agreement to write a letter to the Parole Board before being assured as to how Turner would testify. In contrast, Lombardo could only testify that he had "reason to believe" that Ott agreed to this prior to the trial.  (Apr. 13, 2004 Hr'g Tr. at 29.)  Without for a moment questioning Lombardo's honesty or  sincerity, the Court finds that the testimony of Ott and Turner was more persuasive.  Therefore, having found no evidence of an undisclosed "deal," habeas relief based on the prosecution's failure to disclose is not warranted.

Furthermore, even assuming that the promise to write a letter to the Parole Board on Turner's behalf was made prior to the Petitioner's trial, the Petitioner's Giglio claim still fails.  The government is not required to disclose every conversation

or agreement with a witness or his lawyer. United States v. Curtis, 380 F.3d 1311, 1316 n.7 (11th Cir. 2004) (quoting Tarver, 169 F.3d at 717). Rather, the Eleventh Circuit Court of Appeals has made clear that "[s]ome promises, agreements, or understandings do not need to be disclosed, because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count." Tarver, 169 F.3d at 717. For example, in McCleskey v. Kemp, 753 F.2d 877, 883-84 (11th Cir. 1985) (en banc), a police detective offered to "speak a word" on the witness's behalf with federal authorities. The Eleventh Circuit found that the "detective's statement offered such a marginal benefit . . . that it is doubtful it would motivate a reluctant witness, or that disclosure of the statement would have had any effect on his credibility." Id. at 884; see also Depree v. Thomas, 946 F.2d 784, 797-98 (11th Cir. 1991) (prosecutor's statement that he would "take care" of witness need not be disclosed). Because the Parole Board has the final say regarding whether an individual will be paroled, a promise merely to write a letter to the Parole Board on Turner's behalf would offer a similar marginal benefit. See Jenkins v. Byrd, 103 F. Supp. 2d 1350, 1371 n.14 (S.D. Ga. 2000) (government would not be required to disclose district attorney's promise to write a "nice letter" to pardon and parole board). As such, even if the promise to write a letter was part of Turner's agreement, the prosecution was not required to disclose the promise under Giglio.

Lastly, in order to establish a <u>Giglio</u> claim, the Petitioner must show that the undisclosed promise was material, i.e., there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.  <u>Brown</u>, 272 F.3d at 1317. The Petitioner argues that the jury's judgment of Turner's credibility would have been affected, had they heard about the alleged promise to write a letter to the Parole Board, because such a promise indicated that Turner was really receiving only a five-year sentence for armed robbery rather than the 20-year sentence that he testified to during trial.  The Petitioner's argument is without merit.  First, as noted above, Turner was not guaranteed parole after five years simply because Ott wrote a letter to the Parole Board.  Moreover, the jury had already been informed that in return for his testimony, the prosecution planned to dismiss the two counts of malice murder against Turner and that Turner had received a 20-year sentence for armed robbery, an offense which carries a possible life sentence.  <u>See</u> O.C.G.A. § 16-8-41(b).  Therefore, after hearing of this substantial impeaching evidence, there is not a reasonable likelihood that the jury's assessment of Mr. Turner's credibility or the outcome of the trial could have been affected had they been advised that Ott intended merely to write a letter on Turner's behalf.  Because he has not established a promise that the prosecution was required to disclose or that any such promise was material, the Petitioner is not entitled to habeas relief based on his <u>Giglio</u> claim.

B.     Claim A – Right to Counsel During Custodial Interrogation

The Petitioner contends that his Fifth, Sixth, and Fourteenth Amendment rights were violated because law enforcement officers continued to interrogate him after he invoked his right to counsel in violation of Edwards v. Arizona, 451 U.S. 477 (1981) and Smith v. Illinois, 469 U.S. 91 (1984).  As an initial matter, the Court notes that although the Petitioner alleges a violation of his Sixth Amendment rights, his claim based on Edwards v. Arizona deals solely with the Fifth Amendment right to counsel. The Sixth Amendment right to counsel arises only "at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." United States v. Gouveia, 467 U.S. 180, 188 (1984) (internal punctuation and citation omitted).  At the time of the custodial interrogation, no adversary judicial criminal proceedings had been initiated. Thus, the Sixth Amendment right to counsel had not yet attached.  To the extent that the Petitioner asserts a Sixth Amendment claim, the claim is without merit.

In contrast to the Sixth Amendment, the Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In an effort to counteract the "inherently compelling pressures" of custodial interrogation, the Supreme Court has extended the prohibition against compelled self-incrimination to include the right to have counsel present

during a custodial interrogation. <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966). In <u>Edwards</u>, the Supreme Court clarified this right, holding that a person in custody who has "expressed his desire to deal with the police through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards</u>, 451 U.S. at 484-85. The applicability of the "rigid prophylactic rule" set forth in <u>Edwards</u> depends on a two part inquiry. <u>Smith v. Illinois</u>, 469 U.S. 91, 95 (1984). First, the court must determine whether the accused "actually invoked his right to counsel." <u>Id.</u> (citing <u>Edwards</u>, 451 U.S. at 484-85 (whether accused "expressed his desire" for, or "clearly asserted" his right to, the assistance of counsel)). If the right to counsel was invoked, the court should then evaluate whether the accused initiated further discussions with the police and knowingly and intelligently waived his right to counsel. <u>Id.</u>

During the Petitioner's trial, the trial court held a <u>Jackson v. Denno</u>, 378 U.S. 368 (1964) hearing, to determine the admissibility of statements made by the Petitioner while he was in custody. G.B.I. Agent Gary Nicholson testified to the circumstances of the Petitioner's interrogation. He testified that at some point during the interrogation, the Petitioner was informed that Turner had made a statement implicating himself and the Petitioner in the robbery and the murders. After learning

this, the Petitioner stated that he did not believe that Turner had made such a statement and asked if he could call an attorney.  (Resp't Ex. 6 at 387-88, 401.)  Agent Nicholson advised the Petitioner that he could and asked if he would like to continue the interview at that time or stop the interview and talk to his attorney.  The Petitioner did not initially respond to Agent Nicholson but then began asking questions about Turner's statement.  Before responding to his questions, Agent Nicholson testified that he again asked the Petitioner if he wanted to talk to an attorney before continuing the interview.  According to Agent Nicholson, the Petitioner responded that he wanted to continue without an attorney.  (Id. at 401-02, 430, 433, 479-80.)  Following the hearing, the trial court found that: (1) the Petitioner's request for counsel had been equivocal; (2) each time an attorney was mentioned, interrogation stopped except for questions to clarify what the Petitioner meant; and (3) no further interrogation took place until the Petitioner voluntarily initiated a continuance of the interview.  (Id. at 463-64.)

The Supreme Court of Georgia agreed with the findings of the trial court[2] and held that the Petitioner's right to counsel under Edwards had not been violated and that his statements were voluntarily given to authorities.  In reaching this conclusion, the court stated that the Petitioner had not only failed to clearly invoke his right to counsel but had also been the one to initiate further conversation with the police.  Ford v. State, 257 Ga. at 466.  The court further held that the Petitioner limited  a second invocation of his right to counsel to giving a videotaped statement and that the police were not required to honor the invocation to a greater extent.  Id. (citing Connecticut v. Barrett, 479 U.S. 523 (1987)).  The Petitioner acknowledges that the Georgia Supreme Court correctly identified the applicable Supreme Court law, but he contends that the court applied it in an unreasonable manner.

The Petitioner argues that the Georgia Supreme Court unreasonably concluded that he did not clearly invoke his right to counsel when he asked if he could call an attorney.  In support of his contention, the Petitioner cites only lower court decisions

---

[2]The Petitioner alleges that the interrogating officers refused to allow him to use the telephone in the interrogation room and refused to place a call to his attorney. (Am. Petition ¶¶ 28-29.)  However, neither the trial court nor the Georgia Supreme Court found this to be fact, crediting instead the testimony of Agent Nicholson that the Petitioner was told that he could call an attorney.  Ford v. State, 257 Ga. at 466. A state court's factual findings are entitled to a presumption of correctness unless the Petitioner rebuts the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see Lightbourne v. Dugger, 829 F.2d 1012, 1018 (11th Cir. 1987).  The Petitioner has failed to present any evidence to rebut the presumption.

that have found statements similar to his to constitute an unequivocal request.  See

United States v. de la Jara, 973 F.2d 746, 750 (9th Cir. 1992) ("Can I call my lawyer?"

or "I should call my lawyer."); United States v. Cannady, 931 F.2d 752, 755 (11th Cir.

1991) ("I think I should call my lawyer."); Robinson v. Borg, 918 F.2d 1387, 1393

(9th Cir. 1990) ("I have to get me a good lawyer, man.  Can I make a phone call?");

Smith v. Endell, 860 F.2d 1528, 1529-31 (9th Cir. 1988) ("Can I talk to a lawyer?");

United States v. Hughes, 921 F. Supp. 656, 657-68 (D. Ariz. 1996) ("Can I call a

lawyer?").  On the other hand, other courts have characterized as ambiguous and

equivocal statements such as "Maybe I should talk to a lawyer" and "I think I need a

lawyer." Davis v. United States, 512 U.S. 452, 462 (1994); Burket v. Angelone, 208

F.3d 172, 198 (4th Cir. 2000); see also United States v. Cherry, 733 F.2d 1124, 1130

(5th Cir. 1984) (equivocal request when accused stated: "Maybe I should talk to an

attorney before I make a further statement," and then a few minutes later stated: "Why

should I not get an attorney?"); Nash v. Estelle, 597 F.2d 513, 519-20 (5th Cir. 1979)[3]

(in context, defendant's statement that he wanted attorney appointed was equivocal).

In addition, all of the cases relied on by the Petitioner were decided *after* the Georgia

Supreme Court's decision.  Moreover, even if decided before the relevant state court

---

[3]In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc),
the Eleventh Circuit adopted as binding precedent all decisions the former Fifth
Circuit rendered prior to the close of business on September 30, 1981.

decision, those cases are not the clearly established federal law relevant to a habeas analysis as they are not holdings of the Supreme Court of the United States.

At the time of the Georgia Supreme Court's decision, the United States Supreme Court had not addressed what constituted an ambiguous or equivocal request. The Court, however, had provided some guidance in this area by indicating that whether a statement is ambiguous is to be determined by an objective standard. See Barrett, 479 U.S. at 582; see also Davis, 512 U.S. at 459 ("Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.") (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)); Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir. 1994) ("A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent."). The Court had also suggested that ambiguity could be created by "events preceding the request" or "nuances inherent in the request itself." Smith, 469 U.S. at 99-100. Here, the Petitioner did not state that he wanted an attorney at that time. Compare id., 469 U.S. at 93 (request not ambiguous or equivocal when after being informed of right to consult with a lawyer and have one present during questioning, accused stated "Uh, yeah. I'd like to do that.") Rather, he simply inquired whether he was permitted to

call an attorney.  Such a general inquiry creates ambiguity in the request.  Therefore, even if the Supreme Court of Georgia erroneously found that the statement was not a clear invocation of the right to counsel, its decision was not an objectively unreasonable application of the clearly established Supreme Court precedent at the time.

The Petitioner also contends that the Supreme Court of Georgia applied clearly established federal law in an unreasonable manner when it held that the Petitioner reinitiated the interview with police.  The Petitioner relies on Smith v. Illinois in support of his argument.  That reliance is misplaced.  In Smith, the Supreme Court held that "postrequest responses to further interrogation may not be used to cast doubt on the clarity of the initial request itself."  Smith, 469 U.S. at 100 (emphasis omitted). However, whether a request is ambiguous and whether the right to counsel has been waived by reinitiating the conversation are two distinct inquiries.  There is nothing to indicate that the Georgia Supreme Court relied on statements made after the Petitioner asked if he could call a lawyer when making its determination that the request was ambiguous.

To the extent that the Petitioner claims that Smith prohibited the police from asking any questions following his request, this argument also fails.  In Smith, the Supreme Court recognized that an accused's assertion of his right to counsel could be

ambiguous or equivocal.  <u>Smith</u>, 469 U.S. at 95.  At that time, courts had developed the following three standards to address what police could or could not do following such a request: (1) all questioning must cease when a request was made, regardless of how equivocal or ambiguous it may be; (2) requests falling below a court-created threshold standard did not trigger the right to counsel; and (3) if a request was ambiguous, further police questioning was limited to attempts to clarify the statement. <u>Id.</u> at 96 n.3.  The Eleventh Circuit applied the third standard in holding: "When a defendant makes an equivocal request for an attorney during a custodial interrogation, 'the scope of that interrogation is immediately narrowed to one subject and one subject only. *Further questioning thereafter must be limited to clarifying that request until it is clarified.*'" <u>Owen v. Alabama</u>, 849 F.2d 536, 539 (11th Cir. 1988) (<u>quoting</u> <u>Thompson v. Wainwright</u>, 601 F.2d 768, 771 (5th Cir. 1979)); <u>see also</u> <u>Lightbourne</u>, 829 F.2d at 1018 ("[W]hen a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request.") (internal punctuation and citation omitted).  The Supreme Court of Georgia has likewise followed this approach. <u>Hall v. State</u>, 255 Ga. 267, 273 (1985).

　　　Although the <u>Smith</u> Court acknowledged the various approaches to the consequences of ambiguity, because the statement at issue in that case was deemed

clear and unequivocal, the Court declined to address the conflict among the lower courts. Smith, 469 U.S. at 96, 100. In Connecticut v. Barrett, the Court again left the question open. Barrett, 479 U.S. at 529 n.3. Therefore, the law regarding the consequences of an ambiguous or equivocal reference to an attorney during a custodial interrogation was not clearly established at the time of the Georgia Supreme Court's decision.[4] See Davis, 512 U.S. at 456 ("Although we have twice previously noted the varying approaches the lower courts have adopted with respect to ambiguous or equivocal references to counsel during custodial interrogation, we have not addressed the issue on the merits.") (citations omitted). Thus, it was not unreasonable for the Georgia Supreme Court, having found the statement to be ambiguous, to hold that the interrogator was justified in asking questions to determine whether the Petitioner wanted to call his attorney or continue with the interview. Ford v. State, 257 Ga. at 465.

Finally, even if the right to counsel was invoked, the Court agrees with the Georgia Supreme Court that the Petitioner initiated further conversation with the

---

[4]The Supreme Court continued to leave open the question of the appropriate standard until 1994, when the Court decided Davis v. United States, 512 U.S. 452 (1994). In Davis, the Supreme Court eliminated any restriction on the ability of the police to continue questioning an accused after an ambiguous or equivocal request, holding that "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis, 512 U.S. at 461-62.

police.  The Supreme Court has made clear that "Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." Minnick v. Mississippi, 498 U.S. 146, 156 (1990).  In order to show such initiation, the previous police interrogation must have ended prior to the accused's alleged initiatory remarks.   Christopher v. Florida, 824 F.2d 836, 845 (11th Cir. 1987).  Although police are not required to remain totally silent, questions "relating directly or indirectly to the investigation" will constitute continued interrogation. Id. (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983)).  Here, the record shows that after the Petitioner asked whether he could call an attorney, the police did not continue to interrogate him concerning the crimes.  Rather, the questioning was limited to clarifying whether the Petitioner wanted to call a lawyer then or wanted to continue with the interview.  Following the attempts to clarify, the Petitioner himself resumed discussions relating to the crimes by questioning the police about Turner's statement.  Thus, the Georgia Supreme Court properly found that the Petitioner reinitiated the conversation by asking a question relating to the crimes.

To be valid, a waiver of counsel must be made voluntarily, knowingly, and intelligently. Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Miranda, 384 U.S. at 444); Edwards, 451 U.S. at 482.  In other words, the choice to relinquish the rights

must have been deliberate, not the product of intimidation, coercion, or deception, and the waiver must have been made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.  The Petitioner claims that he could not have knowingly and voluntarily waived his right to counsel because he did not know for certain whether he was undergoing a custodial interrogation.   However, the record indicates that the Petitioner was placed in handcuffs and driven to G.B.I. headquarters in a state vehicle.  (Resp't Ex. 6A at 526.) In addition, the Petitioner was advised of his Miranda rights on two occasions – when he was initially stopped by the police and again when he arrived at the G.B.I. headquarters.  (Resp't Ex. 6 at 380, 383; Resp't Ex. 6A at 526-27.)   Under these circumstances, it is difficult to imagine that the Petitioner was not aware that he was in custody and undergoing a custodial interrogation.  Furthermore, while in custody the Petitioner signed a written form acknowledging that he understood his rights and waived them.  (Resp't Ex. 6 at 385, 513-14; Resp't Ex. 6A at 544.)  He does not allege that he did not understand the consequences of the waiver.  Finally, the record fully supports the conclusion of the state courts that the Petitioner's statements were made voluntarily as there is nothing to indicate that the police coerced or pressured the

Petitioner into reinitiating the conversation or making any statements.[5] Therefore, the Georgia Supreme Court did not unreasonably apply clearly established federal law by holding that the Petitioner waived the right by voluntarily initiating further conversation with the police. Habeas relief based on a denial of the Fifth Amendment right to counsel is therefore not warranted.

C.    Claim S – Mental Health Expert

Following a brief mental health examination by the Forensic Services Team of the Georgia Medical Health Institute, the Petitioner moved for funds to retain an independent mental health expert. According to the Petitioner, the trial court granted the request provided, however, that the Petitioner disclose the results of the mental health examination to the court as well as the State. (See Resp't Ex. 2 at 82-83, 83A-83C.) The Petitioner accepted the condition and hired Dr. Cassandra Newkirk, a forensic psychiatrist recommended by the ACLU. She evaluated the Petitioner and testified for the defense during the sentencing phase. However, the Petitioner alleges that under the circumstances, he was denied his due process right to the services of a

---

[5]A federal court conducting a habeas review is not bound by a state court's prior determination of voluntariness. However, the state court's findings regarding historical facts and assessments of witness credibility are entitled to the presumption of correctness accorded findings of fact under 28 U.S.C. § 2254(e)(1). Furthermore, a federal habeas court must accord "great weight to the considered conclusions of a coequal state judiciary." Devier v. Zant, 3 F.3d 1445, 1456 (11th Cir. 1993) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985)).

competent and independent mental health expert under <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), in two ways.  First, he contends that his right to an independent and confidential psychiatric expert was compromised because he was required to make a copy of the expert's report available to the prosecution.  Second, the Petitioner claims that Dr. Newkirk did not conduct a professionally competent mental health evaluation.  The state habeas court denied both claims.[6]  The Petitioner argues that the decision of the state habeas court was contrary to clearly established federal law because it misstates the rule of <u>Ake</u>.  Additionally, he contends that the state court decision was an unreasonable application of <u>Ake</u>.

---

[6]Without distinguishing between the two claims, the Respondent maintains that the Petitioner's <u>Ake</u> claims are procedurally defaulted.  In an earlier motion, the Respondent argued that the claim regarding the competency of the psychiatric expert was procedurally defaulted because it was raised at the state habeas level only in the context of an ineffective assistance of counsel claim.  This Court held that the issue of ineffective assistance of the psychiatrist was clearly presented by the Petitioner and ruled upon by the state habeas court and, thus, was exhausted and properly before the Court.  (Order, Mar. 31, 2003.)  The Respondent has not previously alleged that the claim arising out of the requirement that the expert's report be provided to the prosecution is also procedurally defaulted.  To the extent that the Respondent makes that argument now, it fails as the claim was clearly asserted in Claim W of the Petitioner's Amended Petition and addressed by the state habeas court.  (<u>See</u> Resp't Ex. 15 at 317-22.)

1.   <u>Independent and Confidential Mental Health Expert</u>

The Fourteenth Amendment's due process guarantee of fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." <u>Ake</u>, 470 U.S. at 77 (quoting <u>Ross v. Moffitt</u>, 417 U.S. 600, 612 (1974)).  Accordingly, states are required to provide indigent defendants with the "basic tools of an adequate defense or appeal." <u>Id.</u> (quoting <u>Britt v. North Carolina</u>, 404 U.S. 226, 227 (1971)).  In <u>Ake v. Oklahoma</u>, the Supreme Court recognized competent psychiatric assistance as one such "basic tool."  The <u>Ake</u> Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." <u>Id.</u> at 83.  The Petitioner contends that <u>Ake</u> clearly establishes the right to an independent and confidential psychiatrist and that this right was violated because he was not provided with a psychiatrist that was working exclusively for the defense.

In addressing this claim, the state habeas court found that "the psychiatrist was provided adequate information by defense counsel to conduct her evaluation, and that she provided Petitioner with a competent and independent evaluation."  (Resp't Ex. 16 at 21.)  The Petitioner argues that this decision was contrary to clearly established

federal law because the court relied only on a state court decision that misstates the rule of <u>Ake</u>.  Specifically, the state habeas court cited the decision of the Supreme Court of Georgia in <u>McNeal v. State</u>, 263 Ga. 397 (1993), which states that "[t]he Fourteenth Amendment's due process guarantee of fundamental fairness requires that an indigent defendant be given 'meaningful access to justice,' e.g., access to a competent expert necessary to an effective defense . . . ." <u>McNeal</u>, 263 Ga. at 398, (<u>quoting Ake</u>, 470 U.S. at 77).  The Petitioner's argument that the decision was contrary to <u>Ake</u> fails for two reasons.  First, the Supreme Court has made expressly clear that "[f]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation." <u>Bell v. Cone</u>, 543 U.S. 447, 125 S. Ct. 847, 853 (2005).  A state court is not required to cite any federal law and, in fact, need not even be aware of controlling Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002); <u>Maharaj v. Secretary for Dep't of Corr.</u>, 432 F.3d 1292, 1320 n.8 (11th Cir. 2005).  Second, the Petitioner appears to take issue with the fact that, although it clearly cited to <u>Ake</u>, <u>McNeal</u> did not quote the verbatim holding.  However, assessing whether a decision is "contrary to" Supreme Court precedent does not depend on the use of specific verbiage.  The <u>McNeal</u> court's reference to "access to a competent expert necessary to an effective

defense" reasonably summarizes the requirement of <u>Ake</u> that a defendant be provided

"access to a competent psychiatrist who will conduct an appropriate examination and

assist in evaluation, preparation, and presentation of the defense." <u>Ake</u>, 470 U.S. at

83. A decision is not contrary to clearly established federal law simply because the

state court uses shorthand references to Supreme Court standards. <u>See</u> <u>Woodford v.</u>

<u>Visciotti</u>, 537 U.S. 19, 23-24 (2002) ("[R]eadiness to attribute error is inconsistent

with the presumption that state courts know and follow the law [and] . . . is also

incompatible with § 2254(d)'s highly deferential standard for evaluating state-court

rulings, which demands that state court decisions be given the benefit of the doubt.")

(internal citation omitted). Therefore, by merely summarizing rather than quoting, the

state habeas court did not misstate or render a decision contrary to <u>Ake</u>.

The Petitioner argues that even if the state habeas court applied the correct

standard, its decision was unreasonable because it found no error in requiring the

defense to share Dr. Newkirk's report with the prosecution. In support, the Petitioner

relies on two circuit court cases that held that the right to psychiatric assistance is not

satisfied by a neutral psychiatrist. <u>Cowley v. Stricklin</u>, 929 F.2d 640 (11th Cir. 1991);

<u>Smith v. McCormick</u>, 914 F.2d 1153 (9th Cir. 1990). In <u>Smith</u>, the trial court

appointed a neutral psychiatrist that reported directly to the court and did not assist in

the evaluation or preparation of the defense. <u>Smith</u>, 914 F.2d at 1158. According to

the Ninth Circuit, "to grant court-appointed psychiatric assistance only on condition of automatic full disclosure to the fact finder impermissibly compromises presentation of an effective defense, by depriving him of an adequate opportunity to present his claims fairly within the adversary system." Id. at 1159 (internal punctuation and citation omitted). In Cowley, the trial court denied the defendant's motion for an independent psychiatrist and instead required that the evaluating state psychiatrist provide his report to both the prosecution and defense. Cowley, 929 F.2d at 641, 644. The Eleventh Circuit noted that the psychiatrist was called by the prosecution, testified against the defendant, and, as in Smith, provided little if any assistance in the defense's trial preparation. Id. at 644. In concluding that the psychiatrist's lack of assistance did not satisfy Ake, the court relied on the statement in Smith that "[t]he right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of psychiatrist in whatever capacity defense counsel deems appropriate." Id. (quoting Smith, 914 F.2d at 1157). In Ake, the Supreme Court established the general rule that a state must provide an indigent defendant a competent psychiatrist to assist in preparing and presenting his defense. However, the Court expressly left the decision to the states as to how to implement the right to psychiatric assistance. Ake, 470 U.S. at 83. The Ninth and Eleventh Circuits have interpreted this decision to

mean that appointing a psychiatrist whose report is provided to the court and the prosecution violates due process. However, because these cases are not clearly established law as determined by the Supreme Court, they are not controlling. Moreover, the Fifth Circuit has taken a position directly contrary, holding that providing "an indigent defendant with the assistance of a court-appointed psychiatrist, whose opinion and testimony is available to both sides," satisfies a defendant's due process rights under Ake. Granviel v. Lynaugh, 881 F.2d 185, 191 (5th Cir. 1989), cert. denied sub nom, Granviel v. Texas, 495 U.S. 963 (1990). The Supreme Court has neither addressed nor held that making available the report of the appointed psychiatrist constitutes a violation of due process, particularly where there is no objection in the trial court. The conflicting authority in the circuits regarding what satisfies a defendant's due process rights with respect to psychiatric assistance highlights the fact that the existing Supreme Court precedent did not compel a particular result under these circumstances. As such, this Court cannot conclude that the state habeas court unreasonably applied, or acted contrary to, clearly established federal law.[7]

---

[7]In concluding that it was not error for the defense to be required to turn over Dr. Newkirk's report to the prosecution, the state habeas court also relied on Rower v. State, 264 Ga. 323 (1994). In Rower, the Georgia Supreme Court held that the State is entitled to discover any written expert reports that the defense intends to introduce at trial. Rower, 264 Ga. at 325. Thus, because Dr. Newkirk testified to the

### 2.   Ineffective Assistance of Expert Witness

The Petitioner also contends that Dr. Newkirk failed to conduct an adequate and professionally appropriate psychiatric examination in accordance with the applicable standard of care and, thus, he did not receive the assistance of a competent psychiatrist.  (See Am. Petition ¶¶ 178-88.) In conducting her evaluation, Dr. Newkirk met with the Petitioner on two occasions, spoke with the Petitioner's parents and trial counsel, and reviewed various medical and psychological records that she was able to obtain.  (Resp't Ex. 6A at 994-95; see also Resp't Ex. 2 at 83A.)  The Petitioner maintains that such an evaluation was incomplete and inadequate.  According to the Petitioner, in order to assess an individual properly and render an accurate diagnosis, the standard of care requires a psychiatrist to: (1) obtain an accurate medical and social history from the patient and sources independent of the patient; (2) conduct a thorough physical examination, including a neurological examination; and (3) conduct appropriate diagnostic studies in light of the history and physical examination.  In addition, the Petitioner maintains that a standard mental status examination cannot be relied upon in isolation as a diagnostic tool in assessing the presence or absence of organic impairment.  (Am. Petition ¶ 182.)  The Petitioner alleges that Dr. Newkirk's

_____

results of her evaluation during the sentencing phase, the prosecution was entitled to a copy of her written report, regardless of any preevaluation disclosure requirement imposed by the trial court.

evaluation did not meet the standard of care in a number of ways.  First, he claims that Dr. Newkirk obtained incomplete psychological and medical histories of the Petitioner because she failed to interview enough people, review available records, or conduct a physical examination.  Second, he contends that Dr. Newkirk fell below the standard of care because she conducted no psychological testing.  According to the Petitioner, based on the inadequate evaluation, Dr. Newkirk misdiagnosed the Petitioner with antisocial personality disorder and ultimately offered testimony harmful to the defense.  He further asserts that had Dr. Newkirk acted in a professionally competent manner, she would have developed evidence that would have affected the outcome of the guilt-innocence and sentencing phases of the Petitioner's trial.

As discussed, the Supreme Court has established that due process requires that a state "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination . . . ."  Ake, 470 U.S. at 83.  The focus of Ake was to establish a due process right to access to a competent psychiatrist; however, the Supreme Court emphasized that a defendant does not have a constitutional right to choose a psychiatrist of his personal liking.  Id.  The Petitioner does not argue that the trial court denied him access to psychiatric assistance.  Instead, he alleges a denial of due process based on incompetent psychiatric assistance.  In evaluating whether a defendant's due process rights were violated, a court must "examine the information

before the trial court when it is alleged to have deprived the defendant of due process" and "determine whether that information should have led the trial court to conclude that the defendant would probably not receive a fair trial." Clisby v. Jones, 960 F.2d 925, 930 (11th Cir. 1992). The Petitioner does not point to any information available to the trial court that should have led to a conclusion that the Petitioner would probably not receive a fair trial. The Petitioner has never attacked or taken issue with the general qualifications and competency of Dr. Newkirk.[8] At no point during or prior to the trial did the Petitioner's trial counsel ever complain that Dr. Newkirk's examination was inadequate nor did he present any facts to alert the trial court to any inadequacy. Instead, the Petitioner relies almost entirely on the report of a licensed clinical psychologist that was introduced during the state habeas hearing to establish Dr. Newkirk's alleged incompetence. (Am. Petition ¶¶ 181-88.) However, none of this information was before the trial court and, therefore, it cannot be considered in the due process analysis. Thus, the Petitioner has not alleged any action or inaction

---

[8]Dr. Newkirk received her medical degree from the University of North Carolina at Chapel Hill and completed her psychiatry training at Grady Memorial Hospital and the Emory University Law School, both in Atlanta, Georgia. At the time of the Petitioner's trial, Dr. Newkirk had been practicing forensic and adult psychiatry for over four years and was a faculty member at the Emory School of Medicine and the Morehouse School of Medicine. In addition, she had examined approximately 150 to 200 criminal defendants and testified in about ten capital cases. (Resp't Ex. 6A at 992-94.)

of the trial court regarding the competency of Dr. Newkirk that would establish a denial of due process.

Rather than setting forth any allegations implicating due process, the Petitioner's claim is more akin to one of professional malpractice or ineffective assistance of a mental health expert. Neither claim is recognized under Ake. In recognizing the right of access to a competent psychiatrist, the Supreme Court relied exclusively on due process grounds and explicitly refused to consider the applicability of the Sixth Amendment. Ake, 470 U.S. at 87 n.13; Clisby, 960 F.2d at 934. In addition, although Ake held that the Due Process Clause requires access to a competent mental health professional who will conduct an appropriate examination, the Court never defined what qualifies as an "appropriate" psychiatric evaluation nor did it establish what, if any, level of psychiatric competence is mandated by the Constitution. See Mason v. Mitchell, 320 F.3d 604, 616 (6th Cir. 2003); Wilson v. Greene, 155 F.3d 396, 402 (4th Cir. 1998); Harris v. Vasquez, 949 F.2d 1497, 1517-18 (9th Cir. 1990); Silagy v. Peters, 905 F.2d 986, 1013 (7th Cir. 1990). The Petitioner has not cited to any holding of the Supreme Court establishing a cognizable claim of ineffective assistance of a mental health expert. See Moody v. Polk, 408 F.3d 141, 150 (4th Cir. 2005); Clisby, 960 F.2d at 934. Rather, somewhat to the contrary, the Supreme Court emphasized in Ake that psychiatry is not an exact science and that

"psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness."  <u>Ake</u>, 470 U.S. at 81. Accordingly, the state habeas court's rejection of the Petitioner's claim of incompetent psychiatric assistance was neither contrary to nor an unreasonable application of clearly established federal law, and the Petitioner's claim for relief is denied.

        D.    <u>Claim P – Modification of Jury Verdict (Apprendi)</u>

The Petitioner alleges that the trial court improperly modified the jury verdict at the sentencing phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  He contends that the jury returned a verdict that did not contain any valid statutory aggravating circumstances as required by Georgia law.  The Petitioner argues that the trial court rewrote the verdict making the finding of statutory aggravating circumstances in the jury's place, in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).  In <u>Ford</u> II, the state habeas court found this claim to be defaulted based on the successive petition rule for habeas corpus cases, set forth in O.C.G.A. § 9-14-51.  In a previous order, this Court deferred to the ruling of the <u>Ford</u> II court, in accordance with <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991), and held that the claim is procedurally defaulted and barred by independent and adequate state grounds.  (Order, Mar. 31, 2003, at 8-17.)  Nevertheless, the Petitioner argues

that the Court must revisit the procedural default issue and reach the merits of the claim because a failure to do so will result in a fundamental miscarriage of justice. The Court previously considered the "fundamental miscarriage of justice" argument and found it to be without merit.

However, even if the claim is not procedurally barred, the Petitioner is not entitled to relief.  In Teague v. Lane, 489 U.S. 288 (1989), the Supreme Court adopted a rule against retroactive application in federal habeas corpus cases of new rules of criminal procedure that had not been announced at the time the defendant's conviction became final,[9] with two narrow exceptions.  Teague, 489 U.S. at 310-13.  A rule is "new" under Teague if it breaks new ground, imposes a new obligation on the states or the federal government, or was not dictated by existing precedent at the time the defendant's conviction became final. O'Dell v. Netherland, 521 U.S. 151, 156 (1997); Teague, 489 U.S. at 301.  Such a rule will not apply retroactively unless it falls within one of the following exceptions: (1) the new rule places certain kinds of conduct beyond the power of a state to proscribe, or addresses a "categorical guarantee" in the Constitution, such as a rule prohibiting a certain category of punishment for a class

_____

[9]A state prisoner's conviction becomes "final" when the United States Supreme Court denies certiorari or the time for filing a petition for writ of certiorari from the judgment affirming the conviction has expired.  Graham v. Collins, 506 U.S. 461 (1993); Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987).

of defendants because of their status or offense; or (2) the rule announced a "bedrock" or "watershed" rule of procedure that implicates the fundamental fairness and accuracy of the criminal trial.  Teague, 489 U.S. at 307.

In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490.  In Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court extended its holding in Apprendi to facts increasing a defendant's sentence from life imprisonment to death.[10]  Turner v. Crosby, 339 F.3d 1247, 1280 (11th Cir. 2003).  The Supreme Court has held that Ring announced a new rule of criminal procedure that does not fall within either of the narrow Teague exceptions and, thus, does not apply retroactively.  Schriro v. Summerlin, 542 U.S. 348, 358 (2004); Turner, 339 F.3d at 1286.  Similarly, Apprendi announced a new procedural rule and does not apply retroactively.  Cooper-Smith v. Palmateer, 397 F.3d 1236, 1245-46 (9th Cir. 2005); Lambert v. McBride, 365 F.3d 557, 562 (7th Cir. 2004); United States v. Swinton, 333 F.3d 481, 490 (3d Cir. 2003); Goode v. United States, 305 F.3d 378, 385 (6th Cir. 2002); United States v. Brown, 305 F.3d 304, 310 (5th

---

[10]At the time the Petitioner filed this federal habeas corpus petition in 2001, the Supreme Court had not yet decided Ring v. Arizona.

Cir. 2002); United States v. Mora, 293 F.3d 1213, 1219 (10th Cir. 2002); McCoy v. United States, 266 F.3d 1245, 1256-57 (11th Cir. 2001); United States v. Sanders, 247 F.3d 139, 151 (4th Cir. 2001); see Blakely v. Washington, 542 U.S. 296, 323-24 (2004) (O'Connor, J., dissenting) (recognizing the Court's holding in Summerlin "that Ring (and a fortiori Apprendi) does not apply retroactively on habeas review"). Because Apprendi had not been announced at the time the Petitioner's convictions became final,[11] he cannot collaterally challenge his convictions and sentences on the basis of a claimed Apprendi error. The Petitioner's claim for relief is denied.

E.      Claim D – Limitation of Voir Dire

The Petitioner claims that he was denied the right to a fair trial by an impartial jury because the trial court refused to allow the Petitioner to conduct an adequate voir dire examination of prospective jurors. The Petitioner asserts three bases for this allegation: (1) defense counsel was denied the right to conduct individual, sequestered voir dire; (2) the trial court prohibited defense counsel from asking detailed questions from his proposed questionnaire; and (3) defense counsel was not permitted to ask questions regarding whether prospective jurors would automatically vote in favor of the death penalty. On direct appeal, the Petitioner raised the first two issues but he did

---

[11]The Petitioner's convictions became final on April 25, 1988, when the United States Supreme Court denied certiorari. Ford v. Georgia, 485 U.S. 943, reh'g denied, 485 U.S. 1030 (1988).

not specifically argue that he was precluded from identifying jurors who would immediately vote to impose a death sentence.[12]   The Supreme Court of Georgia rejected the Petitioner's claim that voir dire was improperly limited.  The court found that, although it correctly observed that many of the proposed voir dire questions were improper, the trial court did not expressly rule on any specific questions prior to trial and did not disallow any defense questions during voir dire.  Ford v. State, 257 Ga. at 465.  The state habeas court reached similar conclusions.  (Resp't Ex. 16 at 34.) According to the Petitioner, the Supreme Court of Georgia's holding was based on unreasonable factual determinations and was contrary to or an unreasonable application of clearly established federal law.  Because the state habeas court made

_____

[12]The Petitioner's direct appeal set forth the following enumerated errors regarding voir dire:

> 10.   The trial court erred in denying to Appellant, as requested, an individual voir dire, examination and sequestration of the prospective jurors prior to the selection thereof.
>
> . . .
>
> 18.   The trial court erred in unnecessarily restricting and confining the scope of the voir dire examination as to the effect of pre-trial publicity upon prospective jurors.
>
> . . .
>
> 20.   The trial court erred in denying Appellant the opportunity to propound voir dire questions to prospective jurors . . . .

(Resp't Ex. 8.)

essentially the same findings, he argues that its findings and conclusions suffer from the same deficiencies.

The Supreme Court of Georgia found that the trial court did not expressly rule on any specific voir dire questions and did not disallow any questions actually posed by defense counsel.  Prior to trial, defense counsel submitted an extensive list of proposed voir dire questions.  (Resp't Ex. 2 at 85-93.)  When pressed for a ruling on which questions would be allowed, the trial court declined to rule on the particular questions, stating that: "Defense counsel is expected to know what a permissible question is and most of these are not permissible questions."  (Resp't Ex. 6 at 33-34; see also id. at 27, 29.)  During voir dire, the trial court did not disallow any question actually posed by defense counsel.  Thus, the record clearly supports the findings of the Supreme Court of Georgia.  Moreover, these factual findings are presumed correct unless the Petitioner rebuts the "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 125 S. Ct. 2317, 2325 (2005). The Petitioner has failed to present such clear and convincing evidence.  Rather, he simply contends that the Supreme Court of Georgia's finding is unreasonable because it "fails to take into account the hostile nature of the trial court's response to the voir dire questions proposed by defense counsel."  (Post-Hr'g Br. in Supp. of Petition for Writ of Habeas Corpus at 50.)  According to the Petitioner, given the alleged hostility

toward defense counsel's proposed manner of voir dire, the trial court impliedly prohibited all of defense counsel's list of questions by stating that most of the proposed questions would not be allowed. Whatever decisions defense counsel made regarding which specific questions from his proposed list to ask or not ask during voir dire, however, cannot be attributed to any action or ruling of the trial court. Thus, the Supreme Court of Georgia's determination that voir dire was not improperly limited by the trial court was not based on unreasonable factual findings.

The Petitioner also challenges the substance of the Georgia Supreme Court's decision, arguing that it is contrary to or an unreasonable application of clearly established federal law. Specifically, he contends that he was denied the opportunity to determine whether prospective jurors would automatically vote for the death penalty because the trial court: (1) denied his request for individual, sequestered voir dire; and (2) refused to ask "reverse-Witherspoon" questions of prospective jurors. The right to trial by jury guarantees that a criminal defendant will receive a fair trial by an impartial jury. Irvin v. Dowd, 366 U.S. 717, 720 (1961). The purpose of voir dire is to determine whether prospective jurors can render an impartial verdict based solely on the evidence and the court's instructions. Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). Thus, "voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be

honored."  Id.; see also Mu'Min v. Virginia, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges.").    Although the Constitution requires an impartial jury, it "does not dictate a catechism for voir dire." Morgan v. Illinois, 504 U.S. 719, 729 (1992).  Individual, sequestered voir dire may be a preferable manner in which to examine and test for potential biases of prospective jurors; however, the Supreme Court has never held that such a procedure is constitutionally required.  See Mu'Min, 500 U.S. at 425; Patton v. Yount, 467 U.S. 1025, 1034 n.10 (1984); see also Cummings v. Dugger, 862 F.2d 1504, 1508-09 (11th Cir. 1989).  Rather, the trial court is granted wide discretion in determining the scope and manner of voir dire, including which questions will be asked and whether individual questioning will be permitted.  Mu'Min, 500 U.S. at 427; Ham v. South Carolina, 409 U.S. 524, 528 (1973); Aldridge v. United States, 283 U.S. 308, 310 (1931); Cummings, 862 F.2d at 1507.  Thus, the Supreme Court of Georgia's holding that the trial court did not improperly restrict voir dire, even in the absence of individual, sequestered voir dire, was neither contrary to nor an unreasonable application of clearly established federal law.

The Petitioner claims that the trial court refused either to ask or to allow defense counsel to ask "reverse-<u>Witherspoon</u>" questions,[13] which are used to determine whether there are jurors who would vote automatically to impose the death penalty if the defendant were found guilty of a capital crime.  As noted, the trial court has the discretion and authority to limit the scope of voir dire.  However, "the exercise of the trial court's discretion, and the restriction upon inquiries at the request of counsel, are subject to the essential demands of fairness."  <u>Morgan</u>, 504 U.S. at 730.  In <u>Morgan v. Illinois</u>, the Supreme Court held that a capital defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty."  <u>Id.</u> at 736.  <u>Morgan</u>, however, was decided several years after the Petitioner's conviction became final.  Thus, the Court must determine whether the rule announced in <u>Morgan</u> applies retroactively.  Prior to <u>Morgan</u>, the Supreme Court had not imposed a mandatory requirement that a defendant be permitted to ask life-qualifying questions upon request.  <u>Morgan</u> placed a new obligation on the states that was not simply a logical extension of established precedent.  <u>See</u> <u>Thomas v. Beard</u>, 388 F. Supp. 2d 489, 531 (E.D. Pa. 2005).  In fact, the Supreme Court expressly stated

---

[13] "Reverse-<u>Witherspoon</u>" questions are also referred to as "life-qualifying" questions.

that it granted certiorari in Morgan "because of the considerable disagreement among state courts of last resort" on this issue.  Morgan, 504 U.S. at 725.  Therefore, because it was not dictated or compelled by existing precedent, the rule announced in Morgan constitutes a "new rule" of criminal procedure.  Thomas, 388 F. Supp. 2d at 531; Jermyn v. Horn, No. Civ. A. 1:CV-97-634, 1998 WL 754567, at *54 (M.D. Pa. 1998); Commonwealth v. Blystone, 725 A.2d 1197, 1203 (Pa. 1999); People v. Caballero, 688 N.E.2d 658, 665 (Ill. 1997).

A "new rule" will only be given retroactive effect if it falls within one of the two narrow exceptions of Teague.  The Morgan rule does not place certain kinds of conduct beyond the power of a state to proscribe and, thus, it does not fit the first exception.  Under the second exception, a new rule will apply retroactively if it constitutes a "watershed rule" of criminal procedure implicating fundamental fairness. This exception is "clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." Beard v. Banks, 542 U.S. 406, 417 (2004) (quoting O'Dell, 521 U.S. at 157).  The Supreme Court has emphasized that such a qualifying rule "would be so central to an accurate determination of innocence or guilt that it is unlikely that many such components of basic due process have yet to emerge."  Id. (internal punctuation omitted).  The fact that Morgan applies only when the defendant makes a specific

request for life-qualifying questions "suggests that such voir dire questioning is not 'so central to an accurate determination of innocence or guilt' as to constitute a component of basic due process." Caballero, 688 N.E.2d at 665.  As such, it cannot be said that Morgan is "implicit in the concept of ordered liberty" such that it qualifies as a "watershed rule."  Jermyn, 1998 WL 754567, at *54; Caballero, 688 N.E.2d at 665.  Because Morgan does not apply retroactively to the Petitioner's claim, he cannot challenge his sentence on the basis that the trial court refused to ask "reverse-Witherspoon," or life-qualifying questions.

Furthermore, even if Morgan applied retroactively, the Petitioner's claim would fail.  As noted, Morgan requires a trial court to allow life-qualifying questions only after a request from the defendant.  The Petitioner included a number of "reverse-Witherspoon" questions in his list of proposed voir dire questions.  (Resp't Ex. 2 at 92-93.)  As discussed above, however, his contention that the trial court refused to ask these questions or refused to allow defense counsel to ask the questions is not supported by the record.  The trial court neither expressly discussed nor ruled upon the propriety of asking these specific questions, either prior to or during voir dire.  Moreover, defense counsel made no effort to ask the questions during voir dire.  Thus, the absence of voir dire questioning regarding whether prospective jurors would automatically vote to impose the death penalty was not due to any error on the part of

the trial court. The holding of the Supreme Court of Georgia that no improper limitations were placed upon voir dire was not contrary to or an unreasonable application of clearly established federal law. Accordingly, relief based upon this claim is not warranted.

F.    Claims F and M – Handcuffs and Excessive Security

During the trial, the jury allegedly viewed the Petitioner in handcuffs as he was being led to lunch. Following the Petitioner's motion for a mistrial, the trial court held a brief hearing and heard testimony from the Petitioner and two deputies. (Resp't Ex. 6 at 300-12.) The Supreme Court of Georgia summarized that testimony as follows:

> The jury left the courthouse first. After waiting during what they believed was a sufficient period of time for the jury to be removed away from the area, two deputies walked Ford from the rear of the courthouse. Ford exited first and began descending the steps when he noted the jury boarding a bus some 20 yards away. He was wearing an overcoat, the sleeves of which covered but did not completely hide the cuffs. Ford turned his back to the jury. He and the deputies then returned to the courthouse.

Ford v. State, 257 Ga. at 465. The trial court denied the motion for a mistrial but gave the following curative instruction to the jury:

> It has come to my attention that at the beginning of the noon recess perhaps one or more of you jurors saw the defendant wearing handcuffs as he was being escorted from the courthouse. I want to explain to you that the security measures that we have taken here are not to be interpreted by you as any indication from the Court that the defendant is

a dangerous person.  It is my responsibility as presiding judge to control the flow of people in to and out of the courtroom and the courthouse and I have given you a ten minute head start at the noon recess and also when we adjourn for the evening as to allow you sufficient time to exit the courthouse before other persons are allowed to disperse.

You are not to infer by that that the defendant is dangerous and in fact you are to make no inference at all harmful to him because of that.  Now, obviously the defendant is in custody, he is accused of serious crimes and the sheriff's department is responsible for his custody throughout this trial and placing him in handcuffs, if they elect to do so, is a very simple, ordinary measure.

If, in fact, any of you did see him in handcuffs you are not to infer from that that he is guilty of any crime or that he is dangerous to you or anyone else or that he presents a threat of harm to you or anyone else during this trial.  In fact, you are to make no inference at all from that fact, especially no inference of harm to the defendant.

(Resp't Ex. 6 at 314-15.)  The Petitioner contends that the viewing and the subsequent curative instruction by the trial court were inherently prejudicial because they imprinted an image of him as "dangerous" in the minds of the jurors.  Thus, the Petitioner claims that he was denied the right to a fair trial by an impartial jury.  The Supreme Court of Georgia denied this claim:

"Absent justifying circumstances, the defendant normally should not be seen by the jury handcuffed in the courtroom or courthouse.  However, where one or more jurors by chance see the defendant in handcuffs outside the courtroom, it is not error to deny a motion for mistrial."  Gates v. State, 244 Ga. 587, 593, 261 S.E.2d 349 (1979).

The court did not err by failing to declare a mistrial in this case.  The defendant did not object at trial to the curative instruction given by the

court, and may not now complain that the instructions "served only to impress the incident upon the minds of the jurors."

Ford v. State, 257 Ga. at 465.[14]  The Petitioner also argues that the impression that he was dangerous was exacerbated by the presence of excessive security personnel in the courtroom.  He asserts that the combined effect of excessive security and being viewed in handcuffs denied him the right to a fair trial.[15]  The state habeas court found that security was not excessive and, therefore, that the Petitioner's constitutional rights were not violated.  (Resp't Ex. 16 at 43.)

"Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."  Holbrook v. Flynn, 475 U.S. 560, 567 (1986) (quoting Taylor v. Kentucky, 436 U.S. 478, 485 (1978)).  Recognizing that "jurors are quite aware that the defendant appearing before them did not arrive there

---

[14]Although the Petitioner raised this claim in his first state habeas petition, the state habeas court found that the claim had been addressed on the merits on direct appeal and could not be relitigated.  (Resp't Ex. 16 at 21-22.)

[15]The Petitioner did not raise these claims in combination on direct appeal or in his state habeas petition.  This Court has previously held, however, that both claims were "fairly presented" to the state court and may be considered together to determine whether there was prejudice.  (Order, Mar. 31, 2003.)

by choice or happenstance," the Supreme Court, however, has never held that all indications of custody or alleged criminal conduct must be completely eliminated from trial proceedings. Id. Nevertheless, certain practices may be deemed "inherently prejudicial" such that they pose a threat to the "fairness of the factfinding process" and, therefore, are prohibited unless "justified by an essential state interest." Id. at 568-69; see, e.g., Deck v. Missouri, 125 S. Ct. 2007, 2013 (2005) ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."). If the challenged security measures are not found inherently prejudicial, the burden rests on the defendant to show actual prejudice. Holbrook, 475 U.S. at 572; United States v. Moreno, 933 F.2d 362, 368 (6th Cir. 1991); United States v. Robinson, 645 F.2d 616, 617 (8th Cir. 1981).

The Petitioner was not handcuffed, shackled, or restrained in any manner during courtroom proceedings. Rather, he alleges only that the jury observed him in handcuffs during a lunch recess, briefly and from a distance. None of the jurors were questioned following the incident. Thus, there is no direct evidence that any of the jurors, who were approximately 20 yards away, actually noticed the handcuffs, which were partially concealed. Ford v. State, 257 Ga. at 465. The Petitioner argues that the fact that jurors viewed him in handcuffs, regardless of the circumstances of the observation, deprived him of the presumption of innocence and, thus, the right to a

fair trial.  However, each of the cases cited by the Petitioner in support of this contention addressed only the propriety of courtroom shackling of a defendant.  See, e.g., Elledge v. Dugger, 823 F.2d 1439, 1450 (11th Cir. 1987); Zygadlo v. Wainwright, 720 F.2d 1221, 1223 (11th Cir. 1983); United States v. Samuel, 431 F.2d 610, 614-15 (4th Cir. 1970).  Although visibly shackling a defendant inside the courtroom is inherently prejudicial and must be justified by an essential state interest, the Supreme Court has never considered whether a brief, inadvertent viewing of the defendant in handcuffs outside of the courtroom is likewise inherently prejudicial. The Eleventh Circuit, however, has stated that "[t]he well established rule in this circuit is that 'a brief and fortuitous encounter of the defendant in handcuffs is not prejudicial and requires an affirmative showing of prejudice by the defendant.'" Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir. 1984) (quoting Wright v. Texas, 533 F.2d 185, 187 (5th Cir. 1976); United States v. Bankston, 424 F.2d 714 (5th Cir. 1970); Hardin v. United States, 324 F.2d 553 (5th Cir. 1963)); Parker v. Turpin, 60 F. Supp. 2d 1332, 1365 (N.D. Ga. 1999).  This position is consistent with other circuit courts that have been presented with the issue and have held that when the jury's observation of a handcuffed defendant is brief, inadvertent, and outside the courtroom it is not inherently prejudicial.  See Ghent v. Woodford, 279 F.3d 1121, 1132-33 (9th Cir. 2002) ("brief or inadvertent glimpse" of defendant shackled while being

transported through hallway not inherently or presumptively prejudicial); Moreno, 933 F.2d at 368 ("Defendants are required to show actual prejudice where the conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial."), quoted in United States v. Waldon, 206 F.3d 597, 607 (6th Cir. 2000); United States v. Johnson, 911 F.2d 1394, 1397 (10th Cir. 1990) ("[A] juror's fleeting glance of a defendant in handcuffs does not warrant a mistrial.") (citing Glass v. United States, 351 F.2d 678, 681 (10th Cir. 1965)); United States v. Pina, 844 F.2d 1, 8 (1st Cir. 1988) (brief exposure of defendant in shackles to three jurors not inherently prejudicial); United States v. Fahnbulleh, 748 F.2d 473, 477 (8th Cir. 1984) ("The danger of prejudice to defendants is slight where a juror's view of defendants in custody is brief, inadvertent and outside of the courtroom."); United States v. Taylor, 562 F.2d 1345, 1359 (2d Cir. 1977) ("[A]n inadvertent view by jurors of defendants in handcuffs, without more, is not so inherently prejudicial as to require a mistrial."); United States v. Shaver, 511 F.2d 933, 935 (4th Cir. 1975) ("The 'brief sighting' of an accused in handcuffs is not per se prejudicial.").

Because clearly established federal law does not dictate that it was inherently prejudicial for the jurors to briefly and inadvertently observe the Petitioner in handcuffs while being escorted out of the courthouse, the Petitioner must show actual

prejudice.  See United States v. Diecidue, 603 F.2d 535, 549 (5th Cir. 1979) ("The conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial" and, thus, defendant required to show actual prejudice).  He has failed to present any such evidence.  In fact, any argument of actual prejudice would be undermined by the curative instruction given by the court in which the trial judge advised the jurors that handcuffing a criminal defendant when he is being transported from the courthouse is a routine security measure and should not be viewed as an indication that the defendant is guilty or dangerous.  See Moreno, 933 F.2d at 368.  Nevertheless, the Petitioner takes issue with the curative instruction.  He argues that the comments served only to reinforce the incident and to create an image of the defendant as a dangerous man because the trial judge used the word "dangerous" three times and stated that the Petitioner was "in custody" and "accused of serious crimes."  By mentioning that the Petitioner was in custody and accused of serious crimes, however, the trial judge presumably was not apprising the jurors of any facts of which they were not already aware.  In addition, the trial judge used the word "dangerous" only when repeatedly instructing the jury that they were not to make any harmful inferences and, in particular, were not to infer that the handcuffs indicated that the Petitioner was dangerous.  Jurors are presumed to follow the instructions of the trial court.  Weeks

v. Angelone, 528 U.S. 225, 234 (2000).  Moreover, as the Fifth Circuit noted in

Wright v. Texas, 533 F.2d 185 (5th Cir. 1976), "rational jurors would understand and

follow a proper instruction that handcuffing persons in custody for transportation to

and from the courtroom is a reasonable precaution that in no way reflects upon the

presumption of innocence or the individual propensities of any defendant."  Wright,

533 F.2d at 188; see also United States v. Leach, 429 F.2d 956, 962 (8th Cir. 1970)

("It is a normal and regular practice . . . to handcuff prisoners when they are being

taken from one place to another, and the jury is aware of this.").  Absent any evidence

of prejudice, inherent or actual, and because the trial court appropriately instructed the

jury not to make any harmful inferences, the incidental viewing of the Petitioner in

handcuffs outside the courtroom did not violate the Petitioner's right to a fair trial.

Thus, the holding of the Supreme Court of Georgia was not an unreasonable

application of clearly established federal law.[16]

---

[16]The Petitioner makes reference to the fact that the Supreme Court of Georgia
based its holding on only one Georgia case and did not cite any federal law.  It is
unclear whether the Petitioner highlights this fact as part of the basis for habeas relief.
Assuming that this was the Petitioner's intention, the fact that the Georgia Supreme
Court did not explicitly reference or rely upon federal law is inconsequential.  As
previously noted, a state court is not required to cite to, or even be aware of,
controlling Supreme Court precedent provided that its decision does not contradict the
precedent.  Early v. Packer, 537 U.S. 3, 8 (2002).

Even considering the jury's observation of the Petitioner in handcuffs in combination with the alleged excessive security, the Petitioner has not established that the security measures were prejudicial.  The Petitioner was not handcuffed or shackled during courtroom proceedings.  According to John Howell, the Petitioner's trial counsel, there were typically two or three bailiffs present during a trial in Newton County.  During the Petitioner's trial, there were only one or two additional deputies, which was not unusual for a murder case.  (Resp't Ex. 17 at 187.)  Howell also noted that after he expressed concern regarding the impact that extra security could have on the jury's perception of the Petitioner, the trial judge cautioned the deputies to keep a low profile.  (Id. at 188.)  There is no evidence to indicate that the deputies were unusually armed or that they did not abide by the trial court's request to maintain a low profile.  Under the circumstances, the state habeas court found that the number of security personnel was not excessive.

In Holbrook v. Flynn, the United States Supreme Court addressed the effect of security personnel on a defendant's right to a fair trial.  Distinguishing security personnel from shackling and prison clothes, which are indicative of a need to separate the defendant from the community, the Supreme Court explained that it was possible for jurors to draw a wide range of inferences from the presence of armed security personnel that were not inherently prejudicial to the defendant's right to a fair

trial.  Holbrook, 475 U.S. at 569.  In fact, the Supreme Court noted that "society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern."  Id.  As such, the Supreme Court held that "reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial."  Id.  Absent a presumption, the test for determining inherent prejudice on a case-by-case basis is whether "an unacceptable risk is presented of impermissible factors coming into play."  Id. at 570.  In Holbrook, the Supreme Court determined that supplementing the customary eight courtroom security officers with four uniformed state troopers sitting on the first row of the spectator's section did not create an unacceptable risk of prejudice and, thus, did not violate the defendant's right to a fair trial.  Id. at 570-71. Rather, the Supreme Court reasoned that the four troopers were likely to have been viewed simply as part of a normal official concern for safety and order of the proceedings.  Id.; see also Spivey v. Head, 207 F.3d 1263, 1272-73 (11th Cir. 2000) (not inherently prejudicial to have unshackled defendant surrounded by, at times, eight uniformed guards).  Thus, it was reasonable to conclude that the unextraordinary presence of one or two additional deputies during the Petitioner's trial, for a total of between three and five security personnel, similarly did not "brand [Petitioner] . . .

with an unmistakable mark of guilt" or pose an unacceptable risk of prejudice and cannot be deemed inherently prejudicial.  See Holbrook, 475 U.S. at 571.  Because the Petitioner has not presented any evidence of inherent or actual prejudice arising out of the security measures taken during his trial, individually or in combination, the Georgia courts did not unreasonably apply, or decide contrary to, clearly established federal law.  Accordingly, the Petitioner's claims for relief are denied.

G.    Claim N – Closing Argument (Sentencing Phase)

The Petitioner alleges that the prosecutor's improper, misleading, and inflammatory closing argument during the sentencing phase resulted in a denial of due process.  In order to establish a denial of due process based upon prosecutorial misconduct, the Petitioner must prove that: (1) the prosecutor made improper remarks during the closing argument; and (2) that the statements were so prejudicial as to render the sentencing proceeding fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181-83 (1986); Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974).  Improper comments result in a denial of due process if they were "so egregious as to create a reasonable probability that the outcome was changed because of them." Cargill v. Turpin, 120 F.3d 1366, 1379 (11th Cir. 1997) (citing Brooks v. Kemp, 762 F.2d 1383, 1403 (1985) (en banc), vacated on other grounds, 478 U.S. 1016 (1986), reinstated, 809 F.2d 700 (11th Cir. 1987) (en banc)).  In other words, "[a] sentence

proceeding is rendered unfair by an improper argument if, absent the argument, there is a reasonable probability that the result would not have been a death sentence, a reasonable probability being one which undermines our confidence in the outcome." Romine v. Head, 253 F.3d 1349, 1368 (11th Cir. 2001).  However, proper comments, even if prejudicial or outcome-determinative, do not render a trial unfair.  Spivey, 207 F.3d at 1276.  The Petitioner asserts that the prosecutor improperly and prejudicially: (1) referenced the Bible and injected religion into the jury's sentencing deliberations: (2) diminished the jury's sense of responsibility for reaching its own decision as to the sentence to be imposed; (3) implied that the jury had a duty to return a death sentence based on its oath; (4) misled the jury regarding appropriate mitigating circumstances; (5) argued deterrence as a justification for imposing the death penalty; (6) used inflammatory language regarding the victims and their families; (7) characterized the Petitioner as guilty of other crimes; and (8) implied that the Petitioner lacked remorse. (Am. Petition ¶¶ 127-44.)  These arguments will be addressed in turn.

> ### 1.   Biblical References

During his closing argument, the prosecutor made the following biblical reference:

> There is sometimes some questions raised about whether the Bible would condone an execution.  Sometimes well people say I don't know if the Bible would condone it.  But knowing from Genesis Nine, Chapter Nine, Verse Six, God only made his covenant to Noah, said two points, he

> would never flood the earth again and secondly, if man should shed the blood of a fellowman, then so should his blood be shed by man, because man was made in the image of God.  God never broke his promise, never gone back on his promise, never changed his promise in the Bible.

(Resp't Ex. 6A at 1040.)  The Petitioner contends that this argument was improper in that it substituted biblical law, which demands the death penalty, for statutory law, which requires the jury to assess aggravating and mitigating circumstances before determining if death is appropriate.  The state habeas court agreed with the Petitioner, finding the argument to be improper pursuant to Hammond v. State, 264 Ga. 879 (1995).  (Resp't Ex. 16 at 49.)  In Hammond, the prosecutor argued that the defendant violated not only Georgia law but the law of God, which states that "[w]hoever sheds the blood of man by man shall his blood be shed, for God created man in his own image.  An eye for an eye; a tooth for a tooth.  A life for a life."  Hammond, 264 Ga. at 886.  The Supreme Court of Georgia held that this argument was improper because it was an "inflammatory appeal to the jurors' private religious beliefs" and impermissibly suggested that death was mandatory for all defendants convicted of homicide.  Id. at  886-87 (internal citations omitted); see also Carruthers v. State, 272 Ga. 306, 308-09 (2000).  Finding that mercy is implicit in Supreme Court decisions in capital cases, the Eleventh Circuit has similarly held that arguments based on the

notion that the Bible rejects the concept of mercy are improper.[17] <u>Romine</u>, 253 F.3d

at 1366-68; <u>Nelson v. Nagle</u>, 995 F.2d 1549, 1556-57 (11th Cir. 1993); <u>Wilson v.</u>

<u>Kemp</u>, 777 F.2d 621, 623-24 (11th Cir. 1985) (<u>citing</u> <u>Lockett v. Ohio</u>, 438 U.S. 586,

604 (1978); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303 (1976)); <u>Drake v. Kemp</u>,

762 F.2d 1449, 1458-59 (11th Cir. 1985) (en banc); <u>see also</u> <u>Coe v. Bell</u>, 161 F.3d

320, 350-51 (6th Cir. 1998); <u>Bennett v. Angelone</u>, 92 F.3d 1336, 1345-46 (4th Cir.

1996).[18] Nevertheless, the Supreme Court has never expressly addressed the propriety

of references to biblical law during closing argument.  Thus, the decision of the state

habeas court that the argument was improper was not contrary to or an unreasonable

application of clearly established Supreme Court precedent.

       As noted, however, finding that a prosecutorial argument is improper does not

end the due process inquiry: the argument must also render the sentencing proceeding

fundamentally unfair.  <u>See</u> <u>Cape v. Francis</u>, 741 F.2d 1287, 1301 & n.15 (11th Cir.

---

[17]The Eleventh Circuit, however, has declined to address whether biblical references are per se improper.  <u>Romine</u>, 253 F.3d at 1368 n.19.

[18]The Petitioner also relies upon <u>Jones v. Kemp</u>, 706 F. Supp. 1534 (N.D. Ga. 1989) to establish the impropriety of references to biblical law.  The discussion in <u>Jones</u> regarding the conflict between biblical law and mercy as a valid sentencing consideration was dicta.  Rather than condemning a prosecutorial closing argument, the constitutional error in that case was based on the trial court's implied approval of the use of extraneous materials, which just happened to be a Bible, during deliberations.  <u>Jones</u>, 706 F. Supp. at 1560.

1984) (biblical arguments during penalty stage, including "the Bible supports mercy only for the merciful" and "Genesis says 'Who so sheddeth man's blood by man, his blood be shed,'" had no real prejudicial effect on jury).   After finding that the argument was improper, the state habeas court held that "[i]n the context of the entire sentencing phase . . . this argument neither changed the result of the sentencing trial nor rendered it fundamentally unfair."  (Resp't Ex. 16 at 49) (internal quotations and citation omitted).   The Petitioner argues that this decision was an unreasonable application of clearly established federal law.

When assessing whether arguments are sufficiently egregious to warrant habeas relief, the court must consider the statements in context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors.  Romine, 253 F.3d at 1370; Cargill, 120 F.3d at 1379; see also Bennett, 92 F.3d at 1345 ("In making [prejudice] determination, we must look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated.") (internal quotation and citation omitted).   Although the prosecutor referenced the Bible only briefly, the Petitioner argues that the reference was part of

an overarching theme of retribution and "making the punishment fit the crime." However, it is entirely permissible, and therefore not fundamentally unfair, for a prosecutor to present arguments based on valid penological justifications for capital punishment, including retribution.  See Drake, 762 F.2d at 1458.  Moreover, the Petitioner's trial counsel did not object to any of the prosecutor's remarks.  (See Resp't Ex. 6A at 1069-70.)  The lack of objection by defense counsel weighs against a finding that the argument was severe enough to render the proceeding fundamentally unfair.  Romine, 253 F.3d at 1370 (citing Cargill, 120 F.3d at 1379; Williams v. Kemp, 846 F.2d 1276, 1283 (11th Cir. 1988); Brooks, 762 F.2d at 1397 n.19).  Rather than objecting, the defense counsel countered any implication that the Bible rejects mercy by responding with a biblical quotation himself:

> Mr. Ott was giving you a quotation from the Bible a moment ago.  I thought of one, it's for you to determine whether it's appropriate or not and I am not a biblical scholar by any means, don't pretend to preach to you on this, but I do recall something about mercy.  Something to the effect that blessed be the merciful, they shall obtain mercy.

(Id. at 1056-57.)  Defense counsel further responded to the prosecutor's reference to Genesis as follows:

> Mr. Ott's passage that he read from Genesis about shedding the blood, what did he say; so shall his blood be shed by Me, not by us, but by God all mighty is what Genesis said, we are not God.  We are not God like. We don't have the infallibility or the omnipotence to make those type decisions, do we?  Is that reason enough to decline to impose the death penalty in this case?

(Id. at 1059.)   Countering biblical law with biblical law likely minimized any prejudice caused by the prosecutor's statements.   See Cargill, 120 F.3d at 1382 (defense counsel's argument ameliorated alleged improper argument regarding lack of severity of life sentence); Tucker (Richard) v. Kemp, 762 F.2d 1496, 1509 (11th Cir. 1985) (en banc) (improper argument regarding premature release by parole board "was effectively countered by defense counsel's argument that [the defendant] would probably never be released again."). In addition, although not specifically mentioning the word mercy, the trial court implicitly instructed the jury that its sentence could be based on mercy:

> You shall consider any mitigating circumstances and you may, if you see fit, and *this is a matter entirely within your discretion fix the penalty as life imprisonment based upon any mitigating circumstance or reason satisfactory to you or without any reason whatever*, if you see fit to do so.  You may fix the penalty as life imprisonment even though you have found one or more of the statutory aggravating circumstances given to you in this charge to have existed beyond a reasonable doubt.

(Id. at 1065) (emphasis added).

Finally, the strength of the aggravating factors versus the minimal evidence of mitigation is relevant to the determination that the prosecutor's argument did not undermine the confidence in the outcome.  The jury had already found the Petitioner guilty of armed robbery, burglary, and the murder of Lisa Chapman, three of the statutory aggravating circumstances argued by the State.  These were horrific crimes.

Conversely, other than the plea for mercy by the Petitioner's mother, the only evidence of mitigation presented by the defense was the fact that the Petitioner had a history of psychological and behavioral problems as well as substance abuse.  There is no indication in the record that the jury struggled to reach a sentencing verdict. Contra Romine, 253 F.3d at 1370 (jury's difficulty in reaching unanimous verdict of life or death sentence weighed in favor of finding reasonable probability that biblical law argument affected the result).  Considering the prosecutor's improper argument in the context of the entire proceeding, including the evidence presented, defense counsel's argument, and the court's instructions, there is not a reasonable probability that the death sentence would not have been imposed absent the reference to biblical law.  As such, the state habeas court's holding that the biblical references did not render the sentencing proceeding fundamentally unfair was not based on an unreasonable application of clearly established federal law.

> 2.      Caldwell v. Mississippi

As part of his claim regarding the prosecutor's reference to the Bible, the Petitioner contends that the argument diminished the jury's sense of responsibility for reaching its own decision as to the sentence to be imposed, in violation of Caldwell v. Mississippi, 472 U.S. 320 (1985).  In Caldwell, the prosecutor urged the jury not to consider itself the final decisionmaker as to whether the defendant would be put to

death because any death sentence would be automatically reviewed for correctness by the state supreme court.  Caldwell, 472 U.S. at 323, 325-26.  The Supreme Court vacated the death sentence, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Caldwell, 472 U.S. at 328-29.  Caldwell, however, applies only to certain types of comments: those that improperly describe the role assigned to the jury by local law.  Dugger v. Adams, 489 U.S. 401, 407 (1989); Carr v. Schofield, 364 F.3d 1246, 1258 (11th Cir. 2004); see also Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (no Caldwell violation when "jury was not affirmatively misled regarding its role in the sentencing process").  Therefore, if the "challenged instructions accurately described the role of the jury under state law, there is no basis for a Caldwell claim." Dugger, 489 U.S. at 407.  In this case, the prosecutor did not expressly or impliedly misinform the jurors as to their role in sentencing under Georgia law.  Rather, both the prosecutor and defense counsel articulated the jury's ultimate responsibility to reach a sentencing verdict after evaluating the statutory aggravating circumstances and any mitigating circumstances.  (See Resp't Ex. 6A at 1034, 1045.)  Furthermore, the trial court made expressly clear during its charge that the decision whether to impose death was "one entirely for the jury to make," emphasizing that "[i]f the jury fixes the

penalty as death, the defendant shall be sentenced to death."  (Id. at 1061.)  Under these circumstances, the Court cannot conclude that the jury was led to believe that the responsibility for determining whether to put the Petitioner to death rested elsewhere.  See Brooks, 762 F.2d at 1414  (based on defense counsel's argument and the trial court's instructions, "the jury labored under no misperception as to its role; the jury clearly understood that it alone bore the responsibility for deciding whether [the defendant] should live or die.").  The Petitioner's Caldwell claim is without merit and is denied.

3.     Jury's Duty Based on Oath

In United States v. Young, 470 U.S. 1, 18 (1985), the Supreme Court found that it may be error for a prosecutor to exert pressure on the jury by urging the jury to "do its job."  According to the Petitioner, the prosecutor committed this sort of error by arguing that the jurors had sworn that they were not opposed to the death penalty and, therefore, implied that they were required by their oath to sentence the Petitioner to death.  The state habeas court found that the prosecutor's argument did not imply that the jury was required to impose the death penalty.  This decision was not an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.  Although the prosecutor reminded the jurors that each had sworn under oath that they were not absolutely opposed to the death

penalty, he did not state that the oath mandated that they impose a death sentence.  As the Petitioner correctly pointed out, the only oath sworn by the jurors before trial was that they would "well and truly try" the case and "a true verdict give according to the evidence."  (Resp't Ex. 6 at 180.)  Accordingly, when referencing the oath taken by the jurors prior to the trial, the prosecutor specifically urged the jury to "[l]ook at the evidence that's been presented" when making their sentencing determination.  (Resp't Ex. 6A at 1042.)  In the context of the sentencing proceeding, reasonable jurors would not interpret the prosecutor's references to the oath as implying that they were duty bound to return a sentence of death.

However, even if the statements were in error, the comments were not "so egregious as to create a reasonable probability that the outcome was changed because of them."  Cargill, 120 F.3d at 1379.  As discussed above, when evaluating prejudice caused by prosecutorial argument, a court should consider whether "defense counsel's closing argument ameliorated the damage done to the defense by the prosecutor's statement" and whether the trial court's instructions remedied the effects of the improper comments.  Id. (internal punctuation and citations omitted).  Here, in response to the prosecutor's reference to the jurors' oath, defense counsel specifically emphasized that they did not take an oath to put the Petitioner to death.  (Resp't Ex. 6A at 1057.)  Moreover, the jurors were repeatedly instructed by the prosecutor,

defense counsel, and the trial court that they were not bound to fix the penalty at death, even if some or all of the statutory aggravating circumstances were found.  (Id. at 1031-32, 1034, 1053, 1056, 1065.)  Therefore, when considering the entire context, the prosecutor's comments did not render the sentencing proceeding fundamentally unfair.

### 4.   Mitigating Circumstances

The Petitioner asserts that the prosecutor incorrectly defined mitigating circumstances as "those circumstances that lessen the crime," and therefore misled the jury into believing that certain evidence, such as the Petitioner's character and psychological history, was not relevant to mitigation.  However, the trial court clearly and correctly instructed the jury that mitigating circumstances are those circumstances which "in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame."  (Resp't Ex. 6A at 991.)  Instructions from the court are "definitive and binding statements of the law" and carry more weight than arguments of counsel.  Boyde v. California, 494 U.S. 370, 384 (1990).  Therefore, even if the prosecutor's definition improperly limited the scope of mitigating circumstances, because the trial court correctly charged the jury regarding mitigating circumstances, there is no reasonable probability that the prosecutor's misstatement affected the sentence.

5.   <u>Deterrence</u>

The Petitioner argues that the prosecutor improperly argued deterrence as a justification for the death penalty.  During his closing argument, the prosecutor briefly referenced deterrence as follows:

> Commonly, there are two reasons that everybody knows about for a death sentence, one is for deterring.  You might deter somebody else; you might not deter anybody else by deterring anybody else, but do deter one person and that's Ray Ford.  He will not be able to hurt anybody else.

(Resp't Ex. 6A at 1035.)   According to the Petitioner, this argument improperly indicated that the Petitioner would be paroled from a life sentence and free to commit further crimes if the death penalty was not imposed.  This Court agrees with the state habeas court that there was no such implication.  Furthermore, along with retribution, deterrence is an accepted penological justification for imposition of the death penalty.  As such, the Eleventh Circuit has held that arguments based on deterrence, either specific or general,[19] are appropriate and relevant during the sentencing phase:

> [W]ith respect to specific deterrence, the jury may appropriately consider whether a particular defendant is so likely to be dangerous in the future and so unlikely to be rehabilitated that incapacitation is warranted.  Even general deterrence, while principally a concern for the legislature, can be

---

[19]"General deterrence" is the "the deterrent effect of a sentence in one case on others who might otherwise commit the crime," whereas "specific deterrence" refers to "deterring the criminal who is sentenced from committing more offenses in the future."  <u>Collins v. Francis</u>, 728 F.2d 1322, 1339 n.18 (11th Cir. 1984)

considered in fixing a punishment.  In deciding whether to impose the
death penalty in a particular case, it is appropriate for a jury to consider
whether or not the general deterrence purpose of the statute would be
served thereby.  Georgia permits argument about these penological
justifications.  Such arguments are logically relevant to the jury's proper
task.  Neither reason nor precedent suggests that we should raise a
constitutional barrier to such arguments.

Brooks, 762 F.2d at 1407 (internal citations omitted); see also Duren v. Hopper, 161

F.3d 655, 662-63 (11th Cir. 1998); United States v. Chandler, 996 F.2d 1073, 1095

(11th Cir. 1993).  Arguing that executing the Petitioner would prevent him from

killing again is an acceptable reference to specific deterrence and is not prejudicial.

Drake, 762 F.2d at 1460.  The state habeas court's decision that the prosecutor's

deterrence argument was not improper was, therefore, not contrary to or an

unreasonable application of clearly established federal law.

In a similar vein, the Petitioner contends that the prosecutor improperly

commented on the possibility that the Petitioner could kill or injure guards or other

inmates if he were not given the death penalty.  These comments were made in the

context of addressing the testimony of Dr. Newkirk, the psychiatrist called by the

defense, that the Petitioner had antisocial personality disorder, including a tendency

to be impulsive, and might "boil over" in prison and injure someone.  (Resp't Ex. 6A

at 1039.)  Arguments regarding a defendant's future dangerousness are permissible

and, thus, cannot support the Petitioner's claim for relief.  Cargill, 120 F.3d at 1385;

Tucker (Richard), 762 F.2d at 1507.

      6.    Victim Impact Evidence

During his closing argument, the prosecutor argued that unlike the Petitioner's

mother, the families of the victims did not have the opportunity to plead for the lives

of Chapman and Matich.  (Resp't Ex. 6A at 1036.)  The Petitioner argues that this was

inflammatory and improperly detracted from the mitigation testimony offered by the

Petitioner's mother.  A prosecutor is prohibited from making improper suggestions,

insinuations, or assertions that could inflame the jury's prejudices or passions.  United

States v. Rodriquez, 765 F.2d 1546, 1560 (11th Cir. 1985).  However, the Supreme

Court has held that the Eighth Amendment does not create a per se bar to the

admission of victim impact evidence or to prosecutorial argument regarding the same.

Payne v. Tennessee, 501 U.S. 808, 826 (1991); Duren, 161 F.3d at 662; see also

Johnson v. Wainwright, 778 F.2d 623, 630 (11th Cir. 1985) (permissible to reference

loss suffered by victim's family).  Citing Payne, the state habeas court held that the

argument was permissible and, furthermore, given the limited nature, the comments

were not likely to have resulted in a sentence based on passion, prejudice, or other

arbitrary factor.  (Resp't Ex. 16 at 49.)  This decision was neither contrary to nor an

unreasonable application of clearly established federal law.

### 7.   Improper Characterization of Evidence

Lastly, the Petitioner alleges that the prosecutor improperly introduced new evidence and improperly construed trial testimony when he characterized the Petitioner as guilty of other crimes and without remorse.  The prosecutor argued that the Petitioner was a "criminal" who had admitted to theft by receiving, drug use, and procurement of drugs.  (Resp't Ex. 6A at 1039.)  The Petitioner claims that no evidence of such crimes had been presented and that the trial court had instructed the prosecutor that prior convictions could not be introduced during sentencing.  The Petitioner ignores the fact, however, that he testified during the trial to buying and using marijuana, (Resp't Ex. 6A at 709, 715-16, 726, 729), as well as purchasing a gold watch that he knew was stolen at the time he bought it, (id. at 754).  Therefore, the state habeas court correctly found that the prosecutor was arguing inferences based on evidence properly before the jury rather than improperly introducing new evidence.  See Tucker (Richard), 762 F.2d at 1506 ("It has long been held that a prosecutor may argue both facts in evidence and reasonable inferences from those facts.").  Furthermore, a defendant's previous criminal activity is relevant to sentencing, even activities for which no charges have been filed.  Devier v. Zant, 3 F.3d 1445, 1464-65 (11th Cir. 1993).  Thus, it was not improper for the prosecutor to reference the Petitioner's other uncharged illegal activities during his closing argument.

Although he does not identify any particular testimony, the Petitioner argues that the prosecutor improperly construed the Petitioner's testimony to indicate that he felt no remorse over the deaths of the victims.   The prosecutor argued that the Petitioner's lack of remorse regarding the death of Martha Matich was evidenced by the Petitioner's actions following the murders, including buying marijuana and ordering pizza, as well as his testimony that he was sorry about Matich's death for about four months but had gotten over it.   (Resp't Ex. 6A at 1039-40.)   Prosecutors are permitted to argue inferences based on evidence presented during the trial.   Tucker (Richard), 762 F.2d at 1506; see also Jones v. State, 273 Ga. 231, 234 (2000) (defendant's lack of remorse may be argued during penalty phase).   Thus, the argument that the Petitioner felt no remorse for Matich's death was not improper. With regard to Lisa Chapman, the prosecutor stated:

> Now, as I indicated yesterday, he has no remorse at all for Lisa, never mentions her name.  Never heard anything about any remorse except one statement when I questioned him about the statement he made when Gary Nicholson asked him about Lisa and he said she shouldn't have been in there; did you make that statement, his response was something to the effect if you stand in the middle of the road you can expect to be hit by a truck, as if somehow it was that child's fault for getting killed or perhaps her parents [sic] fault for having her there and that he is not to blame somehow for this.  So no remorse at all.

(Id. at 1039-40.)   In making this argument, the prosecutor did nothing more than summarize testimony given by the Petitioner.[20]  Thus, the prosecutor was at liberty to draw inferences based upon the Petitioner's testimony and argue the State's interpretation of the statement.  The Petitioner has not established that it was contrary to or an unreasonable application of clearly established federal law when the state habeas court held that the various comments made by the prosecutor during his closing argument were either proper or did not render the sentencing phase fundamentally unfair.  Thus, the Petitioner is not entitled to habeas relief based upon this claim.

H.    Claim B – Improper Exclusion of Prospective Juror

The Petitioner argues that he was denied his right to a fair trial and impartial jury because prospective juror Gwen Gibbs was improperly excused due to her views

_____

[20]The Petitioner's trial testimony regarding Lisa Chapman's presence at the convenience store was as follows:

Q: He [Agent Gary Nicholson] also said you indicated you didn't know where in the store the child had come from because you didn't see her when you came up to the store and that she shouldn't have been there, it was a school night.

A: I said that she shouldn't have been there, it was a school night.  If you will let me turn to that, that's a fact.  If you are not standing out in the street you won't get hit by a truck.

(Resp't Ex. 6A at 796-97.)

regarding capital punishment.  The Supreme Court of Georgia denied this claim, finding that Gibbs indicated that she would not vote to impose the death penalty regardless of the facts and circumstances of the case and was, therefore, properly excused.  Ford v. State, 257 Ga. at 464.  Although stating that the issue could not be relitigated because it had been decided on direct appeal, the state habeas court likewise found that Gibbs had "a previously formed opinion against the death penalty that disqualified her from service."  (Resp't Ex. 16 at 36.)

In Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), the Supreme Court held that:

> A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

The Supreme Court's subsequent decision in Wainwright v. Witt, 469 U.S. 412 (1985), clarified the proper standard for excusing jurors based on opposition to the death penalty.  In that case, the Supreme Court held that a prospective juror may be excused for cause if the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Witt, 469 U.S. at 424.  The Court noted that this standard does not require that juror bias be proved with "unmistakable clarity."  Id.  Moreover, a finding of bias is "based upon determinations of demeanor and credibility that are

peculiarly within a trial judge's province."  Id. at 428.  Such credibility assessments

constitute factual findings and, therefore, the trial judge's determinations regarding

bias are entitled to deference as well as the "presumption of correctness" afforded

under 28 U.S.C. § 2254(e)(1).  Id. at 428-29; Patton v. Yount, 467 U.S. 1025, 1037-38

(1984).

During voir dire, the trial judge asked the prospective jurors if they were

conscientiously opposed to capital punishment.  Gibbs responded in the affirmative.

(Resp't Ex. 6 at 41.)  During individual, sequestered voir dire, the following exchange

took place between the trial judge and Juror Gibbs:

| | |
|---|---|
| THE COURT: | Would you vote against the death penalty regardless of what transpires at the trial? |
| THE JUROR: | Uh-huh. |
| THE COURT: | Regardless of what happens, you would vote against the death penalty? |
| THE JUROR: | I think I would. |
| THE COURT: | Even though the evidence and the law said otherwise? |
| THE JUROR: | As far as guilty or not guilty, you know, I think I could fairly decide that.  I just do not want the responsibility of sentencing someone to death. |
| THE COURT: | Do I understand that you are so committed to vote against the death penalty that you would vote against |

it regardless of the facts and circumstances of the case?

THE JUROR:       I think I would.

. . .

MR. HOWELL[21]: . . .  Now, your answer that you gave, the Judge posed that question to you sounded somewhat equivocal to me that there was some room there for imposition of the death penalty if the case were hard enough and warranted it.

THE JUROR:       I would not want to vote for the death penalty for anyone just, you know, my own conscious, my own beliefs, am I answering you?

THE COURT:       You say you would not want to, the question is would you?

THE JUROR:       No, sir.

THE COURT:       You would not vote the death penalty?

THE JUROR:       No.

THE COURT:       Regardless of the facts, regardless of the circumstances?

THE JUROR:       I don't think I could.

THE COURT:       Don't say – the question –

THE JUROR:       No, sir, I would not.

---

[21]John Howell represented the Petitioner during trial.

THE COURT:      You would not?

THE JUROR:      No, sir.

THE COURT:      And you are firm about that?

THE JUROR:      Uh-huh.

. . .

THE COURT:      . . .  You are positive you would not vote for the
                death penalty period?

THE JUROR:      Yes.

(Id. at 63-66.)  The trial judge's determination, following this testimony, that Ms.

Gibbs should be excused for cause is afforded a presumption of correctness.  Although

some of Gibbs's responses could seem equivocal if viewed in isolation, her testimony

as a whole, including her unequivocal statements that she would not vote for the death

penalty under any circumstances, sufficiently demonstrates that her views would

prevent or substantially impair her ability to impose the death penalty if warranted.

The Supreme Court of Georgia's holding that it was constitutionally proper to exclude

Gibbs was neither an unreasonable determination of the facts nor an unreasonable

application of the standard set forth in Witt.  The Petitioner's claim for relief is denied.

I.      Claim C – Failure to Exclude Biased Prospective Jurors

        In contrast to Claim B, in which the Petitioner alleged improper exclusion of

a prospective juror, the Petitioner also contends that the trial court failed to excuse a

number of biased prospective jurors, in violation of his right to a fair and impartial jury.   Specifically, the Petitioner alleges that thirteen individuals plus the 34 prospective jurors who had been exposed to pretrial publicity, some of whom overlap the specifically identified venire members, should have been excused for cause. During voir dire, the Petitioner moved to exclude Mrs. Clarence Henderson for cause. The trial court granted the motion and she was excused.  (Resp't Ex. 6 at 90-91.) Thus, any claim that the jury was not impartial based upon Mrs. Henderson is completely meritless.  The Petitioner, however, did not move to excuse for cause any of the other allegedly biased jurors.  The state habeas court reviewed the voir dire for each of the alleged biased jurors and found that none were biased such that excusal for cause was warranted.  (Resp't Ex. 16 at 4-10, 31-32.)

The Sixth and Fourteenth Amendments protect a criminal defendant's right to be tried by an impartial jury.  Ross v. Oklahoma, 487 U.S. 81, 85 (1988).  A prospective juror is not impartial and, thus, must be excused for cause if his views "would prevent or substantially impair the performance of duties as a juror" and he would be unable to lay aside his opinion and render a verdict based on the evidence presented in court.  Witt, 469 U.S. at 424; Irvin v. Dowd, 366 U.S. 717, 723 (1961). As noted in the discussion of the previous claim, the trial judge's determination of whether a juror is impartial or biased is a question of fact and is entitled to a

presumption of correctness.  <u>Yount</u>, 467 U.S. at 1036-38 & 1037 n.12; <u>Heath v. Jones</u>, 941 F.2d 1126, 1132 (11th Cir. 1991).  However, even if a juror should have been removed for cause, there is no constitutional violation if the biased prospective juror does not actually sit on the jury.  <u>Ross</u>, 487 U.S. at 85-86; <u>Spivey v. Head</u>, 207 F.3d 1263, 1272 n.7 (11th Cir. 2000); <u>Heath</u>, 941 F.2d at 1132-33.  Here, the Petitioner used his peremptory challenges to strike eight of the prospective jurors alleged to be biased[22] and the State struck one.[23]  (Resp't Ex. 17 at 116-18.)[24]  Only three of the specifically identified alleged biased venire members ultimately served on the jury: Willie James Belcher, Bradley S. Rutledge, and Donald Kelly.  (<u>Id.</u>)  Therefore, any claim that the jury was not impartial must be based on these individuals.  Moreover, to the extent that the Petitioner argues that his right to an impartial jury was violated because he was forced to use peremptory challenges to strike biased jurors, his claim fails.  The Supreme Court has expressly held that "peremptory challenges are not of

---

[22]Jane Crowell, Nancy Hood, Carol S. McCanless, Mrs. William E. Coady, Woodrow Wilson Jr., Jean Y. Jenkins, Vivian Sue Baker, and Billy A. Lindsey

[23]William D. Osborne

[24]Mr. Howell, the Petitioner's trial counsel, testified that peremptory strikes were indicated by placing a "D#" beside the name of the juror.  An "S#" signified a peremptory strike by the State.  A "J#" was placed next to individuals that were chosen to sit on the jury.  (<u>See</u> Resp't Ex. 17 at 101-03; Resp't Ex. 17, Ex. 16 at 116-18.)  For instance, the "S1" next to William D. Osborne indicated that Mr. Osborne was the state's first strike.  Similarly, the "D3" next to Nancy Hood meant that she was the defense's third peremptory strike.  (Resp't Ex. 17 at 101-02.)

constitutional dimension," but are simply "a means to achieve the end of an impartial jury." <u>Ross</u>, 487 U.S. at 88.  As such, "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." <u>Id.</u>; <u>see also</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 315-17 (2000) (defendant's decision to use peremptory challenge to cure trial court's erroneous failure to excuse for cause does not violate federal or constitutional law).

Turning to the alleged biased members of the jury, the Petitioner contends that Juror Belcher should have been excused for cause because he had been the defendant in a debt collection action in which the former law firm of Ben Hendricks, the Petitioner's trial counsel, represented a creditor.  Hendricks testified during the state habeas hearing, however, that the suit was filed by his former partner three and a half years before the Petitioner's trial and that he had no knowledge of Belcher.  (Resp't Ex. 17 at 308-09, 316-17, 338.)  Nonetheless, according to the Petitioner, Juror Belcher's failure to bring up the conflict had a damaging impact on the impartiality of the jury.  The state habeas court found that the Petitioner had presented, at most, "bare speculation that Juror Belcher even remembered the associate defense counsel and harbored ill will to such a degree that he would sentence the attorney's client to death to 'get even.'"  (Resp't Ex. 16 at 10.)  The court, therefore, held that striking

Belcher for cause would not have been justified.  The Petitioner has not presented any evidence to establish otherwise.

Juror Rutledge stated during voir dire that he had learned from media accounts that robbery was a suspected motive for the murders.  (Resp't Ex. 6 at 77.)  The Petitioner argues that such exposure could have led Juror Rutledge subconsciously to accept robbery as the motive and, thus, prevented him from being impartial.  Again, the Petitioner's sole reliance on speculation is insufficient to establish bias.  Moreover, Rutledge stated that nothing he had heard prior to trial would affect his ability to remain impartial.  (Id. at 78.)  The trial court's finding that Juror Rutledge did not indicate any bias or preconceived ideas is presumed correct.  (See id. at 117 ("No other jurors who were examined individually while being sequestered indicated any bias, leaning or prejudice or preconceived ideas at all about the case based upon any news reports or street talk or any other source of information they may have had about the case.").)  The Petitioner has not presented any evidence to rebut this presumption.  Along these same lines, the Petitioner alleges generally that 34 members of the venire were exposed to pretrial publicity and that five of these individuals, presumably including Rutledge, sat on the jury.  (Am. Petition ¶ 54.)  Jurors are not deemed impartial simply because they have heard something about the case, and the Petitioner has not presented any evidence that these prospective jurors entertained such

preconceived ideas that they could not render an impartial verdict.  See Yount, 467 U.S. at 1035.

Lastly, the Petitioner claims that Juror Kelly could not be impartial, and should have been excused for cause, because he was a local attorney whose livelihood depended on his reputation in the community.  The Petitioner presents absolutely no support for this contention.  Nor, this Court feels quite safe in assuming, has any court ever held that merely practicing law in a community impugns a prospective juror's impartiality and provides cause to excuse the juror.  Thus, absent any indication that the seated jurors possessed any bias or preconceived notions about the Petitioner or the case, the state habeas court's holding that the Petitioner was not denied an impartial jury is neither contrary to nor an unreasonable application of clearly established federal law.

> J.    Claim E – Change of Venue

> 1.    Prejudicial Pretrial Publicity

The Petitioner contends that, given the amount and type of pretrial publicity, the trial court's refusal to grant a change of venue deprived him of the right to a fair trial.  In support of a pretrial motion for change of venue, the Petitioner tendered four newspaper articles (three of which ran within a week of the crimes and one that was published several days before the beginning of the trial) and news stories from the

three major Atlanta television stations that were broadcast around the time of the crimes.  (Resp't Ex. 5 at 5-8; Resp't Ex. 6 at 7-10.)  After reviewing this evidence, the trial court reserved ruling on the motion until after the completion of voir dire.  (Resp't Ex. 6 at 10.)  During voir dire, 34 out of 60 prospective jurors indicated that they recalled reading, seeing, or hearing something about the case.  The trial court conducted individual, sequestered voir dire of each of these prospective jurors.  (Id. at 48-116.)  The trial court excused two prospective jurors that "indicated some pre-existing feelings about the case, which they said would make it difficult for or impossible for them to decide the case impartially . . . ."  (Id. at 117.)  None of the remaining prospective jurors were found to have any bias, leaning or prejudice, or preconceived ideas about the case based upon pretrial publicity.  (Id.)  Therefore, following the individual voir dire and after consideration of all of the evidence of publicity, the trial court found that the Petitioner could receive a fair trial in Newton County and refused to grant a change of venue.  (Id. at 117-18.)  The Supreme Court of Georgia found no error in the denial of the change of venue motion.  Ford v. Georgia, 257 Ga. at 464-65.  After considering additional newspaper articles submitted by the Petitioner, the state habeas court likewise found that the publicity surrounding the case did not result in an unfair trial, particularly in light of the fact

that an impartial jury had been empaneled following the trial court's careful scrutiny of the venire's exposure to pretrial publicity.  (Resp't Ex. 16 at 35-36.)

The Due Process Clause of the Fourteenth Amendment safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors.  Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985) (citing Irvin, 366 U.S. at 722).  Prejudicial pretrial publicity or an inflamed community atmosphere may preclude the trial court from seating an impartial jury.  Under such circumstances, due process requires the trial court to grant a change of venue or a continuance.  Id. (citing Rideau v. Lousiana, 373 U.S. 723, 726 (1963); Sheppard v. Maxwell, 384 U.S. 333, 362-63 (1966)).  However, a change of venue is not required, or even inevitable, in every case that involves pretrial publicity, even if the publicity is pervasive and adverse.  Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554 (1976).  As the Supreme Court stated in Irvin v. Dowd:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particular true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  *It is sufficient if the juror can lay aside his impression or opinion and render the verdict based on the evidence presented in court.*

Irvin, 366 U.S. at 722-23 (emphasis added).

A trial is deemed fundamentally unfair, and thus a change of venue warranted, only if the pretrial publicity resulted in actual or presumed prejudice.  See Murphy v. Florida, 421 U.S. 794, 803 (1975); Devier v. Zant, 3 F.3d 1445, 1461 (11th Cir. 1993). To establish actual prejudice, the defendant must show that: (1) one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty; and (2) these jurors could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court. Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000); see also Irvin, 366 U.S. at 723, 727-28.  As noted, the relevant question is not whether the jurors were aware of the case but whether they had such fixed opinions as to the defendant's guilt that they could not render an impartial verdict.   Yount, 467 U.S. at 1035.  According to the Petitioner, of the 34 prospective jurors who indicated that they had been exposed to pretrial publicity about the case, five served on the Petitioner's jury: Willie James Belcher, Bradley S. Rutledge, Winston Kelly, Donald Kelly, and Richard P. Massey. (Am. Petition ¶ 54; Resp't Ex. 17 at 116-18.)  The question, however, is not whether a prospective juror heard of or remembered the case from the media.  Heath, 941 F.2d at 1136 (citing Yount, 467 U.S. at 1033).  The trial court concluded that these individuals had not formed any preconceived ideas about the case and were impartial.

(See Resp't Ex. 6 at 117.)  Partiality determinations are questions of fact and, thus, the trial judge's findings on the issue are entitled to a presumption of correctness.  Yount, 467 U.S. at 1031 n.7, 1036-37; Casey v. Moore, 386 F.3d 896, 910 (9th Cir. 2004); Coleman, 778 F.2d at 1537.  Not only has the Petitioner failed to present any evidence to rebut the presumption, but the record clearly supports the trial judge's findings.  During individual voir dire, the five jurors indicated that they had read or heard about the crime but did not remember any specific details.  (Id. at 60-61, 77-78, 86-87, 95-96, 98-100.)  None of these jurors indicated that he had already formed any opinions about the case or about the Petitioner's guilt.  Rather, each stated he could serve as an impartial juror and would not be influenced by the exposure to pretrial publicity.  (Id.) Thus, because none of the empaneled jurors entertained an idea before trial that the Petitioner was guilty based on pretrial publicity or held any such opinions that could not be set aside in favor of the evidence presented in court, there is no evidence of actual prejudice.  See Heath, 941 F.2d at 1134 ("The petitioner cannot establish actual prejudice without proving that at least one juror should have been dismissed for cause.").

The Petitioner appears to argue that due process required a change of venue based on presumed prejudice.  Prejudice is presumed when the defendant establishes that the community where the trial was held was saturated by pretrial publicity that

was sufficiently prejudicial and inflammatory.  Meeks, 216 F.3d at 961; see also Murphy, 421 U.S. at 798-99; Rideau, 373 U.S. at 726-27.  Presumed prejudice, however, is reserved for extreme situations where the prejudicial pretrial publicity "so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community."  Coleman, 778 F.2d at 1490; Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980).  For instance, the Supreme Court has presumed prejudice in cases where the trial was "conducted in a circus atmosphere, due in large part to the intrusions of the press," Murphy, 421 U.S. at 799 (citing Estes v. Texas, 381 U.S. 532 (1965)), or where the trial was "infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival," id. (citing Sheppard v. Maxwell, 384 U.S. 333 (1966)).  The circumstances surrounding the Petitioner's trial in no way approach this type of circus atmosphere.  As such, he has failed to present sufficient evidence to satisfy the "extremely heavy" burden necessary to warrant relief under the "rarely applicable" presumed prejudice standard.  See Spivey, 207 F.3d at 1270; Coleman, 778 F.2d at 1537; see also Casey, 386 F.3d at 906 ("We rarely find presumed prejudice because 'saturation' is 'reserved for an extreme situation.'").

The Petitioner claims that the murders and robbery were the subject of extensive and highly sensational publicity at the times the crimes were committed and

immediately prior to the trial.  However, the newspaper articles submitted by the

Petitioner fall short of showing that the publicity was "pervasive" or "inflammatory"

and, thus, do not raise the presumption of prejudice.  See Meeks, 216 F.3d at 963.  The

Petitioner tendered only ten newspaper articles to the state habeas court.  (Resp't Ex.

17 at 64-77.)  One article, titled "State Patrol increasing coverage of rural stores" and

published a month after the crimes, discussed an increase in rural and suburban

convenience store violence.  The article did not contain any mention of the Petitioner

or the murders of Matich and Chapman.  (Resp't Ex. 17 at 66.)  One article simply

announced the beginning of the trial, along with three other trials, on the following

Monday, and very briefly set forth the charges against the Petitioner.  (Id. at 67.)

Three of the articles were published during and following the Petitioner's trial: one

merely recounted witness testimony and the other two announced the verdict and

sentence.  (Id. at 68-74.)  These articles could not have affected the prospective jurors.

The remaining five articles[25] were published within a week of the crimes, i.e.,

over seven months before voir dire started, and primarily provided factual accounts

of: (1) the circumstances surrounding the crimes, the reporting of which was not

unnecessarily graphic; (2) the developing case, including the arrest of the Petitioner

---

[25]Three of the five articles appeared in the *Atlanta Journal and Constitution*,
and the remaining articles appeared in two local papers, *The Covington News* and the
*Rockdale County Citizen*.

and Turner; and (3) brief descriptions of the victims.  (Resp't Ex. 17 at 64-65, 74-77.)

News articles such as these that are largely factual in nature are not considered

sufficiently prejudicial or inflammatory to presume prejudice.  See Murphy, 421 U.S.

at 802 (news articles did not create inflamed community atmosphere when largely

factual in nature); Heath, 941 F.2d at 1134-35 (purely factual pretrial publicity is

deemed acceptable) (citing Patton v. Yount, 467 U.S. 1025 (1984)); United States v.

De La Vega, 913 F.2d 861, 865 (11th Cir. 1990) (330 newspaper articles were

"largely factual in nature and could not have created the sort of inflamed community

atmosphere which courts deem presumptively prejudicial").  Admittedly, two of these

articles contained prejudicial elements, i.e., referencing the fact that the Petitioner had

previously been arrested for aggravated assault and theft by conversion and that the

G.B.I. had recently been interested in using the Petitioner as a drug informant.  (Id. at

64, 77.)  However, given the limited mention of these facts, the Petitioner has not

shown that such references were "typical or widespread."  Spivey, 207 F.3d at 1271

(isolated instances of prejudicial elements, including letter written by defendant

confessing guilt did not amount to presumed prejudice), comparing Rideau, 373 U.S.

at 726 (refusal to grant change of venue was a denial of due process where community

was exposed "repeatedly and in depth" to television broadcast of interview of

defendant confessing in detail); see also Heath, 941 F.2d at 1135 (inflammatory

articles were atypical and not sufficient to presume prejudice). Thus, the Petitioner has failed to establish that the pretrial publicity was sufficiently prejudicial or inflammatory to require a change of venue.

Moreover, the Petitioner has not shown that the alleged prejudicial pretrial publicity saturated the community in which he was tried. In <u>Rideau</u>, the Supreme Court presumed prejudice when the defendant's 20-minute taped confession was broadcast three times to tens of thousands of people, in a community of only 150,000 people. <u>Rideau</u>, 373 U.S. at 724. Similarly, the Eleventh Circuit presumed prejudice in <u>Coleman v. Kemp</u>, where the defendant presented over 150 newspaper articles written about his case, media broadcast transcripts, and witness statements indicating that the case was a main topic of conversation for an extended period of time. <u>Coleman</u>, 778 F.2d at 1491-1540. Here, the Petitioner identified only nine newspaper articles which mentioned the Petitioner or the crimes, three of which were published after the conclusion of voir dire, and a very limited number of news stories that were broadcast immediately following the crimes.[26] Such a minimal showing of pretrial publicity falls obviously short of establishing saturation of the community. The lack

---

[26]The trial court viewed tapes of the news broadcasts prior to ruling on the change of venue motion. However, there is nothing in either the trial or state habeas record to indicate the content of these broadcasts nor has the Petitioner presented any such evidence to this Court.

of community saturation is further supported by the results of the voir dire, in which only two prospective jurors were struck based on preexisting feelings arising out of their exposure to pretrial publicity.  The remaining jurors had not heard anything about the case or had very limited recollection beyond the mere occurrence of the crimes.  The state habeas court reasoned that the ability of the trial court to empanel an impartial jury was particularly indicative of the fact that the pretrial publicity did not result in an unfair trial.  (Resp't Ex. 16 at 35.)  Similarly, in holding that the trial court's determination that the Petitioner could receive a fair trial in Newton County, the Georgia Supreme Court cited Curry v. State, 255 Ga. 215, 221 (1985), in which the court considered the low percentage of prospective jurors (22.1%) who were excused based on pretrial publicity.  Ford v. State, 257 Ga. at 465.  The Eleventh Circuit has agreed that a low percentage of jurors excused for cause because of pretrial publicity is "strong evidence of the absence of prejudicial community bias." Spivey, 207 F.3d at 1271 (quoting Spivey v. State, 253 Ga. 187, 198 (1984)).  Because the Petitioner has not shown any evidence of actual or presumed prejudice arising out of the pretrial publicity surrounding his case, the decisions of the state courts that the trial court's denial of the motion for change of venue did not deprive the Petitioner of the right to a fair trial were neither contrary to nor an unreasonable application of clearly established federal law.

2.    Expert Witnesses

Although not directly related to the alleged prejudicial effects of pretrial publicity, the Petitioner also challenges the court's denial of funds to hire an expert to examine the potential effects of the publicity and for a psychologist to assist in voir dire.  (See Resp't Ex. 2 at 70-72.)  The Petitioner raised this claim as enumeration of error fourteen on direct appeal.  (Resp't Ex. 8.)  Without specifically addressing the claim, the Supreme Court of Georgia rejected it as having no arguable merit.  Ford v. Georgia, 257 Ga. at 462 n.2.  The state habeas court, however, did specifically address the claim.   That court held that a jury selection expert is not essential to the fundamental fairness of a trial and, thus, the denial of funds to employ such an expert did not violate due process.  (Resp't Ex. 16 at 38-39.)  As discussed above in relation to the Petitioner's request for psychiatric assistance, the United States Supreme Court has held that an indigent defendant, upon a proper showing that his sanity will be a significant factor at trial, is entitled to access to a competent psychiatrist who will conduct an examination and assist the defense.  Ake v. Oklahoma, 470 U.S. 68, 83 (1985).   In Caldwell v. Mississippi, the Supreme Court, in a footnote, briefly addressed a trial court's refusal to provide an indigent defendant with a criminal investigator, a fingerprint expert, and a ballistics expert.  Caldwell, 472 U.S. at 323 n.1.  The Court found no deprivation of due process caused by the trial court's refusal,

noting that the petitioner had presented only undeveloped assertions that the assistance would be beneficial.  Id.  However, the Supreme Court went on to state that it had "no need to determine as a matter of federal constitutional law what *if any* showing would have entitled a defendant to assistance of the type [the petitioner] sought."  Id. (emphasis added).  Therefore, although the Supreme Court arguably left open the possibility that the denial of nonpsychiatric assistance in a given case could constitute a denial of due process, the Court has never extended Ake to nonpsychiatric experts. Conklin v. Schofield, 366 F.3d 1191, 1206 (11th Cir. 2004); Moore v. Kemp, 809 F.2d 702, 711-12 (11th Cir. 1987); see also Frazier v. Mitchell, 188 F. Supp. 2d 798, 850 (N.D. Ohio 2001) (right to use a jury consultant "does not exist, no matter how useful some lawyers may believe such consultants to be," and denial of funds to hire such expert did not violate right to fair trial).  Accordingly, the decision of the state habeas court, and the implicit decision of the Supreme Court of Georgia, that the Petitioner's claim was without merit was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.  The Petitioner's claim for relief is properly denied.

      K.     Claim G – Prosecutor's Opening Statement

      The Petitioner argues that he was denied due process and the right to a fair trial because the prosecution's opening statement contained inaccurate and improper

statements and misled the jury as to potential evidence.  None of the complained of remarks were objected to by the Petitioner's trial counsel.  The state habeas court found the Petitioner's claims of prosecutorial misconduct in the opening statement to be without merit.  (Resp't Ex. 16 at 61-63.)  As discussed above with regard to the closing argument, the threshold inquiry when evaluating a prosecutorial misconduct claim is to determine whether the prosecutor's remarks were improper.  However, it is not enough simply to establish that the prosecutor's remarks were "undesirable or even universally condemned."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  The Petitioner must also show that the improper remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Cargill v. Turpin, 120 F.3d 1366, 1379-80 (11th Cir. 1997) (applying standard to opening statement); United States v. Lacayo, 758 F.2d 1559, 1565 (11th Cir. 1985) (same).  Improper comments result in a denial of due process if they "were so egregious as to create a reasonable probability that the outcome was changed because of them."  Cargill, 120 F.3d at 1379 (citing Brooks, 762 F.2d at 1403).  However, as previously noted, proper comments can never render a trial unfair.  See Spivey, 207 F.3d at 1276.  The Petitioner identifies four allegedly improper and prejudicial remarks made by the prosecutor during his opening statement.

First, the Petitioner argues that the prosecutor's reference to the appointed status of his trial counsel was error because it allowed the jurors to conclude that the egregious nature of the crimes may have prevented the Petitioner from getting a lawyer on his own.  This statement came at the beginning of the prosecutor's opening statement and in the context of introducing himself to the jury.  See Cargill, 120 F.3d at 1379 ("[A] reviewing court should not assess prosecutorial comments in isolation, shorn of their context.").  Specifically, the prosecutor informed the jury that he would be representing the State along with the prosecuting investigator and, at the same time, remarked that two defense attorneys had been appointed to represent the Petitioner. (Resp't Ex. 6 at 194-95.)  It is not unreasonable to assume that the public is generally aware that attorneys may be appointed if a criminal defendant cannot afford one. Thus, simply remarking that the Petitioner's trial counsel had been appointed would not necessarily speak to the nature of the crimes or imply that the Petitioner could not find anyone willing to represent him.  Even assuming that the statement was improper, such a passing reference would not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643; see Romine v. Head, 253 F.3d 1349, 1369 (11th Cir. 2001) ("Isolated, or ambiguous or unintentional remarks must be viewed with lenity, and a brief remark is less likely to cause prejudice.") (citing Brooks, 762 F.2d at 1400, 1415).

The Petitioner also alleges that the prosecutor made misleading statements about evidence, some of which was never presented during the trial.  In particular, in the context of describing the events allegedly leading up to the murders, the prosecutor stated:

> We think the evidence is going to show that meanwhile Roger Turner, who is driving Ray Ford in the Toyota they are driving around the area . . . they realize after the last person left the store no one is there except [the victims].  At that time the evidence should reveal that Roger pulled his car up to the side of the store . . . *and he had told Ray he wasn't getting out of the car, that all he was going to do is drive him down there . . . and if Ray got stuck out there that was his problem.*

(Resp't Ex. 6 at 198) (emphasis added).  The Petitioner contends that the italicized statement was improper because the prosecutor never introduced evidence of such an agreement.  "The purpose of an opening statement is to inform the jury and the court of the nature of the case, and to give an outline of the proof the party anticipates presenting."  Parker v. State, 277 Ga. 439, 440 (2003) (internal punctuation omitted).  In doing so, the prosecutor may state what he expects to prove, provided that he has a good faith basis for believing that such evidence will be introduced during trial.  Id.; Ramirez v. State, 276 Ga. 249, 250 (2003).  Here, the prosecutor prefaced the statement at issue with the qualifier that "the evidence should reveal . . . ."  There is no evidence to suggest that the prosecutor lacked a reasonable belief that Turner would testify to making the statement to the Petitioner.  Thus, there was nothing

improper about the prosecutor's remark.  In addition, there is nothing to suggest that the comment was sufficiently prejudicial, particularly in light of the fact that defense counsel did not object to the statement, and both the prosecutor and defense counsel made clear that opening statements are not to be considered evidence, Resp't Ex. 6, at 194, 206.  Cargill, 120 F.3d at 1381.

Similarly, while describing what the State anticipated the evidence to show about the scene inside the convenience store, the prosecutor stated that: "[A]ccording to Roger Turner what we feel the evidence is going to reveal, the child eleven-year old Lisa Chapman was in the bathroom seated cowarding on a green bucket."  (Resp't Ex. 6 at 201.)  According to the Petitioner, this statement was intentionally misleading and meant to incite the jury because the prosecutor knew that Turner remained in the car and, thus, could not see and had no way of knowing the position of Chapman.  The Petitioner is correct in asserting that the prosecution knew Turner would testify that he did not enter the convenience store and did not witness what occurred inside.  However, two other witnesses, the officers that first responded to the scene, testified that Lisa Chapman was found in the bathroom and seated on a bucket.  (Resp't Ex. 6A at 557-58, 582-83.)  Therefore, although the evidence did not come from Turner, the prosecutor had more than a good faith belief that the evidence would be presented in court.  Accordingly, the remark was neither improper nor misleading.

Finally, the Petitioner claims that the prosecutor misled the jury as to the strength of the State's case by commenting that not all of the prosecution's witnesses would be called to testify. This comment was made in the context of informing the jury that the prosecution would try to keep the trial as short as possible, including not calling redundant witnesses. (Resp't Ex. 6 at 204.) It is the prosecution's prerogative whether to call all of its witnesses, and there is nothing improper about this statement. Any inferences drawn by the jury as a result of the remark are pure speculation. Because the Petitioner cannot show that the prosecutor's remarks were improper or rendered the trial fundamentally unfair, the decision of the state habeas court denying the Petitioner's claim of prosecutorial misconduct in the opening statement was neither contrary to nor an unreasonable application of clearly established federal law. The Petitioner is not entitled to habeas relief based on this claim.

L.    Claim H – Photographs

The Petitioner claims that the introduction into evidence of photographs of the victims denied him his right to due process and a fair trial. Specifically, the trial court admitted into evidence during the guilt-innocence phase a photograph of the body of Martha Matich at the crime scene (Resp't Ex. 6A at 559-60) as well as four pre-autopsy photos of the two victims that depicted the location and extent of the gunshot wounds (id. at 594-95, 601-03). According to the Petitioner, these photographs served

no other purpose than to inflame the jury and further prejudice them against the Petitioner. This same objection was made by defense counsel during the trial, and each photograph was examined by the trial judge and admitted over objection. Under Georgia law, photographs which depict the crime scene and demonstrate the location and nature of wounds to a victim are relevant and material, even if they are duplicative or tend to inflame the jury. Jackson v. State, 270 Ga. 494, 498 (1999); James v. State, 274 Ga. App. 498, 503-04 (2005) (citing Burgan v. State, 258 Ga. 512, 514 (1988)). The Petitioner argues that the photographs were unnecessary because there was no dispute as to whether and at what range the victims had been shot. However, photographs are not excludable merely because the defendant has stipulated to the cause of death. James, 274 Ga. App. at 504 (quoting Jones v. State, 253 Ga. 640, 643 (1984)).

The state habeas court determined that the photographs, although gruesome, had evidentiary value and were properly admitted by the trial court. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see Smith v. Newsome, 876 F.2d 1461, 1468 n.8 (11th Cir. 1989) ("Federal courts reviewing habeas corpus petitions are not empowered to correct erroneous evidence rulings of state trial courts."). Thus, evidentiary errors in the admission of photographs, which

are matters of state law, ordinarily will not support habeas relief.  Rather, in order for an evidentiary error to warrant habeas relief, the admission of the evidence must have rendered the proceeding fundamentally unfair.  Payne, 501 U.S. at 825 ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."); Jacobs v. Singletary, 952 F.2d 1282, 1296 (11th Cir. 1992); Smith, 876 F.2d at 1468 n.8.  "Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the defendant's conviction.  The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair."  Jacobs, 952 F.2d at 1296 (internal citations and punctuation omitted); Jameson v. Wainwright, 719 F.2d 1125, 1127 (11th Cir. 1983); see also Gonzalez v. DeTella, 127 F.3d 619, 621 (7th Cir. 1997) ("[A]dmission of 'gruesome' photos of the decedent in a murder case does not justify collateral relief, even when the evidence is cumulative and likely designed more to inflame the jury than to supply an essential underpinning of the prosecution's case.").  The five photographs, introduced mainly to corroborate the testimony of the medical examiners, served a minor role in the state's case and the Petitioner has not demonstrated how their admission adversely affected his trial.  Therefore, even if

erroneously admitted, the photographs did not render the trial fundamentally unfair. The Petitioner's claim for relief is denied.

M.    Claim I – Prosecutor's Closing Argument (Guilt-Innocence Phase)

As with the claims of prosecutorial misconduct in the opening statement and sentencing phase closing argument, the Petitioner contends that a number of statements during the prosecutor's closing argument of the guilt-innocence phase denied him due process and a fair trial.  As discussed above, a prosecutor's argument results in a denial of due process if the prosecutor's remarks were improper and, when considered in context of the entire proceeding, rendered the trial fundamentally unfair. Donnelly, 416 U.S. at 642-43; Spivey, 207 F.3d at 1275; Cargill, 120 F.3d at 1379. If the decision of the jury would have been no different, absent the comments, the proceeding cannot be deemed fundamentally unfair.  Cargill, 120 F.3d at 1379 (quoting Tucker v. Kemp, 802 F.2d 1293, 1296 (11th Cir. 1986)).  The Petitioner identifies a number of statements that were allegedly improper and prejudicial to his constitutional rights.  (Am. Petition ¶¶ 85-93.)  The same allegations were asserted in his state habeas petition.  That court found no constitutional error in the prosecutor's closing argument during the guilt-innocence phase.

The state habeas court correctly stated that a prosecutorial misconduct claim requires proof that the argument was improper and rendered the proceeding

fundamentally unfair.  (Resp't Ex. 16 at 44-45.)  Thus, the proper inquiry here is

whether the state habeas court relied on an objectively unreasonable application of

clearly established federal law or determination of facts in denying the Petitioner's

claim.  In holding that the closing argument was neither improper nor harmful, the

state habeas court thoroughly addressed the allegedly improper statements as follows:

> Petitioner alleges that the prosecutor should not have characterized the crimes as "horrendous' and an "execution," or Petitioner as a "manipulator", "arrogant", "weaseling" and a "cowboy," or the defense argument as "muddying the waters."  Attorneys may, however use figurative speech in closing arguments.  Stancil v. State, 158 Ga. App. 147, 148, 279 S.E.2d 457 (1981).  These comments were not so inflammatory or prejudicial that Petitioner was denied a fair trial, or that the validity of the verdict is now questionable because of the comments.

> Petitioner complains that arguments concerning the credibility of Petitioner's testimony or his exculpatory evidence were inappropriate comments on Petitioner's presumption of innocence and right against self-incrimination.[27]  Once Petitioner testified, however, he waived his right to silence and his testimony could be weighed (and attacked) as any other witness.  Carter v. State, 161 Ga. App. 734, 736, 288 S.E.2d 749, 751 (1982) ("A defendant in a criminal case who voluntarily testifies in

---

[27]As part of his claim that the closing argument undermined the presumption of innocence and his Fifth Amendment right, the Petitioner points to the fact that the prosecutor commented on defense counsel's decision not to call certain witnesses. (Am. Petition ¶ 90.)  Although the state habeas court did not explicitly address the claim in this context, it later rejected the argument as meritless.  (Resp't Ex. 16 at 51.) This Court agrees.  "A comment on the failure of the *defense*, as opposed to that of the *defendant*, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege."  Duncan v. Stynchcombe, 704 F.2d 1213, 1215-16 (11th Cir. 1983); see also Sinkfield v. State, 266 Ga. 726, 728 (1996).

his own behalf, waives completely his privilege under the Fifth Amendment. Furthermore, when a defendant voluntarily takes the stand in his own behalf and testifies as to his guilt or innocence as to a particular offense, his waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.").

Petitioner also cites as error argument by the district attorney concerning events leading up to the murders, and a phone conversation with Petitioner's mother after the murders. There is evidence in the record to support the inference that Petitioner did solicit more than one person to assist in the robbery and did alter his story over time. Likewise, whether or not Petitioner was intoxicated at the time of his conversation was also a contested matter that the State could argue.

The district attorney was also at liberty to argue the State's interpretation of Petitioner's statement that Lisa Chapman would not have been killed if she had not been in the store. The statement is a matter of record introduced by one of the law enforcement agents, and acknowledged and explained by Petitioner. (T. Trans. at 485-86; 796-97). While the district attorney did refer to a Frito-Lay display box that was not admitted into evidence, the Court finds that there was only a reference to the box and not argument concerning the bullet trajectory for which it had originally been offered. (T. Trans. at 889). Therefore, no improper argument was made on these points.

The Court has reviewed the Prosecutor's argument distinguishing felony and malice murder. (T. Trans. at 884-85; 913-14). The Court finds that this argument was legally correct and proper. Whether or not the district attorney argued the law correctly, however, is irrelevant since the trial judge's charged on the legal issues superseded any comments made by the attorneys regarding the law.

Petitioner argues that the Prosecutor's statement that "these victims deserve" for the jury to look at the autopsy photographs, made while he described the relevant evidence that could be ascertained from the photographs, was improper. (T. Trans. at 890). Petitioner also contends that the Prosecutor's comment on Petitioner's objection to admission of

his custodial statements was improper.  (T. Trans. at 906).  The Court
finds that these arguments could be fairly inferred from and related to the
evidence.  Further, they are not so inflammatory that they call the
impartiality of the jury's verdict into question when taken in context of
the entire argument.  There was no constitutional error committed in
these arguments.

(Id. at 45-48.)

The Petitioner does not present any particular argument as to how the state
habeas court's holding was an unreasonable application of federal law.  After
independently reviewing the trial record and the habeas record, this Court cannot
conclude that the state habeas court's denial of habeas relief based on the prosecutor's
closing argument during the guilt-innocence phase was contrary to or involved an
unreasonable application of clearly established federal law.  In reaching this
conclusion, the Court notes that the Petitioner's trial counsel did not object to the
State's closing argument.  (Resp't Ex. 6A at 994.)  The Eleventh Circuit has stated
that the lack of an objection "may demonstrate defense counsel's belief that the live
argument, despite its appearance in a cold record, was not overly damaging" and, thus,
weighs against a determination that the argument was in fact prejudicial.  Cargill, 120
F.3d at 1379, 1381.  The statements made during the prosecution's closing argument
were proper and, furthermore, the Petitioner has not shown a reasonable probability
that the arguments changed the outcome of the case. Accordingly, the Court denies
habeas relief based on this claim.

N.    Claim J – Improper Jury Instructions (Guilt-Innocence Phase)

The Petitioner argues that the trial court's improper jury charge during the guilt-innocence phase and its failure to give critical instructions requested by the Petitioner violated his right to due process and a fair trial.   However, the Petitioner's trial counsel did not expressly object to any of the instructions given by the trial court. (Resp't Ex. 6A at 944-45.)  And, as the Supreme Court has noted, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."  Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  The state habeas court declined to grant relief based on this claim, finding that the charges given by the trial court were proper statements of the law and were not constitutionally infirm.  The court further found that the trial court's failure to give certain requested charges was not error.  As the Supreme Court has made clear, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Rather, in order to warrant habeas relief, the Petitioner faces a substantial burden and must establish that the erroneous instruction given by the trial court was so prejudicial that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Kibbe, 431 U.S. at 154.  It is not enough to show merely that the instruction was "undesirable, erroneous, or even universally condemned."  Id.

Moreover, a challenged instruction should not be viewed in isolation but in the context of the entire charge as well as the entire trial record.  Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); Parker v. Secretary for the Dep't of Corr., 331 F.3d 764, 779 (11th Cir. 2003) (citing Estelle, 502 U.S. at 72; Agan v. Vaughn, 119 F.3d 1538, 1545 (11th Cir. 1997)).  The Petitioner faces an even heavier burden with regard to his claims that the trial court failed to give certain instructions or gave incomplete instructions because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Kibbe, 431 U.S. at 155; Parker, 331 F.3d at 779.

####    1.    Presumption of Innocence

The Petitioner challenges a number of the trial court's instructions.  First, he contends that the trial court failed to give proper weight to the presumption of innocence by stating that "the plea of not guilty entered by the defendant to the indictment is not evidence of innocence; that is simply the manner in which the issue is joined and presented to you for your decision."  (Resp't Ex. 6A at 919.)  The trial court expressly instructed the jury that the defendant is presumed innocent and that the presumption remains with the defendant until and unless it is overcome by evidence sufficient to establish his guilt beyond a reasonable doubt.  (Id. at 919-20.)  Moreover, the challenged statement was made in the context of explaining that the burden rests on the State to prove beyond a reasonable doubt all elements of the

crimes charged against the Petitioner and that the plea of not guilty, like the

indictment, is not to be considered evidence.  (Id. at 918-19.)  The Petitioner's claim

is without merit.

### 2.    Reasonable Doubt

The Petitioner also challenges the trial court's instructions on reasonable doubt.

The trial court charged the jury as follows:

> *A reasonable doubt is just what the term implies.  It is a doubt based*
> *upon reason.  It is not a fancy or a conjecture or a supposition that the*
> *defendant might be innocent*, but is just such a doubt as a reasonable man
> or woman would have and would act upon or decline to act upon in a
> matter of importance or of grave concern to himself or herself.  In other
> words, it is the doubt of a fair minded, impartial juror honestly seeking
> the truth and it may arise from a consideration of the evidence or from
> a lack of evidence.

(Resp't Ex. 6A at 920) (emphasis added).  According to the Petitioner, the emphasized

portion improperly implied that the defendant had the burden of proving his innocence

beyond a reasonable doubt.  The wording of this particular sentence may not be the

picture of clarity, but what is clear is the fact that the trial court repeatedly instructed

the jury that the burden rests upon the *State* to prove *guilt* beyond a reasonable doubt.

(Id. at 918-20.)  The Petitioner also contends that the trial court lessened the State's

burden of proof by implying that the jury need only be convinced beyond mere

"conjecture."  The Petitioner, however, seems to ignore the fact that the trial court

specifically stated that reasonable doubt is *not* simply conjecture.  The trial court's

instruction, taken as a whole, accurately conveyed the concept of reasonable doubt, and the Petitioner's claim is without merit.  See Victor v. Nebraska, 511 U.S. 1, 20 (1994) (holding constitutional instruction stating that "[a] reasonable doubt is an actual and substantial doubt . . . as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.").  The Petitioner is not entitled to relief based on this claim.

　　　　3.　Custodial Statement

　　　The Petitioner next asserts that the trial court's instruction regarding the voluntariness and admissibility of his custodial statement was inadequate.  The trial court instructed the jury that before it could consider as evidence the Petitioner's statements made while in custody, it must determine whether he was advised of his constitutional rights, whether he knowingly and voluntarily waived them, and whether his statement was freely and voluntarily given. (Resp't Ex. 6A at 926.) The court also explained that if the Petitioner exercised his rights by requesting an attorney, the police could not question him further without an attorney present, "unless the defendant himself freely and voluntarily requests and initiates further conversations with the police without an attorney being present." (Id. at 927.)  The court further instructed the jury that any statement made after an invocation of the right to counsel must be disregarded if the police, and not the Petitioner, initiated or continued the

conversation.[28]  (Id.)  The state habeas court found this to be a proper statement of law, and this Court agrees.  Habeas relief is not warranted.

    4. <u>Statements by Defendant</u>

  The Petitioner challenges another instruction given in connection with the charge regarding the defendant's custodial statement.  Specifically, the Petitioner claims that the trial court improperly gave a prejudicial instruction when it encouraged the jury to "consider with great care and caution the evidence of any statement made by the defendant."  (Resp't Ex. 6A at 929.)  According to the Petitioner, a reasonable juror could construe this as indicating that the jury should presume the defendant's testimony to be untrue.  However, the Petitioner takes the statement out of context.  The entirety of this instruction, given immediately following the charge on the voluntariness of the custodial statement, was as follows:

> You should consider with great care and caution the evidence of any statement made by the defendant.  The jury may believe any statement in whole or in part, believing that which they find to be true and rejecting that which they find to be untrue.  Upon you alone rests the duty protesting the believability of witnesses and to decide what weight should be given to all or any part of any such evidence.

---

[28]During the charge conference, the judge paraphrased his charge as to the custodial statement and invocation of the right to counsel.  Defense counsel made no objection to or commented on the validity of the charge.  (Resp't Ex. 6A at 819-20.)

(Resp't Ex. 6A at 929.)  The instruction as a whole does not imply that the Petitioner's testimony was to be disbelieved.  Moreover, the language of the trial court's charge is substantially similar to that contained in the Petitioner's Request to Charge 7. (Resp't Ex. 2 at 104 ("I charge you that an alleged statement by the Defendant was admitted in evidence.  You should consider with great caution the evidence of any admission.  The jury may believe admissions or incriminating statements in whole or in part, believing that which they find to be true and rejecting that which they find to be untrue.").)  The Petitioner's claim is without merit.

5.     Accomplice Testimony

The Petitioner next argues that the trial court improperly instructed the jury regarding testimony of an accomplice and the need for corroborating evidence.  The trial court explained that "a person accused of crime cannot be convicted on the testimony of an accomplice unless such testimony is supported by other evidence connecting the accused with the alleged crime and tending to show his participation therein . . . ."  (Resp't Ex. 6A at 929-30.)  The court further explained that whether a witness was in fact an accomplice and, thus by implication, whether corroborating evidence was necessary, was a determination to be made by the jury.  These are correct statements of Georgia law.  See O.C.G.A. § 24-4-8; Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II, Part 3, ¶ 208.40 CC

(2d ed.1991).  Nevertheless, the Petitioner argues that by stating that "[t]he Court does not intimate to you that there is or that there is not any testimony of an accomplice in this case," Resp't Ex. 6A at 930, the trial court improperly emphasized a finding that Turner was not an accomplice.  This contention is in no way supported by, and is in fact contradicted by, the trial court's statement.  The state habeas court's finding of no constitutional error was correct and the Petitioner's claim is properly denied.

> 6.   <u>Malice</u>

The trial court charged the jury that "[m]alice may be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."  (Resp't Ex. 6A at 932.)  According to the Petitioner, this charge impermissibly allowed the jury to presume intent, in violation of <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979).  In <u>Sandstrom</u>, the Supreme Court held that a jury instruction is unconstitutional if it includes a presumption that shifts the burden of persuasion regarding the element of intent from the government to the defendant.  <u>Sandstrom</u>, 442 U.S. at 524.  The threshold inquiry in determining whether a jury instruction impermissibly shifts the burden of proof is whether the instruction is a permissive inference or a mandatory presumption.  <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1509 (11th Cir. 1995) (<u>citing</u> <u>Francis v. Franklin</u>, 471 U.S. 307, 313-14 (1985)).

Here, the instruction given by the trial court did not create an unconstitutional mandatory presumption of intent but rather a permissive inference.  A permissive inference "merely allows an inference to be drawn and is constitutional so long as the inference would not be irrational."  Baxter, 45 F.3d at 1509 (quoting Yates v. Evatt, 500 U.S. 391, 402 n.1 (1991)).  By stating that malice "may be" implied, the instruction simply allowed the jury to draw the inference of malice after consideration of the circumstances surrounding the commission of the offense.  See Lamb v. Jernigan, 683 F.2d 1332, 1340 (11th Cir. 1982) ("abandoned and malignant heart" instruction "is really a directive to the jury that the finding of malice must often be based entirely on circumstantial evidence-that it is not entitled to refuse to find malice solely because direct evidence of malicious intent is lacking."); see also Jenkins v. Byrd, 103 F. Supp. 2d 1350, 1365 (S.D. Ga. 2000).  Nowhere in the instruction was there an indication that the Petitioner was required to come forward with any evidence to rebut a presumption or inference of malice.

Moreover, when considered in the full context of the charge, the challenged statement did not impermissibly shift the burden.  The trial court explained that "[a]n accused person will not be presumed to have acted with criminal intention," Resp't Ex. 6A at 931, and clearly instructed the jury that intent to kill is an element of malice.  (Resp't Ex. 6A at 932 ("Malice in it's legal sense is not necessarily ill will or hatred.

It is the unlawful, deliberate intention to kill a human being without justification or excuse, which intention must exist at the time of the killing.").) Accordingly, the trial court charged the jury: "It is for you to decide whether or not the facts and circumstances of this case show malice." (Id.) In addition, the court specifically instructed the jury that the State bears the burden of proving each element of a crime beyond a reasonable doubt. Thus, this Court finds that the state habeas court's decision that the malice charge did not violate Sandstrom was not contrary to or an unreasonable application of clearly established federal law. Habeas relief is not warranted based on this instruction.[29]

### 7.   Elements of Crimes Charged

The Petitioner also contends that the trial court failed to give certain required and requested instructions. First, the Petitioner maintains that the trial court failed to charge the jury as to the State's obligation to prove beyond a reasonable doubt each

_____

[29]Additionally, as correctly decided by the state habeas court, even if the instruction violated Sandstrom, it was harmless error. See Rose v. Clark, 478 U.S. 570, 580-82 (1986) (applying harmless error standard to jury instruction that violated Sandstrom); Bowen v. Kemp, 832 F.2d 546, 548-49 (11th Cir. 1987) (en banc). The sole question at trial was whether the Petitioner committed the murders, not whether he acted with any particular intent. Thus, intent was not "at issue" and any error in the malice instruction would be harmless. Bowen, 832 F.2d at 549 (citing Davis v. Kemp, 752 F.2d 1515, 1521 (11th Cir. 1985) (en banc); see also Hill v. Kemp, 833 F.2d 927, 930 (11th Cir. 1987) (Sandstrom violation harmless error when alibi is defense and only dispute is identity of defendant).

of the elements of the crimes charged and failed to instruct the jury as to the elements of armed robbery and burglary.  As previously discussed, however, the trial court specifically charged the jury regarding the State's burden.  (Resp't Ex. 6A at 918) ("[T]he burden is upon the State to prove beyond a reasonable doubt all of the material elements and allegations of each of the crimes charged in order for you to find the defendant guilty of such crime.")  In addition, the trial court's instructions regarding armed robbery and burglary (Resp't Ex. 6A at 937, 940-41) mirror the language of the Georgia statutes defining these crimes.  See O.C.G.A. § 16-8-41(a) (armed robbery); O.C.G.A. § 16-7-1 (burglary); see also O.C.G.A. § 16-8-2 (theft by taking).  Similarly, the Petitioner claims that the trial court failed to distinguish properly between felony murder and malice murder.  The state habeas court determined that the trial court properly charged the jury regarding these crimes, and this Court will defer to that determination.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

8.   <u>Voluntary Intoxication</u>

Finally, the Petitioner contends that the trial court failed to give his requested charges regarding: (1) the effect of voluntary intoxication on criminal intent; and (2) voluntary and involuntary manslaughter.  As noted above, in instances where a

petitioner seeks habeas relief based on a court's failure to give an instruction, the burden of proof is "especially heavy" because omissions are less likely to be prejudicial than substantive misstatements of the law.  Kibbe, 431 U.S. at 155.  The Petitioner has not met his burden in either instance.  The Petitioner alleges error based on the fact that the trial court failed to charge the jury on voluntary intoxication and the formation of criminal intent.  But, there is nothing in the record to suggest that the Petitioner ever requested that such a charge be given.  (See Resp't Ex. 2, at 97-118; Resp't Ex. 6A, at 820-35.)  However, even if the charge had been requested, its omission by the trial court was not unconstitutional.  First, although voluntary intoxication was not mentioned, the trial court properly instructed the jury that in connection with criminal intent, it should consider "words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." (Resp't Ex. 6A at 931, 938, 941.)  Moreover, Georgia law provides that voluntary intoxication is not an excuse for a criminal act.  O.C.G.A § 16-3-4(c); Haywood v. State, 256 Ga. 694, 696 (1987).  Accordingly, a trial court is not required to charge the jury that a defendant should not be held criminally responsible if he was intoxicated to the point where he could not form the requisite intent for the crimes. Foster v. State, 258 Ga. 736, 745 (1988); Sydenstricker v. State, 209 Ga. App. 418, 420 (1993); Franklin v. State, 183 Ga. App. 58, 59 (1987).  Thus, the state habeas

court correctly concluded that there was no error in the trial court's failure to give the charge and the Petitioner's claim fails.

9.   <u>Manslaughter</u>

The Petitioner contends that the trial court's failure to charge the jury on voluntary and involuntary manslaughter violated his constitutional rights, as set forth in <u>Beck v. Alabama</u>, 447 U.S. 625 (1980).  In <u>Beck</u>, the Supreme Court held that a capital defendant cannot receive a death sentence if the trial court prohibits the jury from considering a verdict of guilt on a lesser-included, noncapital offense.  <u>Beck</u>, 447 U.S. at 637-38.  However, this applies only in cases where the evidence presented at trial supports such a verdict.  <u>Hopper v. Evans</u>, 456 U.S. 605, 610-11 (1982);  <u>Beck</u>, 447 U.S. at 635-36; <u>Walker v. Jones</u>, 10 F.3d 1569, 1573 (11th Cir. 1994).  Thus, a lesser-included offense instruction should be given only "if the evidence would permit a jury rationally to find a defendant guilty of the lesser included offense and acquit him of the greater."  <u>Evans</u>, 456 U.S. at 612 (<u>quoting</u> <u>Keeble v. United States</u>, 412 U.S. 205, 208 (1973)) (internal punctuation omitted); <u>see also</u> <u>Hall v. Head</u>, 310 F.3d 683, 695 (11th Cir. 2002) ("[A]t least some evidence must support the charge of voluntary manslaughter before it is required.").

In Georgia, in order to warrant a charge on voluntary manslaughter, the evidence must show that the defendant was acting solely "as the result of a sudden,

violent, and irresistible passion resulting from serious provocation sufficient to excite
such passion in a reasonable person."  O.C.G.A. § 16-5-2(a).  The Petitioner makes
a conclusory argument that the circumstances under which he allegedly killed his ex-
girlfriend could have constituted "heat of passion."  However, to the contrary, the
State introduced substantial evidence that the Petitioner contemplated killing Martha
Matich for a number of weeks before the murders, including evidence that he
approached several people, the day before and the day of the murders, for a ride to the
convenience store where Matich worked.  See Ford v. Georgia, 257 Ga. at 462.  None
of this evidence is indicative of the serious provocation or sudden, excited passion
necessary to warrant a charge on voluntary manslaughter.  Accordingly, the trial court
found no evidence in the record to suggest that the Petitioner acted out of "a sudden,
violent, and irresistible passion resulting from serious provocation."  With regard to
involuntary manslaughter, the Petitioner initially requested a charge on involuntary
manslaughter in the commission of an unlawful act and involuntary manslaughter in
the commission of a lawful act.  See O.C.G.A. § 16-5-3.  However, during the charge
conference, the Petitioner's trial counsel conceded that the evidence did not support
either charge.  (Resp't Ex. 6A at 823-24, 826.)  The state habeas court agreed.  "A
federal court must follow a state court's decision as to whether a defendant could be
convicted legally of a lesser included offense in deciding whether the failure to give

a lesser included offense charge violates the Constitution." <u>Hill</u>, 833 F.2d at 929. After an independent review of the record, this Court sees no reason not to afford such deference to the state habeas court's determinations and, thus, habeas relief based on the trial court's failure to give the voluntary and involuntary manslaughter charges is unwarranted.

  O. <u>Claim K – Knowing Presentation of False Testimony (Brady/Giglio)</u>

  The Petitioner contends that the prosecutor knowingly presented false testimony, or at least allowed false testimony to go uncorrected, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Specifically, the Petitioner alleges that a number of law enforcement officers testified falsely regarding what occurred when Roger Turner was brought into the Petitioner's interrogation room, following Turner's admission of involvement in the crimes. As discussed in connection with the Petitioner's claim regarding Turner's plea agreement, the Supreme Court has clearly established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (<u>citing</u> <u>Giglio</u>, 405 U.S. at 154; <u>Napue v. Illinois</u>, 360 U.S. 264, 271 (1959); <u>see also</u> <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935). The same rule applies when the State does not solicit the false

testimony but allows it to go uncorrected.  <u>Napue</u>, 360 U.S. at 269.  In either case, the false testimony must have been material.  <u>Giglio</u>, 405 U.S. at 154.  Therefore, "[i]n order to prevail on a <u>Giglio</u> claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."  <u>Ventura v. Attorney General, Fla.</u>, 419 F.3d 1269, 1277 (11th Cir. 2005)  (quoting <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1339 (11th Cir. 1999)).  The state habeas court found that the Petitioner had not proven that the testimony of the officers was untruthful and, furthermore, found no merit to the contention that the prosecutor knowingly allowed perjured testimony.  (Resp't Ex. 16 at 60.)

During trial, the four officers who were present during the interrogation room encounter[30] each testified that when Turner was brought into the room, he informed the Petitioner that he had told the truth about what happened the night of the murders.  (Resp't Ex. 6 at 482, 516; Resp't Ex. 6A at 546-47, 572.)  According to the officers, the Petitioner responded that Turner should not worry because the Petitioner would testify that Turner was not involved in the murders.  (Resp't Ex. 6 at 482, 509, 516-18; Resp't Ex. 6A, at 547-48, 573.)  The Petitioner argues that this testimony is

---

[30]G.B.I. Investigators Gary Nicholson and David Bartlett and Newton County Sheriff's Investigators Wardell Reed and Ezell Brown.

contradicted by an affidavit of Roger Turner submitted during the state habeas proceeding in 1992.  In his affidavit, Turner stated:

> After I had been interrogated for quite some time, I was taken to the room where Ray Ford was being interrogated.  After I was brought into the room, I was asked by one of the officers to tell Ray whether or not I had made a statement.  I indicated to Ray that I had made a statement to the GBI.  Ray was sitting down with his head in his hands.  He didn't look up.  The same officer then asked Ray if he wanted to make a statement.  Ray said "no".  After that I was escorted out of the room and did not see Ray again that day.  At no time did Ray say anything other than the word "no" while I was in his presence in the interrogation room.

(Resp't Ex. 17, Plaintiff's Ex. 15 ¶ 3.)  Although he relied on Turner's affidavit to establish the alleged falsity of the officers' testimony, even the Petitioner's trial testimony was not consistent with Turner's affidavit.  Rather than claiming that he had remained silent during the encounter, as Turner testified, the Petitioner testified to making a few comments to Turner in the interrogation room.  In particular, the Petitioner testified that he told Turner he was sorry he had gotten him involved, that everything would be alright, and that he should cover his a--.  (Resp't Ex. 6A at 737-38, 787-88, 799.)

The Petitioner must show conclusively that the statements of the four law enforcement officers were actually false.  Maharaj v. Secretary for Dep't of Corr., 432 F.3d 1292, 1313 (11th Cir. 2005).  He has failed to do so.  Simply pointing to a conflict in testimony does not conclusively establish that perjury occurred and in no

way proves that the prosecutor suborned perjury.  Given that the four officers testified

consistently and that their accounts were in part  supported by the Petitioner's own

testimony, it was not unreasonable for the state habeas court to find that the Petitioner

failed to prove that the officers' testimony was false based solely on an affidavit given

approximately six years after the fact.  Accordingly, the state habeas court's resolution

of the Petitioner's <u>Brady</u> and <u>Giglio</u> claim was neither contrary to nor an unreasonable

application of clearly established federal law.

     P.    <u>Claim L – Unlawful Use of Peremptory Strikes (Batson)</u>

The Petitioner alleges that the prosecutor violated the mandate of <u>Batson v.</u>

<u>Kentucky</u>, 476 U.S. 79 (1986), by using peremptory challenges in a racially

discriminatory manner.  Specifically, the Petitioner, a white defendant, asserts that the

prosecutor unconstitutionally used seven of his nine peremptory challenges to remove

African-Americans from the jury.  The state habeas court denied this claim, stating

that <u>Batson</u> did not apply to the Petitioner at the time of his trial.  This decision was

not contrary to or an unreasonable application of federal law.

In <u>Batson</u>, the Supreme Court held that an African-American defendant stated

an Equal Protection claim based on allegations that the prosecutor exercised

peremptory strikes in a manner allegedly intended to exclude African-Americans from

serving on the jury in a systematic manner.  <u>Batson</u>, 476 U.S. at 96-98.  In reaching

this holding, the Supreme Court stated that in order to establish such a claim, "the defendant must first show that he is a member of a cognizable racial group, and *that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race*." Id. at 96 (emphasis added) (internal citations omitted). Thus, Batson unambiguously limited its application to peremptory strikes of jurors of the same race as the defendant. See Farrell v. Davis, 3 F.3d 370, 372 (11th Cir. 1993); United States v. Rodriguez-Cardenas, 866 F.2d 390, 392 (11th Cir. 1989). In Powers v. Ohio, 499 U.S. 400 (1991), the Supreme Court extended Batson and held that an Equal Protection claim arising out of the discriminatory use of peremptory challenges does not require racial identity between the defendant and the venire persons allegedly discriminated against. However, Powers, a noticeable departure from the racial identity limitation imposed in Batson, was decided three years after the Petitioner's conviction became final. Therefore, because the rule announced in Powers was not "dictated" by precedent established at the time the Petitioner's conviction became final, it is deemed a "new rule" under Teague v. Lane, 489 U.S. 288, 301 (1989), and cannot be applied retroactively on collateral review. Fortenberry v. Haley, 297 F.3d 1213, 1221 (11th Cir. 2002) (citing Farrell, 3 F.3d at 372); Coe v. Bell, 161 F.3d 320, 353 (6th Cir. 1998); Nguyen v. Reynolds, 131 F.3d 1340, 1351-52 (10th Cir. 1997); Jones v. Gomez, 66 F.3d 199, 202-03 (9th Cir. 1995);

Van Daalwyk v. United States, 21 F.3d 179, 180-83 (7th Cir. 1994); cf. Allen v. Hardy, 478 U.S. 255, 257-61 (1986) (Batson, an "explicit and substantial break with prior precedent," does not apply retroactively on collateral review)).  Accordingly, the decision of the state habeas court in denying the Petitioner's Batson claim was neither contrary to nor an unreasonable application of clearly established federal law.

    Q.    Claim O – Improper Jury Instructions (Sentencing Phase)

As discussed above with regard to Claim J, an erroneous jury instruction warrants habeas relief only when, viewed in the context of the entire charge, "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154.  The Petitioner contends that the trial court's sentencing phase charge violated due process because the trial court: (1) improperly instructed the jury that its sentencing verdict must be unanimous; and (2) failed to instruct the jury properly as to the elements of two statutory aggravating circumstances: armed robbery and burglary.  The state habeas court found the Petitioner's claim to be without merit.

With regard to its sentencing verdict, the trial court instructed the jury, in relevant part:

> The law provides that when a person is convicted of a crime which may be punishable by death, a sentence of death shall not be imposed unless the jury unanimously finds beyond a reasonable doubt that at least one

statutory aggravating circumstance was present, designates such findings in writing, signed by the foreperson and fixes the penalty as death.

If the jury fixes the penalty as death, the defendant shall be sentenced to death.  If the jury fixes the penalty as life imprisonment, the defendant shall be sentenced to life imprisonment.  The decision is one entirely for the jury to make and the jury may in any event, regardless of it's [sic] findings as to aggravating or mitigating circumstances, fix the penalty as life imprisonment.

. . .

If you decide to fix the penalty as death, the foreperson will write on line four below we unanimously fix the penalty as death.  If you decide to fix the penalty as life imprisonment the foreperson will write on line four below we unanimously fix the penalty as life imprisonment . . . .

Whatever your verdict is it must be unanimous . . . .

(Resp't Ex. 6A at 1060-61, 1066-67.)  Under Georgia law, life imprisonment or the death penalty are the only two sentences that can be imposed following a conviction for murder, and "if the convicting jury is unable to agree on which of those two sentences to impose, the trial judge must impose the lesser, life imprisonment."  Hill v. State, 250 Ga. 821 (1983).  As such, the Petitioner argues that the trial court erred in instructing the jury that a life imprisonment sentence required a unanimous verdict because only a death sentence requires unanimity.  As the state habeas court found, the Petitioner's contention is an incorrect statement of Georgia law.  Catchings v. State, 256 Ga. 241, 250 (1986).  Rather, Georgia law provides that "a jury is expected to review the evidence and to endeavor to reach unanimity 'one way or the other' on

the question of sentence, and, if possible, to affirmatively and unanimously recommend either death or mercy." Romine v. State, 256 Ga. 521, 525 (1986) (citations omitted). Because the instruction was not erroneous, the state habeas court was correct in denying the Petitioner's claim and habeas relief is not warranted.

With regard to statutory aggravating circumstances, the trial court instructed the jury as to the specific aggravating factors that it could consider in reaching its verdict. In particular, the trial court advised the jury that it could find the existence of a statutory aggravating circumstance if it determined, beyond a reasonable doubt, that either murder was committed while the Petitioner was in the commission of armed robbery or burglary. The Petitioner contends that the charge regarding these statutory aggravating circumstances was deficient because the trial court did not instruct the jury as to the elements of the offenses and, therefore, impermissibly reduced the State's burden of proof. The Petitioner does not allege that the instructions given by the trial court were substantively erroneous, just that they were incomplete. Generally, the possibility of prejudice is slight under such circumstances. Adams v. Wainwright, 764 F.2d 1356, 1364-65 (11th Cir. 1985) (incomplete jury instruction regarding elements of statutory aggravating factors not constitutional error) (citing Kibbe, 431 U.S. at 155). That is even more so here where the state habeas court found that armed robbery and burglary had been fully charged during the guilt-

innocence phase and, thus, the trial court was not required to instruct the jury as to the elements again.[31]  See Rivers v. State, 250 Ga. 303, 310 (1982); Cofield v. State, 247 Ga. 98, 113 (1981).   Accordingly, the trial court's failure to instruct the jury specifically as to the element of ownership during the sentencing phase did not so infect the sentencing proceeding that the sentence ultimately imposed violates due process.  The Petitioner is not entitled to relief based on this claim.

R.    Claim Q – Unified Appeal Procedure

The Petitioner challenges Georgia's Unified Appeal Procedure ("UAP"), O.C.G.A. § 17-10-36, arguing that it violates his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  The UAP sets forth rules promulgated by the Georgia Supreme Court that prescribe procedures to be utilized in death penalty cases by the trial court, defense counsel, and the prosecutor prior to, during, and after trial.  The procedures were established to prevent or correct errors in the proceedings and to ensure that the defense raises, or expressly waives, all matters that can be raised prior to trial. Buttrum v. Black, 721 F. Supp. 1268, 1306 (N.D. Ga. 1989), aff'd, 908 F.2d 695 (11th Cir. 1990).   One such procedure requires the trial court to hold conferences with defense counsel and the prosecutor where the court inquires whether the defense will raise various issues or whether they will be waived.  The Petitioner contends that this

_____

[31]Furthermore, the jury had already found the Petitioner guilty on both counts.

procedure violates due process because it "upsets the balance of power between the state and the accused in the adversarial system." (Am. Petition ¶ 162.) The Petitioner argues that the UAP violates a defendant's right to silence because it requires the defendant to respond to the court's inquiries regarding his satisfaction with defense counsel and the manner in which his defense is being conducted.  The Petitioner also contends that the procedure violates his right to counsel by: (1) asking counsel to identify which issues will or will not be raised, which allegedly discloses trial strategy; (2) asking the defendant during the course of trial whether he is satisfied with counsel, without providing independent counsel to assist him in making this judgment; and (3) thrusting the court directly into the attorney-client relationship.  Lastly, the Petitioner argues that the UAP violates the Equal Protection Clause because it applies only in capital cases.  Noting that the procedures were enacted for the benefit and not the detriment of a defendant, the Georgia Supreme Court has addressed these challenges on numerous occasions and found the UAP to be constitutional.  See, e.g., Jackson v. State, 270 Ga. 494, 498-99 (1999); Ledford v. State, 264 Ga. 60, 65 (1994); Rogers v. State, 256 Ga. 139, 146 (1986); Sliger v. State, 248 Ga. 316, 318-19 (1981); see also Putman v. Turpin, 53 F. Supp. 2d 1285, 1304 (M.D. Ga. 1999); Buttrum, 721 F. Supp. at 1306.  The Petitioner has not identified any Supreme Court precedent in support of his argument that the UAP is unconstitutional.  Therefore, the state habeas

court's holding was neither contrary to nor an unreasonable application of clearly established federal law, and the Petitioner's claim is properly denied.

S.    Claim R – Failure to Conduct Competency Hearing

The Petitioner alleges that the trial court violated his procedural due process rights by failing to conduct, sua sponte, a competency hearing.  The Due Process Clause prohibits the state from trying and convicting a mentally incompetent defendant.  Drope v. Missouri, 420 U.S. 162, 171 (1975); James v. Singletary, 957 F.2d 1562, 1569 (11th Cir. 1992) (citing Pate v. Robinson, 383 U.S. 375, 384-86 (1966); Dusky v. United States, 362 U.S. 402 (1960)).  A defendant's competence to stand trial depends on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him."  Drope, 420 U.S. at 172 (quoting Dusky, 362 U.S. at 402).  In Pate v. Robinson, the Supreme Court established that due process requires a trial court to conduct a competency hearing, on its own initiative, when the objective facts known to the trial court at the time create a "bona fide doubt" as to the criminal defendant's competency.  Pate, 383 U.S. at 385; Wright v. Secretary for the Dep't of Corr., 278 F.3d 1245, 1256 (11th Cir. 2002); Fallada v. Dugger, 819 F.2d 1564, 1568 (11th Cir. 1987); see also Williams v. Bordenkircher, 696 F.2d 464, 467 (6th Cir. 1983) (standard of review is "[w]hether

a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial").   Relevant factors to consider when assessing whether there existed a bona fide doubt regarding competency include: (1) a defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial.   Drope, 420 U.S. at 180; Fallada, 819 F.2d at 1568.

The Petitioner argues that a bona fide doubt as to his competence to stand trial arose out of a statement he made at a pretrial hearing.   During the pretrial hearing, the trial court addressed a number of the Petitioner's motions, including motions for fees to hire independent experts, motion for change of venue, motion to sever offenses, and motions relating to voir dire.   (Am. Petition ¶ 171; Resp't Ex. 4.)   At the conclusion of the hearing, the trial judge posed the following question to the Petitioner: "Mr. Ford, do you understand what is taking place here today?"   The Petitioner responded: "I understand about half of it."   (Resp't Ex. 4 at 33.)   According to the Petitioner, his response that he only understood "about half" of what transpired during the hearing was evidence of his inability to comprehend the proceedings and was sufficient to create a bona fide doubt regarding his mental competence.   The state habeas court found that:

> [A] proper reading of this statement in context with the hearing, which involved   extensive   legal   argument,   does   not   indicate   mental

> incompetence, but rather a layman's inability to fully comprehend the
> jargon and principles of the law.  No violation of constitutional rights
> occurred when neither defense counsel nor the trial court pursued the
> comment.

(Resp't Ex. 16 at 43-44.)  This conclusion was not contrary to or an unreasonable

application of the clearly established federal law set forth in Dusky, Pate, and Drope.

It was not unreasonable of the state habeas court to conclude that the Petitioner's

statement simply demonstrated a lack of complete understanding of legal argument

intricacies, rather than a lack of a rational or factual understanding of the proceedings.

Moreover, the Petitioner has not presented any evidence of irrational behavior or

evidence that his demeanor during the hearing should have created doubt regarding

his competence.   See Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995)

(petitioner's burden to show that objective facts were sufficient to raise bona fide

doubt regarding competency).   In addition, it appears from the record that the

Petitioner had undergone a psychological examination, at least one month prior to the

hearing, by Dr. Donald W. Smith, who issued a report to the trial court that the

Petitioner was competent to stand trial.[32]  (Resp't Ex. 6 at 11-12, 15-16.)  Based upon

---

[32]Prior to the hearing at issue, the trial court granted the Petitioner's motion for
appointment of an independent psychiatrist, Dr. Newkirk.  In her report, issued in
October of 1986, Dr. Newkirk also found the Petitioner competent to stand trial.
Based upon this report and that of Dr. Smith, the Petitioner waived his right to a jury
trial on the issue of competency and chose not to contest the issue.  (Resp't Ex. 5 at
3-4; Resp't Ex. 6 at 16-17.)  This information, however, cannot be considered in the

the objective facts known to the trial judge at the time and considering the Petitioner's statement in the context of the hearing, it was not unreasonable to conclude that a bona fide doubt as to mental competency did not exist.  The state habeas court did not err in denying habeas relief on this claim.

       T.     Claim T – Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to counsel.  Strickland v. Washington, 466 U.S. 668, 684-85 (1984); Gideon v. Wainwright, 372 U.S. 335 (1963); Powell v. Alabama, 287 U.S. 45 (1932).  As noted in Strickland, "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."  Strickland, 466 U.S. at 685 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 275-76 (1942)).  For that reason, the Supreme Court has long held that the right to counsel contemplates the right to the effective assistance of counsel.  Id.; McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).

---

analysis because it was not something known to the trial judge at the time of the hearing.  See Williams v. Woodford, 384 F.3d 567, 604 (9th Cir. 2004) ("In reviewing whether a state trial judge should have sua sponte conducted a competency hearing, a federal court may consider only the evidence that was before the trial judge."); Fallada, 819 F.2d at 1568 ("A Pate analysis must focus on what the trial court did in light of what it then knew . . . .").

In Strickland, the Supreme Court set out the two components of a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 687; see also Wiggins v. Smith, 539 U.S. 510, 521 (2003).[33]  A petitioner must first show that counsel's performance was deficient.  Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 687. This requires showing that counsel's representation "fell below an objective standard of reasonableness." Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 688.  The petitioner must then show that counsel's deficient performance prejudiced the defense. Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 687.  To demonstrate prejudice, the petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The test for ineffectiveness is not perfection but,

---

[33]Wiggins and Williams v. Taylor, 529 U.S. 362 (2000), had not been decided at the time the state habeas court considered the ineffective assistance of counsel claims raised in this case.  These two decisions, however, do not constitute "new law," as the United States Supreme Court clearly intended each decision to apply and expound upon the standard articulated in Strickland.

instead, whether trial counsels' performance fell within the "wide range of reasonable professional assistance." Waters v. Thomas, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc).  With that in mind, the Supreme Court has made clear that there are no particular rules that dictate counsel's conduct.  Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000); Strickland, 466 U.S. at 688-89.  Nevertheless, in support of a number of his ineffective assistance claims, the Petitioner cites and relies upon various provisions of the ABA Standards for Criminal Justice to establish standards for counsel's performance.  (See Post-Hr'g Br. in Support of Petition at 78-79, 102-03, 116, 119, 127-28.)  The Supreme Court has indeed referenced the ABA Standards on a number of occasions.  See, e.g., Rompilla v. Beard, 125 S. Ct. 2456, 2465-66 (2005); Wiggins, 539 U.S. at 524-25; Flores-Ortega, 528 U.S. at 479; Strickland, 466 U.S. at 688.  However, the Court has stated that the ABA Standards are simply "guides to determining what is reasonable" and do not impose specific guidelines on counsel.  Rompilla, 125 S. Ct. at 2466 (quoting Wiggins, 539 U.S. at 524); Flores-Ortega, 528 U.S. at 479; see Chandler, 218 F.3d at 1317 n.21 ("[W]e do not understand the Supreme Court to make the ABA Standards part of the highest law of the land, even if one accepts that those standards reflect a good policy. We remember that these ABA Standards were also mentioned in Strickland; but the Court went on to shun per se rules.") (citations omitted).

Counsel are presumed to have rendered adequate assistance and to have exercised reasonable professional judgment. Strickland, 466 U.S. at 690. Even when the record is incomplete or ambiguous regarding counsel's actions, the court should presume "that what the particular defense lawyer did at trial – for example, what witnesses he presented or did not present – were acts that some reasonable lawyer might do." Jones, 436 F.3d at 1293 (quoting Chandler, 218 F.3d at 1314-15 n.15). As long as the approach "might be considered sound trial strategy," counsel's performance will not be deemed deficient. Darden v. Wainwright, 477 U.S. 168, 186 (1986). Given this presumption, the habeas court's review of counsel's performance is highly deferential. Strickland, 466 U.S. at 689; Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir. 1994) ("It is important to note that judicial scrutiny of an attorney's performance is appropriately highly deferential because the craft of trying cases is far from an exact science; in fact, it is replete with uncertainties and obligatory judgment calls."). And the court should avoid second-guessing counsel's performance or evaluating the performance with the benefit of hindsight. Strickland, 466 U.S. at 689. For those reasons, the Eleventh Circuit has recognized that "the cases in which habeas petitioners can properly prevail . . . are few and far between." Waters, 46 F.3d at 1511. Unless the Petitioner makes both showings required under Strickland, it

cannot be said that his conviction and capital sentence resulted from a breakdown in the adversarial process that denied him effective assistance.

The Petitioner was represented during trial by John Howell and Ben Hendricks. At that time, Howell had been practicing law for fourteen years and had participated in over two hundred felony trials, including two capital cases. (Resp't Ex. 6A at 1074; Resp't Ex. 17 at 87.) Hendricks, who was appointed to assist Howell, had been a member of the bar for approximately ten years and had been involved in several serious criminal cases prior to representing the Petitioner. (Resp't Ex. 6A at 1075; Resp't Ex. 17 at 296.) During his first state habeas corpus proceeding, the Petitioner asserted a claim of ineffective assistance of counsel based on a number of alleged constitutional deficiencies in trial counsels' performance. Before addressing the individual allegations, the state habeas court correctly stated the two-pronged test from Strickland and noted that there is a "strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy." (Resp't Ex. 16 at 3-4, quoting Noble v. State, 220 Ga. App. 155 (1996).) The court then identified the alleged errors of trial counsel and held that the performance of trial counsel was either not deficient or did not result in prejudice.

Although the state habeas court accurately set forth the controlling law from Strickland, the Petitioner contends that its decision denying the claim was "contrary to" Strickland. Relying on instances where the state habeas court denied individual claims because the Petitioner had not shown prejudice, the Petitioner argues that the state habeas court improperly required the Petitioner to show more than a reasonable probability that the result of the proceeding would be different. In making this argument, the Petitioner seems to ignore the fact that Strickland requires the defendant to show "that the deficient performance *prejudiced* the defense." Strickland, 466 U.S. at 687 (emphasis added). As the Eleventh Circuit has explained, the second prong of Strickland requires a petitioner to "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." Hall, 310 F.3d at 694. Thus, "a reasonable probability that the result would be different" is not a standard distinct from or less burdensome than prejudice. Rather, it simply defines what a defendant must show in order to establish prejudice. Strickland, 466 U.S. at 694. The decisions of the state habeas court were not "contrary to" Strickland simply because the court used the shorthand reference to prejudice. See Hall, 310 F.3d at 700 (after setting out Strickland standard, court's use of abbreviated language when referring to prejudice prong was not "contrary to" clearly established federal law); see also

Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (using term "probable" in place of "reasonable probability", although imprecise, was not error).

The Petitioner also argues that in denying his ineffective assistance of counsel claims, the state habeas court unreasonably determined the facts or unreasonably applied clearly established federal law. The Court will address the Petitioner's specific allegations of ineffective assistance of counsel, of which there appear to be approximately thirty errors alleged, and the state habeas court's ruling thereupon in turn.

### 1. Failure to Investigate and Present Mitigating Evidence

The Petitioner contends that he was denied effective assistance of counsel because trial counsel failed to investigate and present available mitigating evidence during the sentencing phase.  In Strickland, the Supreme Court established a standard for deference given to decisions to limit investigation based on defense strategy:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91, quoted in Wiggins, 539 U.S. at 521-22.  Despite the level of deference usually afforded decisions to limit investigation, in two recent cases, Williams v. Taylor and Wiggins v. Smith, the Supreme Court found counsel's performance leading up to and during a capital defendant's sentencing phase to be ineffective.  In Williams, the Court upheld a defendant's ineffectiveness of counsel claim, holding that trial counsel's performance was deficient because they "did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  Williams v. Taylor, 529 U.S. 362, 396 (2000).  Specifically, the Court found that trial counsel failed to introduce evidence of the defendant's subpar intelligence and education, failed to seek prison records reflecting commendation of the defendant, and failed to return phone calls of a positive character witness.  Id.  Moreover, counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."  Id. at 395.  For these reasons, the Supreme Court found that the sentencing counsel's investigation into the defendant's background was so lacking as to render the proceeding fundamentally unreliable.

In Wiggins, the defendant's counsel at sentencing limited the investigation to three sources: (1) a psychologist's reports; (2) a pre-sentence investigation report

including a one-page account of the defendant's "personal history"; and (3) Department of Social Services records documenting the defendant's placements in the state's foster care system.  <u>Wiggins</u>, 539 U.S. at 523-24.  The Court found it unreasonable that "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."  <u>Id.</u> at 524.  In addition, the Court noted that the limited scope of the investigation was unreasonable in light of the fact that the information that was uncovered revealed a number of leads that a reasonable attorney would have pursued.  <u>Id.</u> at 525, 527-28.  Accordingly, the record of the sentencing evidenced that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."  <u>Id.</u> at 526.  As a result, the Supreme Court held that the state court's deference to counsel's decision to limit the scope of its investigation was objectively unreasonable.  <u>Id.</u>

The Petitioner contends that trial counsel similarly failed to obtain and present adequate mitigating evidence during the sentencing phase.  In preparation for the sentencing phase, trial counsel talked to the Petitioner and members of his family. They also requested that Dr. Newkirk, the appointed psychiatrist who evaluated the Petitioner, conduct her evaluation with an eye toward providing mitigating evidence, including preparing information concerning the Petitioner's family background,

childhood and any drug or alcohol abuse.  (Resp't Ex. 17 at 194-95, 207, 251, 266-67.)  Mr. Howell conceded, however, that he did not undertake an independent investigation of the Petitioner's background.  (See id. at 197, 201.)  During the sentencing phase, the defense presented only two witnesses – Dr. Newkirk and Georgia Ford, the Petitioner's mother.

The Petitioner contends that trial counsels' investigation and presentation of mitigating evidence was based on neglect, not a strategic decision, and fell short of reasonable professional standards.  In support of his claim that trial counsel could have obtained and presented additional mitigation evidence, the Petitioner introduced at the state habeas proceeding the affidavits of a number of family members, a minister, and a former elementary school teacher.  In Waters v. Thomas, the Eleventh Circuit commented on the relatively limited evidentiary value of such affidavits in a habeas case:

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called or, if they were called, had they been asked the right questions.  This case is no exception.  But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.  This case is no exception in that respect either.  That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.  As we have noted before, in retrospect, one may always

identify shortcomings, but perfection is not the standard of effective assistance. The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight - except perhaps the rule that we will not judge trial counsel's performance through hindsight.

Waters, 46 F.3d at 1513-14 (citation omitted).  That is precisely the situation here.

The Petitioner argues that trial counsel were deficient for failing to interview and present the testimony of these available witnesses, failing to obtain medical, psychiatric, and school records, and for relying almost entirely on the appointed psychiatrist to develop the mitigation case.  According to the Petitioner, had trial counsel conducted an adequate investigation, they would have discovered the following important mitigation evidence:

- Petitioner had a history of problems with alcohol and legal and illegal drugs.[34]

- Petitioner had periods of blinding headaches and black-outs.

- Petitioner had a history of severe asthma, allergic reactions, and other physical problems.

---

[34]Although the Petitioner claims that evidence of alcohol and drug abuse should have been presented in mitigation, such evidence is often considered to be more harmful that mitigating.  Stewart v. Secretary, 476 F.3d 1193, 1217 (11th Cir. 2007); Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir. 2002) (citing Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) ("Evidence of drug and alcohol abuse is 'a two-edged sword,' . . . and a lawyer may reasonably decide that it could hurt as much as help the defense.")).

- Petitioner took medications that had the potential to cause euphoria, insomnia, mood swings, personality changes, and severe depression.

- Petitioner had a history of severe emotional difficulties, including major depression and attempts at suicide.

- Petitioner, on several occasions, was sent to counselors and psychologists for psychological treatment.

- Petitioner's father had been addicted to alcohol and pain killers.

- Petitioner's family was financially unstable and unable to provide him with the psychological help he needed as a child.

- Petitioner performed poorly in school.

- In the weeks preceding the murders, the Petitioner had been abusing alcohol and drugs and appeared to be very depressed.

- Petitioner's caring personality.

The state habeas court rejected the Petitioner's ineffectiveness claim, holding

that:

> Mitigation evidence from an independent psychiatrist and from the Petitioner's mother was presented.  Petitioner cannot demonstrate any constitutional violation in his own failure to present other evidence.  The Court finds that Petitioner agreed with counsel's decision not to present certain other witnesses that counsel and Petitioner had discussed. Petitioner cannot now be heard to complain about a strategic decision he and his attorney made.[35]

---

[35]Prior to the commencement of the sentencing phase, the following colloquy took place:

MR. HOWELL: Is there any witness or any type of documentation or

Further, some, if not all, of the evidence that Petitioner alleges should have been presented (other family members, a former school teacher, and a minister) would have been cumulative of some of the testimony and emotional pleas offered by the two mitigation witnesses. The habeas court cannot second guess the decision of a defendant and his counsel regarding when enough mitigation evidence has been presented. The fact is, the opportunity to present such evidence was given and there can be no constitutional violation when a defendant and his counsel decide that they have exercised that right to the fullest extent desirable. Demonstrating in the habeas proceeding that there were other witnesses who could have testified at trial does not, by itself, prove that counsel was ineffective for not presenting them at trial.

---

other tangible evidence that we have not covered that you wanted us to have at the sentencing phase we have not discussed here?

THE DEFENDANT: No, there is no other.

. . .

THE COURT: Are you completely satisfied with the decision you and your defense counsel have made in this regard, Mr. Ford?

THE DEFENDANT: In this regard, sentencing phase?

THE COURT: Yes, sir.

THE DEFENDANT: Yes, sir, I am satisfied.

THE COURT: Do you have any objection to the proposal regarding the sentencing phase that's just been outlined by your counsel?

THE DEFENDANT: No, sir.

(Resp't Ex. 6A at 986.)

(Resp't Ex. 16 at 65-66) (citations omitted).  The Petitioner argues that the state habeas court's decision constitutes an unreasonable application of the standards for effective assistance clearly established in Strickland and outlined in Williams and Wiggins.

The record from the state habeas proceeding suggests the possibility that trial counsel did not perform a thorough investigation of the Petitioner's background.  However, trial counsels' failure to interview a number of these witnesses or to investigate certain aspects of the Petitioner's background may have been due to what, if any, information the Petitioner supplied to trial counsel.  The Supreme Court has stated that the reasonableness of counsel's actions should be evaluated based on "strategic choices made by the defendant and on information supplied by the defendant." Burger v. Kemp, 483 U.S. 776, 795 (1987) (quoting Strickland, 466 U.S. at 691); see also Callahan v. Campbell, 427 F.3d 897, 934 (11th Cir. 2005) ("Information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate . . . An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.") (internal punctuation and citations omitted); Stewart, 476 F.3d at 1215-16.  With regard to potential mitigation witnesses, Mr. Howell testified at the state habeas hearing that he could not recall whether the

Petitioner ever provided him with the names of any additional witnesses that might be helpful during the sentencing phase. (Resp't Ex. 17 at 200-01, 249-50.) According to Howell, if the Petitioner had asked him to contact or to call any witnesses to testify in mitigation, they would have been subpoenaed for trial. (Id. at 249-50.) Similarly, Howell testified that the Petitioner did not alert him to any history of physical problems or substantial drug or alcohol abuse that should be investigated further. (Id. at 198-99.) In addition, the Petitioner also asserts that trial counsel failed to present evidence that he had asked for mental health assistance in Rockdale County several weeks before the murders. However, there is nothing in the record to indicate that trial counsel were given this information. As such, trial counsel should not be faulted for failing to uncover the evidence on their own. See Callahan, 427 F.3d at 934-35. Under such circumstances, trial counsels' investigation would not be deemed constitutionally deficient.

Having found that trial counsel made a strategic decision along with the Petitioner regarding what mitigating evidence to present, the state habeas court did not expressly address the prejudice prong of the Strickland test. However, this Court finds that even if trial counsels' performance was deficient, the Petitioner has not shown prejudice stemming from the alleged failures. Although the Petitioner challenges trial counsels' failure to call a number of witnesses in mitigation, the

Supreme Court has made clear that trial counsel is not required to present all available mitigating evidence during the sentencing phase.  <u>Wiggins</u>, 539 U.S. at 533 (<u>citing</u> <u>Strickland</u>, 466 U.S. at 689).  Similarly, the Eleventh Circuit has stated that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."  <u>Waters</u>, 46 F.3d at 1514; <u>see also</u> <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001) ("[A]t a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy."); <u>Stevens v. Zant</u>, 968 F.2d 1076, 1082 (11th Cir. 1992) ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.").  Furthermore, as the state habeas court found, the majority of the affidavit testimony presented during the state habeas proceeding was not substantively different than the evidence actually presented to the jury.  For example, the Petitioner testified during the guilt-innocence phase about his drug and alcohol use.  At the sentencing phase, Dr. Newkirk testified extensively about the Petitioner's emotional and psychological problems.  Dr. Newkirk testified that as a child, the Petitioner had behavioral problems and had received psychological treatment beginning in elementary school, including a two week in-patient psychiatric stay after dropping out of high school.  (Resp't Ex. 6A at 998.)  She also testified that

the Petitioner had residual attention deficit disorder and antisocial personality disorder, the hallmark of that disorder being the emotional inability to control one's impulses.  According to Dr. Newkirk, in the months leading up to the murders, the Petitioner had become extremely depressed and was using drugs and alcohol, which intensified the depression and exacerbated the impulse control problems.  (Id. at 1005-06.)  The second defense witness, Georgia Ford, agreed with Dr. Newkirk's assessment of the Petitioner's emotional problems, childhood and beyond.  She testified that the family tried, unsuccessfully, to get the Petitioner help for his emotional problems by taking him to school counselors and mental health professionals.  (Id. at 1020-21, 1023.)  Although other witnesses could have testified to the Petitioner's psychological problems or to his behavior leading up to the murders, trial counsel were not required to call additional witnesses to present redundant or cumulative evidence.  Marquard v. Secretary for the Dep't of Corr., 429 F.3d 1278, 1307 (11th Cir. 2005); Waters, 46 F.3d at 1512.

It appears that the only issues addressed in the affidavit testimony that were not presented during the sentencing phase concerned: (1) the Petitioner's history of headaches, allergies, and asthma; and (2) the Petitioner's father's addiction to pain killers and alcohol.  The Petitioner also asserts that the witnesses could have testified to his caring personality.  But see Strickland, 466 U.S. at 700 (evidence that numerous

people thought defendant was a good person "would barely have altered the sentencing profile presented to the sentencing judge").  In order to establish prejudice, the Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Putman, 268 F.3d at 1248; see Callahan, 427 F.3d at 936 ("When a defendant challenges a death sentence, we evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding–and reweigh it against the evidence in aggravation.") (internal punctuation and citation omitted).  Here, the jury found three statutory aggravating circumstances with regard to the malice murder of Martha Matich, i.e., that the murder was committed during the commission of two capital felonies (armed robbery and murder) and during the commission of a burglary, and two statutory aggravating circumstances associated with the malice murder of Lisa Chapman, i.e., that the murder was committed during the commission of a capital felony (armed robbery) and during the commission of a burglary.  In light of the weight of this and other aggravating evidence, including the fact that the Petitioner shot a child in the head at close range, the new evidence cited by the Petitioner is not compelling mitigation evidence, even when combined with the evidence presented at sentencing, such that there is a reasonable probability that had the jury heard this

testimony the sentencing outcome would have been different.  The Petitioner's claim of ineffectiveness based on a failure to investigate and present mitigating evidence is without merit.

2.      Failure to Prepare Mental Health Aspects of Case Adequately

The Petitioner argues that trial counsel rendered ineffective assistance  in presenting the testimony of Dr. Cassandra Newkirk during the sentencing phase.  Dr. Newkirk testified that the Petitioner suffered from residual attention deficit disorder and antisocial personality disorder.  According to Dr. Newkirk, individuals with antisocial personality disorder have an inability to control their impulses.  (Resp't Ex. 6A at 1000-01.)  She analogized this to "water in a pot that's boiling and the lid is on and they get so angry at times that the lid blows."  (Id. at 1000.)  Dr. Newkirk also testified that people who have impulse disorders often suffer from depression and abuse alcohol and drugs.  (Id. at 1004.)  In the Petitioner's case, Dr. Newkirk testified that in the months leading up to the murders, the Petitioner was using drugs and alcohol and had become very angry and depressed.  (Id. at 1004-06.)  As a result, he could not control his behavior and "it was as if the lid blew, it was like it had been seething for a long time and it was that the lid blew at that particular time."  (Id. at 1005.)  Dr. Newkirk testified, however, that impulse control problems tend to lessen when an individual receives psychiatric treatment.  (Id. at 1001-02.)  The Petitioner

also points out that on cross examination, Dr. Newkirk testified that the Petitioner admitted that he was not entirely truthful during her evaluation.  (Id. at 1012.)  The Petitioner asserts that trial counsel were ineffective for calling Dr. Newkirk because she offered only harmful testimony.  In the alternative, the Petitioner argues that if trial counsel were not aware of what Dr. Newkirk was going to say, they were ineffective for failing to prepare the witness.  The state habeas court held that trial counsel were not ineffective "simply because the psychiatrist's findings were not overly favorable to Petitioner."  (Resp't Ex. 16 at 21.)

The crux of the Petitioner's ineffective assistance claim is his contention that Dr. Newkirk's testimony was not  mitigating.  The record does not indicate this to be the case.  For instance, Dr. Newkirk testified that the Petitioner had exhibited psychiatric problems in the past, including attempting suicide, and was suffering from extreme depression at the time of the murders.  (Resp't Ex. 6A at 998-99, 1005.)  The Petitioner focuses, however, on Dr. Newkirk's testimony regarding his diagnosis of antisocial personality disorder with the attendant impulse control problems.  Testimony such as this is a double-edged sword.  Admittedly, comparing the Petitioner to a pot waiting to boil over could be harmful.  However, in Magill v. Dugger, 824 F.2d 879 (11th Cir. 1987), the Eleventh Circuit stated that impulsivity was the most compelling evidence that the defendant could have offered in mitigation

and that trial counsel was ineffective for failing to present expert testimony that the defendant was "explosive" and "a time bomb." <u>Magill</u>, 824 F.2d at 889.   Setting aside whether her boiling-pot-analogy testimony was harmful, Dr. Newkirk's testimony was potentially useful in establishing that the Petitioner was suffering from a recognized psychiatric disorder, made worse by drug and alcohol abuse.  Because jurors may regard the existence of a mental disorder as a factor diminishing a defendant's culpability, such evidence is mitigating.  <u>See</u> <u>Waters</u>, 46 F.3d at 1518; <u>Hance v. Zant</u>, 981 F.2d 1180, 1184 (11th Cir. 1993).  In fact, courts have specifically recognized that evidence of antisocial personality disorder can be considered mitigating evidence.  <u>See, e.g.</u>, <u>Mobley v. Head</u>, 306 F.3d 1096, 1098 n.1 (11th Cir. 2002) (Tjoflat, J., dissenting) (evidence of antisocial personality disorder introduced as mitigating evidence); <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1072-73 (11th Cir. 2002) ("[J]ury could have found a mitigating circumstance based on Brownlee's borderline intellectual functioning and psychiatric disorders, which, again, included . . . antisocial personality disorder . . . .") (<u>citing</u> <u>Clisby v. State</u>, 456 So. 2d 99, 102 (Ala. Crim. App. 1983) (evidence of psychiatric disorders such as antisocial personality "*must* be considered as relevant mitigating evidence")); <u>Smith v. Stewart</u>, 140 F.3d 1263, 1270 (9th Cir. 1998) (recognizing that antisocial personality disorder is a mitigating factor under Arizona death penalty sentencing law).  In addition, Dr. Newkirk's testimony

that the Petitioner's actions were the result of uncontrollable impulses served as a response to the prosecution's claim that he acted with cold-blooded intent.[36]

Dr. Newkirk's testimony may have contained "both favorable and unfavorable elements." Hance, 981 F.2d at 1184. However, had she not testified, the Petitioner would have been unable to present any expert testimony regarding his psychiatric problems. Therefore, under the circumstances, trial counsels' performance was not deficient but, rather, constituted a reasonable strategic decision. See Beardslee v. Woodford, 358 F.3d 560, 583 (9th Cir. 2004) (although testimony regarding defendant's sociopathic diagnosis could be harmful, trial counsel made reasonable strategic decision for expert to testify because he also provided useful mitigating evidence); Waters, 46 F.3d at 1518-19 (reasonable strategic decision to have expert testify regarding mental illness despite fact that some of his testimony could have been unfavorable); Hance, 981 F.2d at 1184-85 (trial counsel not ineffective for presenting expert psychological testimony that was both favorable and unfavorable); Wicker v. McCotter, 783 F.2d 487, 496 (5th Cir. 1986) (trial counsel made strategic decision to call two psychiatrists to testify as to defendant's antisocial personality disorder

---

[36]The Petitioner takes issue with the fact that on cross-examination, Dr. Newkirk testified that she was unaware of a number of facts that indicated that the Petitioner had planned his actions. However, she explained that making plans does not negate impulsive behavior or the fact that someone with impulse control problems can act in a blind rage. (Resp't Ex. 17 at 1016-17.)

because it offered some favorable evidence regarding the existence of a psychiatric disease).  Accordingly, the state court's determination that trial counsel were not ineffective was not an unreasonable application of federal law.

### 3.   Failure to Interview and Prepare Witnesses

The Petitioner alleges that trial counsel were ineffective because they conducted inadequate witness interviews, including interviewing witnesses in the presence of the prosecutor, and failed to interview other witnesses entirely.  Mr. Hendricks testified during the state habeas hearing that he interviewed five or six witnesses in combination with the prosecutor.  According to Hendricks, however, each of these individuals were incidental witnesses, i.e., police officers that were on the scene and citizens that had driven by the scene, who were never called to testify at trial.  (Resp't Ex. 17 at 301-02.)  The Petitioner has not shown any prejudice stemming from these joint interviews.  The Petitioner identified only one specific witness that trial counsel allegedly failed to interview adequately – his aunt, Martha Boleman.  The Petitioner argues that trial counsel were deficient based on an affidavit tendered during the state habeas hearing in which Ms. Boleman stated: "The attorneys hardly talked to me at all before the trial."  (Id., Pet'r Ex. 8 ¶ 9.)  Boleman's testimony was offered in support of the Petitioner's main defense that the Petitioner was intoxicated to the point of incapacitation on the night of the murders.  Specifically, she testified that she saw

the Petitioner at the grocery store where she worked on the night of the murders and that based on his appearance and lack of motor skills, he appeared to be very drunk or high on drugs.  (Resp't Ex. 6A at 663- 65.)  Although he claims that trial counsel failed to interview Boleman adequately, the Petitioner does not identify any information that trial counsel failed to obtain relevant to the guilt-innocence phase.[37] See Lockett v. Anderson, 230 F.3d 695, 713 (5th Cir. 2000) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.") (citation omitted).  In fact, in her affidavit, Boleman testified that trial counsel did indeed question her about the night she saw the Petitioner at the grocery store.  (Resp't Ex. 17, Plaintiff's Ex. 8 ¶ 9.)  There is no evidence that Boleman would have provided any additional or different testimony even if trial counsel had interviewed her more extensively.  Consequently, the Petitioner has not shown any prejudice stemming from trial counsels' performance.

---

[37]The Petitioner's claims regarding testimony trial counsel could have elicited from Boleman during the sentencing phase were addressed in relation to the failure to present mitigating evidence claim.

The Petitioner identifies two witnesses that trial counsel allegedly failed to interview – Donna Ford and Roger Turner.[38]  The Petitioner's claim regarding Turner will be discussed separately.  Here, the Petitioner claims ineffectiveness based on trial counsels' failure to interview, and call as a witness, his sister Donna Ford.  Defense counsel has a duty to "conduct a substantial investigation into any of his client's plausible lines of defense."  Fortenberry v. Haley, 297 F.3d 1213, 1226 (11th Cir. 2002) (quoting House v. Balkcom, 725 F.2d 608, 617-18 (11th Cir. 1984)).  Failure to investigate adequately or prepare evidence to support the sole defense may constitute ineffective assistance.  Id.  The Petitioner alleges that trial counsel were deficient in failing to interview Donna Ford because she would have provided evidence in support of the defense theory of extreme intoxication.  However, other than assumption, the Petitioner has not presented any evidence to establish conclusively that trial counsel did not interview Ms. Ford.  Thus, it may have been a strategic choice on the part of trial counsel not to have Ms. Ford testify during trial. (See Resp't Ex. 6A at 659-60.)

Nevertheless, even assuming that trial counsel were deficient by failing to interview Ms. Ford, the Petitioner cannot establish ineffectiveness under Strickland.

---

[38]Howell testified during the state habeas hearing that either he or Hendricks interviewed or took statements from all the witnesses that were made known to them and that they had access to.  (Resp't Ex. 17 at 145, 234.)

According to the Petitioner, had Ms. Ford been called, she could have testified that she saw the Petitioner drinking hard liquor on the night of the murders and that he was barely able to stand.  (See Resp't Ex. 17, Plaintiff's Ex. 11 ¶ 10.)  This testimony would not have been substantially different from that actually presented during the trial.   The defense called four witnesses: Martha Boleman; Paulette Ford, the Petitioner's sister-in-law; Georgia Ford, his mother; and the Petitioner himself.  Each of these witnesses testified that the Petitioner was intoxicated on the night of the murders.  The Petitioner detailed his  use of marijuana, liquor, and beer on the night of the murders.  (Resp't Ex. 6A at 708-09, 714.).  Paulette Ford corroborated the Petitioner's testimony that he left his parent's house to go buy liquor.  She also testified that the Petitioner was slurring his words, was not very coherent, and was very unstable when walking.  (Id. at 674-76.)  Georgia Ford testified that the Petitioner was slurring his words during a phone conversation that occurred shortly after the time of the murders.  (Id. at 687.)  Finally, as noted above, Martha Boleman testified that Petitioner appeared very intoxicated that night.  Because the jury heard a good deal of testimony regarding the Petitioner's intoxicated state on the night of the murders, there is not a reasonable probability that had trial counsel interviewed and presented the testimony of Donna Ford, the outcome of the proceeding would have been different.  The Petitioner's claim for relief is properly denied.

4.     Failure to Investigate and Cross-Examine Roger Turner Adequately

The Petitioner argues that trial counsel rendered ineffective assistance by failing to interview Roger Turner.  Although they viewed and had a transcript of Turner's videotaped statement, neither Howell nor Hendricks could testify for certain that they interviewed Turner.  (Resp't Ex. 17 at 178, 302.)  The Petitioner contends that as a result of trial counsels' failure to interview Turner, they were unable to present evidence to contradict the officers' account of statements made by the Petitioner during his interrogation.  As discussed above in regard to Claim K, four officers testified at trial that the Petitioner made incriminating statements when Turner was brought into the Petitioner's interrogation room.  Trial counsel cross-examined the officers regarding their recollection of what occurred.  (Resp't Ex. 6 at 517-18, 547-51.) The Petitioner claims, however, that if trial counsel had interviewed Turner, they could have impeached the officers' testimony.  Specifically, the Petitioner relies on the affidavit presented during the state habeas proceeding in which Turner testified that the Petitioner did not make any comments while Turner was present in the interrogation room.  (See Resp't Ex. 17, Plaintiff's Ex. 15 ¶ 3.)  What the Petitioner fails to note, however, is that he clearly testified at trial that he made comments to Turner in the interrogation room, he simply disagreed with the officers as to what those statements were.  (Resp't Ex. 6A at 737-38, 787-88, 799.)  Thus, had Turner

testified in accordance with his affidavit, his testimony would have contradicted the Petitioner's own description of what occurred when he was confronted with Turner. In light of this contradictory evidence, the Petitioner has not established that trial counsels' failure to interview Turner caused prejudice.

In a related claim, the Petitioner argues that trial counsels' lack of adequate preparation is also evidenced by the failure to impeach Turner with a number of inconsistencies between his statement to the police and his testimony at trial. For instance, Turner's statement to the police does not indicate that the Petitioner told Turner details of what transpired inside the convenience store; however, Turner testified during trial that the Petitioner had described in detail what took place when he killed Lisa Chapman. (Resp't Ex. 6 at 260-61.) The Petitioner argues that Turner testified, in accordance with the prosecution's theory that the Petitioner was not drunk, that the Petitioner poured out nearly an entire bottle of liquor at the hotel following the murders but that he failed to mention any alcohol use at the hotel in his statement to the police. The Petitioner contends that trial counsel were ineffective for failing to point out this inconsistency. The Petitioner argues that trial counsel also failed to challenge the fact that despite his inability to do so in his statement to police, Turner was able to provide a clear description of the bag in which the Petitioner allegedly disposed of the gun and to recount the exact amount of money the Petitioner claimed

they could get by robbing the convenience store.  In addition, the Petitioner contends that trial counsel should have challenged Turner's testimony regarding what occurred at the convenience store.[39]  Specifically, in his statement to police, Turner described hearing five gun shots, the last two as "one more shot and another quick one right after that."  (Resp't Ex. 17, Plaintiff's Ex. 20 at 179.)  At trial, Turner testified that there were "two quick shots, pretty much close together" and then a few seconds later there was a "hollow sounding shot."  (Resp't Ex. 6 at 243.)

The decision to cross-examine a witness and the manner in which it is conducted are tactical decisions "well within the discretion of a defense attorney." Fugate v. Head, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting Messer v. Kemp, 760 F.2d 1080, 1090 (11th Cir.1985)).  Trial counsel is not ineffective simply for failing to elicit other testimony from those that testified.  Id. at 1220.  Rather, in order to establish the prejudice prong of Strickland, the Petitioner must show at least one "specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial."  Id. at 1219 (quoting Messer, 760

---

[39]During the trial, Turner testified that the two windows on the side of the convenience store were closed.  The Petitioner argues that this testimony contradicts Turner's statement to the police in which he said that he "*heard* [Petitioner] kind of like arguing with [one of the victims] *through the two windows on the side of the building*."  (Post-Hr'g Br. in Support of Petition at 109.)  This statement, however, does not appear in Turner's statement to the police.  (Resp't Ex. 17, Plaintiff's Ex. 20 at 178.)

F.2d at 1090).  The state habeas court found that trial counsel challenged Turner on a number of inconsistencies between the trial testimony and Turner's previous statements. (Resp't Ex. 16 at 18.)  Indeed, the record indicates that trial counsel cross-examined Turner about inconsistencies in his statements regarding the gun used in the murders, (Resp't Ex. 6 at 293-94, 296-97); whether the Petitioner had described his plan to coerce the occupants of the store into the bathroom, (id. at 323-25); and statements the Petitioner allegedly made following the murders, (id. at 331-32).  In addition, as the state habeas court found, trial counsel questioned Turner about his ability to testify as to what occurred inside the convenience store given that he claimed to have remained outside in the car.  In conjunction with this line of questioning, trial counsel pointed out several discrepancies between Turner's statements. (Resp't Ex. 6 at 325-28.)  Trial counsel clearly attacked Turner's version of the events of that night and repeatedly challenged Turner on the fact that his trial testimony was not consistent in a number of respects with the statement he gave to police.  In fact, even the Petitioner acknowledged that "Mr. Howell spent a great deal of time trying to impeach Mr. Turner by pointing out discrepancies between Turner's original statement to the GBI and the statement he made at trial when examined by the prosecutor."  (Post-Hr'g Br. in Support of Petition at 108.)  Given the entire cross-examination of Turner, the Petitioner has not shown a reasonable probability that the

outcome would have been different had trial counsel cross-examined Turner regarding the additional inconsistencies.  Habeas relief is therefore not warranted based on this claim of ineffective assistance of counsel.

5.    Failure to Conduct Tests of Physical Evidence or Identify Lack of Physical Evidence

During trial, Turner testified that he remained in the car while the Petitioner gained access to the convenience store and the victims by shooting through a glass door.  Although glass samples were recovered from the Petitioner's shoes, the fragments were not sufficiently similar to the glass in the store "to conclude that they could have had a common origin."  (Resp't Ex. 17, Plaintiff's Ex. 22 at 199.)  Further G.B.I. testing on the car floor mat and the Petitioner's jacket failed to reveal the presence of blood.  (Id.)  The Petitioner contends that trial counsel were ineffective for failing to present these results.  However, the Petitioner testified that he never entered the convenience store and trial counsel showed throughout the trial that there was no physical evidence linking the Petitioner with the crime scene.  In addition, trial counsel established on cross examination of the G.B.I. investigator that there were no visible signs of blood or other evidence on the Petitioner.  (Resp't Ex. 6 at 505.) Finally, the fact that similar glass fragments were not recovered from the Petitioner's shoes could have been contradicted by Turner who testified during trial that the Petitioner washed out his shoes after they left the store.  (Id. at 259.)  Therefore, even

assuming that trial counsel were deficient for failing to introduce the forensics report, the Petitioner has not shown a reasonable probability that had the report been introduced the outcome would have been different.

The main defense strategy during trial was to discredit Turner and claim that he entered the store and committed the murders while the Petitioner was passed out in the car.  The Petitioner alleges that trial counsel were therefore deficient in failing to obtain testing to determine whether there were glass fragments or blood on Turner's clothes and shoes.  Trial counsels' performance, however, was not deficient.  Rather, trial counsel attempted to secure independent examinations by requesting funds to hire investigators and experts to examine the physical evidence.  (Resp't Ex. 2 at 70-72; Resp't Ex. 17 at 254-55.)  The trial court denied the request.  Thus, independent testing on Turner's shoes and clothing was not possible under the circumstances and certainly not due to a failure on the part of trial counsel.  Furthermore, as the state habeas court found, the Petitioner has not shown prejudice stemming from the failure to conduct tests on Turner's clothing.  (Resp't Ex. 16 at 19 n.4.)  There was no evidence placing Turner inside the store and the Petitioner does nothing more than assert that independent testing might have revealed inaccuracies in his testimony. This is not sufficient to establish a reasonable probability that the outcome would have been different.  Accordingly, the state habeas court reasonably concluded that trial

counsel were not ineffective for failing to conduct independent testing on the physical evidence.  The Petitioner's claim therefore fails under <u>Strickland</u>.

> 6.     Failure to Conduct Adequate Voir Dire and Exclude Biased Venire Persons

The Petitioner asserts a number of claims of ineffective assistance of counsel which relate to trial counsels' performance during voir dire.  First, the Petitioner argues that trial counsel failed to question adequately and move to excuse for cause a number of allegedly biased prospective jurors.  In particular, the Petitioner alleges that trial counsel were deficient for failing to move to excuse the following venire members: (1) Nancy Hood, who stated that she felt as if the Petitioner was guilty since he had been arrested but acknowledged that the court did not view him as guilty prior to trial, (Resp't Ex. 6 at 56-57); (2) Jane Crowell, who lived next door to a family named Chapman, <u>id.</u> at 53; (3) Mrs. William Coady, who knew a prosecution witness, <u>id.</u> at 71-72; (4) Jean Jenkins, the sister-in-law of a prosecution witness, <u>id.</u> at 136-37; and (5) William Osborne, Bradley Rutledge, Carol McCanless, Vivian Baker, and Billy Lindsey, all of whom indicated that they had heard something about the case from the media, <u>id.</u> at 59, 66, 77, 93, 109.[40]  The state habeas court denied the

---

[40]The Petitioner also cited Mrs. Clarence Henderson because she revealed during voir dire that her husband had been on the grand jury that indicted the Petitioner.  (Am. Petition ¶ 192.)  The Petitioner's claim with respect to Mrs. Henderson is entirely without merit as the record shows that trial counsel did in fact

Petitioner's claim.  The court noted that "the selection of jurors involves strategic and tactical decisions made by counsel after consultation with the client" and held that the Petitioner "made no showing that attempting to remove the jurors he has identified would have resulted in a jury that would have benefitted him and resulted in a reasonable possibility of changing the outcome of the trial."  (Resp't Ex. 16 at 4.)

As discussed with regard to Claim C, a prospective juror must be excused for cause only if he is unable to "lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Irvin v. Dowd, 366 U.S. 717, 723 (1961).  The record reveals that prospective jurors Coady, Jenkins, Osborne, Rutledge, McCanless, Baker, and Lindsey all stated unequivocally that any relationships they had with witnesses or any information they had heard previously would not influence or affect their ability to remain impartial and decide the case based on the evidence presented during trial.  (Resp't Ex. 6 at 59-60, 68, 78, 94, 109-10, 135-37.)  Thus, trial counsel were not ineffective for failing to challenge these individuals for cause as any such challenge would have been unsuccessful.  Similarly, the state habeas court found that prospective juror Hood expressed ambivalence regarding whether her opinion as to the Petitioner's guilt was fixed and, therefore, a motion to strike for cause might not

move for and the trial court excluded Mrs. Henderson for cause.  (Resp't Ex. 6 at 90-91.)

have been granted.  Furthermore, the Petitioner has not shown that there is a reasonable probability that the outcome would have been different given that Hood did not ultimately serve on the jury.  Lastly, trial counsel were not ineffective for failing to challenge prospective juror Crowell.  Although she stated that she lived next door to a family named Chapman, she did not indicate nor has the Petitioner presented any evidence that this family was related to the victims.  Thus, the state habeas court reasonably concluded that the Petitioner had not shown any prejudice based on trial counsels' failure to probe the comment further or move to excuse her for cause.

The Petitioner also contends that trial counsel were ineffective during voir dire by failing to investigate the backgrounds of and probe factual misrepresentations made by two prospective jurors.  The Petitioner alleges that prospective juror Woodrow Wilson falsely answered that he did not know the Petitioner despite the fact that the Petitioner had previously worked with Wilson.  In order to establish unfairness based on a juror's responses during voir dire, a party must show that the juror falsely answered a material question and that the correct response would have provided a valid basis for a challenge for cause.  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).  The state habeas court found that the Petitioner failed to establish that Wilson knowingly misrepresented his knowledge of the Petitioner.  Moreover, Howell testified that the Petitioner himself notified him of this fact and

indicated that he wanted Wilson on the jury panel.  (Resp't Ex. 17 at 124-26.) Particularly in light of the Petitioner's request, trial counsels' decision not to move to exclude Wilson is presumed to be a strategic decision and within the range of reasonable professional assistance.   The Petitioner has not shown otherwise. Additionally, the Petitioner cannot show any prejudice based on trial counsels' failure to inquire further into Wilson's knowledge of the Petitioner or the failure to move to strike for cause because Wilson did not ultimately serve on the jury.

According to the Petitioner, another prospective juror, Arthur Thrasher, reported different information during voir dire than he provided on his juror questionnaire.  Specifically, on the questionnaire, Thrasher reported that he was employed as a custodian with the Newton County Board of Education and that his wife was retired.  During voir dire, however, Thrasher stated that his wife worked for the Georgia Board of Education and that he was retired.  The state habeas court found that Thrasher provided the correct information during voir dire.  The state habeas court also found no evidence that the discrepancy was an intentional misrepresentation and held that even if intentional and material, the discrepancy did not provide a basis for challenging for cause.  This decision was neither an unreasonable determination of the facts nor an unreasonable application of federal law.   Accordingly, the

Petitioner cannot establish that trial counsels' performance was deficient or that his performance resulted in prejudice to the defense.

The Petitioner also argues that he was denied effective assistance of counsel because the prospective jurors were not questioned as to whether they would automatically vote to impose the death penalty upon conviction. First, the Petitioner claims that trial counsel were ineffective in failing to object to the trial court's limitation of voir dire and restriction of "reverse-<u>Witherspoon</u>," or "life-qualifying," questions. As discussed above with regard to Claim D, the trial court did not expressly exclude any of the Petitioner's proposed voir dire questions nor did the court prohibit trial counsel from asking questions designed to reveal a bias in favor of imposition of the death penalty. As such, there was no ruling to which trial counsel could or should have objected. In addition, at the time of the Petitioner's trial, the right to life-qualify prospective jurors had not been established. For either of these reasons, the Petitioner's ineffective assistance claim based on a failure to object is without merit.

The Petitioner also argues that trial counsel rendered ineffective assistance by failing to ask prospective jurors "reverse-<u>Witherspoon</u>" questions. Not only had the right to ask such questions not yet been established, but when the Supreme Court did establish the right in <u>Morgan</u>, it required only that a defendant be given the right to

life-qualify prospective jurors upon request.   Morgan v. Illinois, 504 U.S. 719, 736 (1992).   Morgan did not mandate that such questions be asked during voir dire.   Thus, the failure to ask life-qualifying questions is not per se deficient performance. Furthermore, although no such questions were posed during the Petitioner's trial, the trial court did inquire whether the jurors were automatically opposed to the death penalty.   Accordingly, Howell testified that he felt that the death penalty had been probed an effective amount and decided not push the issue too much for fear of alienating the jurors.  (Resp't Ex. 17 at 252-53.)  Contributing to this decision was the fact that trial counsel, as residents of a small community, personally knew a number of the jurors prior to voir dire and were already aware of their individual feelings regarding the death penalty.   (Id. at 94, 252-53.)   Noting this fact and that "overexposure to questions about unpalatable subjects might actually prejudice the jury pool against the defendant," the state habeas court found trial counsels' decision not to ask the venire whether they would automatically vote to impose the death penalty to be a reasonable tactical decision.  (Resp't Ex. 16 at 11.)  Courts have agreed that actions during voir dire are largely matters of trial strategy and that it is "reasonable for trial counsel to want to focus the jury on the idea of the death penalty as little as possible."  Brown v. Jones, 255 F.3d 1273, 1279 (11th Cir. 2001); see Neill v. Gibson, 278 F.3d 1044, 1055 (10th Cir. 2001) ("Lawyers experienced in the trial

of capital cases have widely varying views about addressing the delicate balance between the disqualification of jurors whose personal beliefs prevent them from ever imposing the penalty of death . . . and those who would automatically recommend that sentence if they found the defendant guilty.") (quoting United States v. McVeigh, 118 F. Supp. 2d 1137, 1152 (D. Colo. 2000) (internal citations omitted). Therefore, particularly in light of trial counsels' expressed strategic decision and the fact that the right to ask life-qualifying questions had not yet been established by the Supreme Court, it was not unreasonable for the state habeas court to determine that trial counsels' performance during voir dire was not deficient.

Moreover, the Petitioner has not satisfied the prejudice prong of Strickland. In order to establish prejudice, the Petitioner must show that but for trial counsels' failure to ask life-qualifying questions, there is a reasonable probability that the result of the trial would have been different. The Petitioner claims that if trial counsel had asked these questions, a group of pro-death penalty jurors would have been removed for cause. However, he fails to identify any potential jurors who were biased in favor of the death penalty. Rather, the only support the Petitioner offers is the fact that Newton County was a conservative, rural county where 70% of the population supported the death penalty. (Post-Hr'g Br. in Support of Petition at 122.) Evidence that a majority of the county supported the death penalty as a means of punishment does not establish

that any of the prospective jurors would automatically sentence a capital defendant to death.  In addition, the record does not indicate, nor does the Petitioner present any evidence, that he was tried by a biased jury.  As such, the state habeas court reasonably concluded that the Petitioner failed to show prejudice as a result of trial counsels' failure to ask "reverse-<u>Witherspoon</u>" questions and that the claim of ineffective assistance fails.

       7.   <u>Failure to Impeach Witnesses</u>

The Petitioner contends that trial counsel were ineffective for failing to cross-examine the interrogating officers regarding a discrepancy between an earlier report and trial testimony.  In a March 13, 1986 report, G.B.I. Agent Nicholson described the circumstances of the Petitioner's transport to the G.B.I. office on the morning after the murders.  He wrote, in pertinent part:

> Agent Zon advised Agent Nicholson that he had transported Mr. Ford to the Region 10 office from Cobb County and that Ford had been advised of his Miranda rights at the time he was picked up and *was told that he was not under arrest at that time.*

(Resp't Ex. 17, Plaintiff's Ex. 21 at 48) (emphasis added).  During trial, Agent Zon testified that the Petitioner had been arrested and handcuffed before he was placed in the officer's vehicle and transported to the G.B.I. office.  (Resp't Ex. 6 at 379-80.) Agent Nicholson similarly testified that the Petitioner had been arrested and read his rights by Agent Zon prior to arriving at the G.B.I. office.  (<u>Id.</u> at 470-71.)  The

Petitioner argues that trial counsel were deficient for failing to cross-examine Agent Nicholson about the discrepancy regarding when the Petitioner was placed under arrest.  According to the Petitioner, by not raising the issue, trial counsel sacrificed an opportunity to challenge the credibility of the officer whose testimony was largely responsible for the admission of the Petitioner's incriminating custodial statements.

The Petitioner does not contend that whether he was arrested prior to or after arriving at the G.B.I. office was a fact material to his defense.  Thus, trial counsel did not ignore or neglect a glaring or material inconsistency.  Compare Nixon v. Newsome, 888 F.2d 112, 115-16 (11th Cir. 1989) (counsel ineffective for failing to impeach crucial witness with inconsistent statements regarding identity of shooter).  He argues only that the discrepancy between the report and the trial testimony is relevant to the credibility of Agent Nicholson in general.  (See Post Hr'g Br. in Support of Petition at 126-27.)  Without addressing whether trial counsels' failure to impeach Agent Nicholson with the inconsistent statements was deficient, the Petitioner's claim fails because he cannot establish prejudice.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  First, it should be noted that Agent Nicholson's trial testimony concerning the arrest was corroborated by Agent Zon.  Additionally, his testimony

regarding the circumstances of the Petitioner's interrogation and his incriminating statements was corroborated by Investigator Reed and Agent Bartlett.  Trial counsel thoroughly cross-examined all three officers on these issues.  (Resp't Ex. 6 at 393-400, 410-17, 428-32, 436-37, 490-503, 507, 517-20; Resp't Ex. 6A at 547-52.)  Thus, considering the proceeding as a whole, the Petitioner has not shown that but for the failure to cross-examine Agent Nicholson regarding the discrepancy between his report and testimony, there is a reasonable probability of a different result in the proceeding.

### 8.    Representation by Appointed Counsel

The Petitioner was indigent and lacked the funds to obtain an attorney on his own.  Had the court not appointed Howell and Hendricks to represent him, the Petitioner would have been left without counsel at all.  Nevertheless, the Petitioner claims that he was denied effective assistance of counsel because "he was forced to use appointed counsel."  (Am. Petition ¶¶ 247-48.)  According to the Petitioner, the performance of counsel appointed to represent unpopular criminal defendants in a small community is compromised by the fact that the success of the attorney's law practice, beyond the appointed case, depends on the good will of the community.  The state habeas court found that the "Petitioner has failed to demonstrate that defense counsel violated their professional obligation to zealously defend their client."

(Resp't Ex. 16 at 25.)  Indeed, the Petitioner does not allege any specific way in which trial counsels' performance was compromised, or deficient, as a result of community pressure.  Nor is there any evidence that trial counsel were concerned about community pressure or the financial implications of representing the Petitioner.  To the contrary, when questioned about those issues during the state habeas hearing, Howell testified as follows:

> Q:  And, along those lines there's an allegation that you somehow felt pressured because you practice in a small community in your representation of Mr. Ford.  Would you comment on that.
>
> A:  I didn't feel pressured – I never have felt pressured in a sense that any adverse consequences that were going to befall me or my practice as a result of representing appointed criminal defendants, no matter what the charge was.  To the contrary, I think people in the community – and I've had it expressed to me – I think they have an appreciation for those of us that, in essence, contribute a lot of our time to make the process work. . .
>
> Q:  Did you feel any pressure that if you somehow succeeded in getting Mr. Ford acquitted it would harm your financial interests?
>
> A:  No.  To the contrary, I think it – I would have been delighted had he been acquitted.  It's good publicity.  I'm not one of these people that gets TV advertisement and puts ads in the telephone directory and newspaper and that sort of thing, and my practice has been built solely on word of mouth, and that's – I would have been delighted if Mr. Ford had been acquitted.  I tried, best I was able, to get him acquitted.

(Resp't Ex. 17 at 268-69.)  Thus, the state habeas court's determination that trial counsel did not provide ineffective assistance under <u>Strickland</u> as a result of

community pressure was neither an unreasonable determination of fact nor an unreasonable application of federal law.

Alternatively, although not specified as such, the Petitioner might be alleging a claim of per se ineffectiveness, as set forth in United States v. Cronic, 466 U.S. 648 (1984).  In Cronic, the Supreme Court set forth four situations in which courts have found per se ineffectiveness: (1) where there has been a "complete denial of counsel"; (2) where the accused is denied the presence of counsel at "a critical stage" such as arraignment; (3) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (4) where circumstances are so prejudiced against the defendant that competent counsel could not render effective assistance.  Cronic, 466 U.S. at 659-61; Conklin v. Schofield, 366 F.3d 1191, 1201 (11th Cir. 2004).  The Petitioner claims that "[t]he tremendous weight of this community pressure, substantially jeopardizing trial counsel's personal and professional reputation in the community, served to deny Petitioner his constitutional right to effective assistance of counsel."  (Am. Petition ¶ 248.)  Based on this assertion, and assuming that the Petitioner alleges per se ineffectiveness, he presumably contends that being forced to use appointed counsel falls within the fourth circumstance recognized by Cronic.  This claim is without merit.  The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel.  In order to assure that all criminal defendants are

assured that right, the Supreme Court established that indigent defendants are entitled to the assistance of appointed counsel.  Gideon v. Wainwright, 372 U.S. 335, 344-45 (1963).  In recognizing such a right, it seems very unlikely that the Supreme Court viewed the circumstances created by representation by appointed counsel in general to be presumptively prejudicial.  Moreover, the Petitioner has not shown that the circumstances particular to his case justify presuming prejudice.  Compare Powell v. Alabama, 287 U.S. 45, 53, 57-58 (1932) (out-of-state counsel, unfamiliar with case or local procedure, appointed to defend multiple capital defendants on first day of trial).  Habeas relief based on this claim of ineffective assistance is not warranted.

The Petitioner raises another ineffective assistance claim related to the appointed status of trial counsel.  During opening statement and closing argument, Howell alerted the jury to the fact that he and Hendricks had been appointed to represent the Petitioner.  (Resp't Ex. 6 at 206; Resp't Ex. 6A at 839.)  The Petitioner alleges that trial counsel rendered ineffective assistance because this "caused the jury to believe that Petitioner's case was so heinous that no attorney would take the case voluntarily."  (Am. Petition ¶ 247.)  The Eleventh Circuit has stated that "reminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused."  Goodwin v. Balkcom, 684 F.2d 794, 806 (11th Cir. 1982); see also Thompson v. Haley, 255 F.3d 1292, 1304 (11th Cir. 2001) ("We

reiterate that a lawyer does not serve his or her client by telling the jury that they have been court appointed."). However, trial counsel did not reference his appointed status in an effort to disassociate himself from or apologize for representing the Petitioner. Compare King v. Strickland, 714 F.2d 1481, 1491 (11th Cir. 1983) (counsel effectively apologized for representing a horrible person and emphasized that he reluctantly represented defendant). Rather, the state habeas court found that "counsel was very adept in using the fact that Petitioner could not afford to hire his own counsel to Petitioner's advantage suggesting that the State had limitless resources that were being brought to bear against a defendant who did not." (Resp't Ex. 16 at 25.) A review of the record reveals that the state habeas court made a reasonable determination of the facts. (See Resp't Ex. 6A at 838-40.) Thus, even assuming deficiency, the Petitioner has not shown a reasonable probability that absent trial counsels' performance, the result of the trial would have been different. The Petitioner's claim for relief is denied.

9.    Failure to Investigate Properly and Present Evidence in Support of Change of Venue Motion

The Petitioner alleges that trial counsel failed to support adequately a motion for change of venue. Specifically, he contends that trial counsel did not present available evidence of pretrial publicity or appropriately emphasize the prejudicial nature of the publicity. As discussed above with regard to Claim E, even if trial

counsel had submitted the evidence of pretrial publicity cited by the Petitioner, the change of venue motion would not have been successful as there was no evidence of actual or presumed prejudice.  As such, the Petitioner cannot establish any prejudice resulting from trial counsels' preparation or presentation of the change of venue motion.  As part of this claim, the Petitioner also maintains that trial counsel failed to voir dire adequately prospective jurors regarding their exposure to pretrial publicity and their ability to weigh the evidence presented during trial impartially.  The record is clear, however, that the trial court specifically inquired whether any of the prospective jurors had been exposed to any form of pretrial publicity or heard anything about the case prior to voir dire.  Those that answered in the affirmative were individually questioned in chambers regarding what they recalled reading, seeing, or hearing.  (Resp't Ex. 6 at 48-116.)  The Petitioner has failed to establish that trial counsels' performance in this respect was deficient or that any prejudice resulted.  The state habeas court's determination that the Petitioner was not denied effective assistance of counsel in his attempt to change venue was not an unreasonable application of clearly established federal law.  Thus, relief based upon this claim is not warranted.

10.    Failure to Preserve the Record of or Object to the State's Use of Peremptory Challenges

The Petitioner alleges that trial counsel rendered ineffective assistance by failing to preserve the record concerning the striking of jurors and by failing to challenge the prosecutor's use of peremptory challenges.  The Court addressed the prosecutor's alleged racially discriminatory use of peremptory strikes in Claim L. Specifically, the Court noted, as did the state habeas court, that in order to challenge legitimately the State's use of peremptory strikes, at the time of the Petitioner's trial, there had to be racial identity between the defendant and the venire members allegedly discriminated against.  See Batson v. Kentucky, 476 U.S. 79, 96 (1986).  Here, the Petitioner, a white male, alleges that trial counsel should have objected to the prosecutor's removal of African-American jurors.   Under the circumstances, an objection to the prosecutor's peremptory strikes would have been groundless. Consequently, trial counsels' failure to object did not constitute deficient performance and the state habeas court reasonably concluded that the Petitioner's ineffective assistance claim fails.

11.    Failure to Make Adequate Motion In Limine Regarding Prior Convictions and Other Crimes

The Petitioner alleges that trial counsel were ineffective in moving to exclude evidence of his prior convictions and unrelated wrongful acts.  In moving to exclude

the evidence, trial counsel set out factual arguments, argued the motion at a hearing, and offered to brief the matter more fully.  The trial court denied the motion.  Under Georgia law, evidence of other crimes may be admissible to show such things as malice, intent, and motive.  State v. Johnson, 246 Ga. 654, 655 (1980); Hicks v. State, 232 Ga. 393, 397 (1974).  Based on this principle, the state habeas court found the trial court's decision to be legally sound.  Federal habeas courts are not permitted to reexamine the determinations of state courts on issues of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Because the evidence was admissible, the state habeas court concluded that trial counsels' failure to brief the issue following the hearing did not result in prejudice.  This decision was neither contrary to nor an unreasonable application of federal law.  Moreover, the State did not actually introduce any evidence of prior convictions or other bad acts during either the guilt-innocence or sentencing phases.  Therefore, even if trial counsel could have successfully excluded the evidence in limine, there is not a reasonable probability that but for their failure to do so, the result would have been different.  The Petitioner's claim of ineffective assistance is without merit.

12.   Insufficient Access to Counsel

According to the Petitioner, he was precluded from receiving effective assistance of counsel because trial counsel did not make themselves available to

Petitioner and did not accept collect calls from the Petitioner.  The state habeas court

rejected the claim as follows:

> Defense Attorney Howell indicated at the habeas hearing . . . that he did
> talk to Petitioner by phone on occasion, but that this was not the
> preferred method of communicating with his client because
> confidentiality could not be assured while using the jail phone.
> Although communication with his attorneys may have been more
> restricted because of Petitioner's incarceration, Petitioner nevertheless
> communicated with his attorneys, and the record does not reflect that
> Petitioner was prejudiced by the inability to have freer access.  The Court
> finds that defense counsel had contact with Petitioner himself and
> numerous other contacts with family members.  Counsel was available
> to Petitioner and was not ineffective in this regard as alleged by
> Petitioner.

(Resp't Ex. 16 at 14) (internal record citations omitted).  The factual findings of the

state court are presumed correct and are supported by the record.  The Petitioner has

not presented any evidence to rebut the findings.  As such, the state habeas court's

denial of the Petitioner's claim of ineffective assistance of counsel was not an

unreasonable application of federal law.

> 13.  <u>Failure to Object to the Prosecutor's Opening Statement and
> Closing Arguments</u>

As discussed in Claims G, I, and N, the Petitioner alleges that the prosecutor

made numerous inflammatory and improper statements during his opening statement

and closing arguments of both the guilt-innocence and sentencing phases.  The

Petitioner takes issue not only with the statements themselves but argues that trial

counsel were deficient for failing to object to the improper remarks.  Having concluded that the prosecutor's remarks were either proper or did not render the trial fundamentally unfair, the Petitioner was not prejudiced by his trial counsels' failure to object.  See Devier v. Zant, 3 F.3d 1445, 1452 (11th Cir. 1993).  Thus, the state habeas court's decision that trial counsel were not ineffective is a reasonable application of federal law, and the Petitioner's claim for relief is denied.

14.   Failure to Object to Specific Questioning by Prosecutor

Prior to trial, the parties agreed not to bring up the Petitioner's prior association with the G.B.I. as a potential drug informant.  Nevertheless, during cross-examination of the Petitioner, the prosecutor bordered on questioning the Petitioner as to that relationship.  (Resp't Ex. 6A at 774.)  The Petitioner claims that trial counsel were deficient in failing to object at that point.  However, the trial judge stopped the line of questioning before any specific questions were asked.  (Id. at 774-76.)  Consequently, it was unnecessary for trial counsel to object, and the Petitioner's claim of ineffective assistance is wholly without merit.

15.   Failure to Argue for a Jury Instruction on Manslaughter

The Petitioner alleges that trial counsel were ineffective in failing to argue that the trial judge should charge the jury on manslaughter.  In his proposed jury instructions, the Petitioner requested charges on both voluntary and involuntary

manslaughter.  (Resp't Ex. 2 at 99-102, 105, 110-11.)  The trial court declined to give the instructions, finding that the evidence presented during trial did not support charging the jury on manslaughter.  As discussed above with regard to Claim J, it was not error for the trial judge to refuse to give the manslaughter charges.  Accordingly, the state habeas court's determination that trial counsel were not ineffective for failing to insist upon the charges was a reasonable application of federal law.

16.  Failure to Object to Curative Instruction Following Jury's View of Petitioner in Handcuffs

As detailed in the Court's discussion of Claim F, the jury briefly witnessed the Petitioner in handcuffs while being escorted to lunch.  Afterwards, the trial court instructed the jury that they were not to make any inferences from the fact that the Petitioner was in handcuffs and, in particular, were not to infer that he was guilty or dangerous.  (Resp't Ex. 6 at 314-15.)  The Petitioner argues that the court's curative instruction was prejudicial because it used the word "dangerous" three times and that trial counsel were deficient for failing to object to the instruction.  The state habeas court found that trial counsels' handling of the handcuff incident was a strategic choice and that the cautionary charge did not render the trial fundamentally unfair. The Petitioner has not overcome the presumption that trial counsels' actions were strategic.  See Strickland, 466 U.S. at 689.  Furthermore, because there is a presumption that the jurors followed the trial court's instruction not to make any

harmful inference about the Petitioner, see Weeks v. Angelone, 528 U.S. 225, 234 (2000), it was reasonable for the state habeas court to find that the Petitioner could not show prejudice stemming from trial counsels' failure to object.

17.    Failure to Object to Trial Judge as Biased

Prior to the commencement of the sentencing phase, the trial judge cautioned the State about submitting new evidence concerning ownership of the convenience store to assure that there was adequate proof of armed robbery and burglary, two statutory aggravating circumstances.  Specifically, the trial judge stated:

> I have reviewed the indictment and allegations in the indictment regarding the robbery and burglary and I suggest that you reconsider the advisability about offering that testimony and I will tell you why: In the first place it is a very serious case and we know that the record will receive all kind of scrutiny if there is a death penalty imposed and I see no need in creating questions without good reason . . . .
>
> . . . [I]f it should be hereafter decided that evidence which you present during the sentencing phase was not properly admitted, in my opinion the penalty would be set aside and it would be a retrial of the sentencing phase and without a doubt you have a lot to lose and nothing to gain by presenting this testimony.
>
> We are all concerned here with a fair trial.  It is not like a typical case. We are all concerned that all rights are properly protected and I see no need in taking unnecessary risks and creating problems without necessity.  What you do is entirely up to you, it is not the Court's wish to tell you how to present your case, but I do make this observation, whatever benefit it might be worth.

(Resp't Ex. 6A at 987-89.)  According to the Petitioner, the trial judge's comments indicated a bias toward the prosecution.  Thus, he argues that trial counsel were ineffective for failing to object to the trial judge's actions or insisting that the judge recuse himself.  As the state habeas court found, the trial judge did not make his comments in front of the jury and did not insist that any course of action be followed.  Rather, the judge emphasized the need to protect the Petitioner's rights and merely reminded the State to avoid the introduction of harmful error.  (Resp't Ex. 16 at 22-23.)  Cautioning the State against potentially violating the Petitioner's constitutional rights, particularly outside the earshot of the jury, does not evidence a bias in favor of the prosecution.  As such, the Petitioner has not shown that trial counsels' lack of objection to the trial judge's comments was outside the range of reasonable professional assistance.  Furthermore, the state habeas court found that even if the judge acted improperly by cautioning the State about offering evidence of ownership, no prejudice resulted because any such evidence would have been cumulative.  (Id. at 23-24.)  Because the state habeas court's holding was neither an unreasonable determination of the facts nor an unreasonable application of clearly established federal law, the Petitioner's claim for relief is properly denied.

18.   Unprofessional Conduct

The Petitioner alleges that trial counsels' unprofessional conduct in having the record reflect that the Petitioner had agreed with certain trial strategies deprived him of effective assistance of counsel.  In particular, the Petitioner contends that he was placed in a position of remaining silent and waiving his right to raise the issues later or revealing disagreements with his counsel to the prosecution. Contrary to the Petitioner's contentions, the state habeas court found that trial counsels' actions were proper in that they allowed for the opportunity to resolve disagreements before strategy was implemented and prevented ambiguity in the record.  The Petitioner has not shown that he was prejudiced by trial counsels' actions.  Thus, the state habeas court's determination that trial counsel did not provide ineffective assistance was not an unreasonable application of established federal law.  Relief based on this claim is not warranted.

19.   Failure to Object to Improper Jury Instructions

The Petitioner claims that trial counsel rendered ineffective assistance of counsel by failing to object to improper charges given to the jury during the guilt-innocence and sentencing phases.  The propriety of the jury instructions has been addressed in Claims J and O.  Because the instructions were not erroneous, trial counsel were not ineffective for failing to object.

20.    Deficient Direct Appeal

In addressing the Petitioner's direct appeal, the Supreme Court of Georgia noted that:

> Although Ford has filed 31 enumerations of error, his brief contains seven areas of argument.  The subheadings for each of these seven arguments contain references to several enumerations of error, so that all 31 ostensibly are argued, but it is apparent that many are unsupported by argument or citation of authority.  We address in this opinion all argued issues, and such additional ones as merit a response.  Any enumeration not specifically addressed has been reviewed and found to have no arguable merit.

Ford v. State, 257 Ga. at 462 n.2 (internal citation omitted).  The Petitioner contends that trial counsels' failure to brief several enumerations of error raised in his direct appeal constituted ineffective assistance.  He has failed to show, however, that trial counsels' decision not to brief every enumeration of error was not a matter of professional judgment.  The Supreme Court has made clear that counsel is not required to raise every nonfrivolous issue on appeal.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  Rather, the Supreme Court has recognized the "importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  Id. at 751-52.  The practice of focusing on stronger arguments, even to the exclusion of weaker ones, is not evidence of incompetence but indicative of effective appellate advocacy.  Smith v. Murray, 477 U.S. 527, 536 (1986).  Here, trial counsel did not fail to raise numerous issues.  Rather, they raised

31 enumerations of error but chose to focus the argument more extensively on some errors than others.  As such, the Petitioner cannot demonstrate that trial counsels' failure to brief fully every error that was placed before the Georgia Supreme Court rendered his performance constitutionally deficient under Strickland.

Even if trial counsels' performance was deficient, the Petitioner cannot show that the poor performance resulted in prejudice.  In order to establish prejudice, the Petitioner must show that the neglected claims had a reasonable probability of success on appeal.  Heath v. Jones, 941 F.2d 1126, 1132 (11th Cir. 1991) (citing Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)).  The Georgia Supreme Court conducted a full review of the enumerations of error, whether fully argued or not, and found them to have no arguable merit.  The state habeas court held, therefore, that the Petitioner could not show prejudice because the claims, even if more fully briefed, would not have been successful.  Thus, it was not unreasonable for the state habeas court to determine that trial counsel had not rendered ineffective assistance of counsel with regard to the direct appeal.

In a related claim, the Petitioner asserts that trial counsel failed to provide to the Georgia Supreme Court examples of cases similar to the Petitioner's in which life, rather than death, sentences were imposed.  He alleges that as a result of trial counsels' failure to challenge the Georgia Supreme Court's proportionality review,

conducted pursuant to O.C.G.A. § 17-10-35(c)(1), he was denied effective assistance of counsel on direct appeal.  The United States Supreme Court has held that there is no Eighth Amendment right to a proportionality review such as that required by the Georgia statute.  Pulley v. Harris, 465 U.S. 37, 43-44 & n.7 (1984).  Consequently, the Petitioner cannot demonstrate prejudice and, thus, his claim for relief is without merit.

### 21.   Failure to Object to Lack of Proof of Venue

The Petitioner alleges that the State failed to prove venue and that trial counsel were ineffective in failing to object.  The state habeas court found that venue was adequately proven, and the record supports this conclusion.  (See Resp't Ex. 6A at 554.)  As such, the Petitioner cannot satisfy either prong of the Strickland analysis. The Petitioner's claim for relief is denied.

### 22.   Failure to Object to Degree of Courtroom Security

The Petitioner claims that trial counsel were deficient for not objecting to the high degree of security in the courtroom during the Petitioner's trial.  At the habeas proceeding, Howell testified that there were approximately three to five deputies present in the courtroom, rather than the typical two or three security personnel. (Resp't Ex. 17 at 187.)  Although the Petitioner claims that trial counsel failed to raise an objection to the level of security, Howell testified that he did in fact express

concern to the court about the extra security.  As a result, the trial judge instructed the deputies to maintain a low profile.  (Id. at 188.)  Furthermore, as discussed above with regard to Claim M, this level of security was neither actually nor inherently prejudicial.  As there is no merit to the underlying due process claim, the Petitioner's claim of ineffective assistance of counsel is properly denied.

> 23.  Failure to Ensure That all Proceedings Were Adequately and Accurately Recorded

The Petitioner alleges that trial counsel were deficient in failing to ensure that all proceedings were adequately and accurately recorded by the court reporter. Although he does not specify any proceedings in the present claim, it appears from the discussion by the state habeas court that the Petitioner challenges the omission of the following three portions of the trial: (1) the actual striking of the jurors; (2) an in-chambers conference concerning a note sent from the jury requesting further information and the trial court's response; and (3) the reprimand given by the trial court to witnesses who were allegedly violating the rule of sequestration.  (Resp't Ex. 16 at 26-27.)  The state habeas court denied the Petitioner's claim, holding that the Petitioner failed to establish either deficient performance or prejudice.  First, the record indicates that trial counsel requested and the trial court ordered all pretrial and trial proceedings to be recorded.  (Resp't Ex. 3 at 7; Resp't Ex. 4 at 29; Resp't Ex. 17 at 189.)  As such, the state habeas court found that trial counsel were not deficient for

failing to supervise the work of the court reporter.  Second, although the Petitioner

maintains that the lack of a full record prevented him from raising and arguing issues

on appeal, he fails to demonstrate even one meritorious claim that he was unable to

assert.  Thus, he has not shown any prejudice that resulted from the failure to record

the select portions of the trial.  The Petitioner's claim for ineffective assistance of

counsel on this ground fails.

24.  <u>Failure to Object to Trial Court's Interpretation of the Felony Murder Verdict</u>

According to the Petitioner, the trial judge misinterpreted the jury's verdicts as

to the felony murders of Lisa Chapman and Martha Matich.  The Petitioner was

convicted of two counts of malice murder, two counts of felony murder, as well as

armed robbery and burglary.  The trial court merged felony murder into malice murder

but did not merge armed robbery and burglary into felony murder.  (<u>See</u> Resp't Ex.

6A at1082.)  The Petitioner alleges that trial counsels' failure to object to the trial

court's interpretation of the felony murder verdict amounted to ineffective assistance.

However, the state habeas court, interpreting state law, held that the trial court

properly merged felony and malice murder without first merging the underlying

felonies because "[w]hile the malice and felony murders are based on the same

occurrence, the deaths of the two victims, the underlying felonies of armed robbery

and burglary were independent criminal acts that would not merge into malice

murder." (Resp't Ex. 16 at 40-41.) Consequently, the Petitioner cannot establish

deficient performance based on trial counsels' failure to object. Nevertheless, even

if the merger was not done properly, the record is clear that trial counsel did in fact

object to the court's merger methodology. (Resp't Ex. 6A at 815-18.) Habeas relief

based on this claim is therefore not warranted.

25. <u>Failure to Assure Petitioner's Presence at all Stages of Trial</u>

The Petitioner contends that trial counsel were ineffective by failing to assure

his presence at all stages of the trial. In Georgia, a criminal defendant has the

constitutional right to be present "at any stage of a criminal proceeding that is critical

to its outcome if the defendant's presence would contribute to the fairness of the

procedure."[41] <u>Huff v. State</u>, 274 Ga. 110, 111 (2001) (<u>quoting</u> <u>Kentucky v. Stincer</u>,

482 U.S. 730, 745 (1987)). A "critical stage in the prosecution is one in which a

defendant's rights may be lost, defenses waived, privileges claimed or waived, or one

in which the outcome of the case is substantially affected in some other way." <u>Id.</u>

However, "the general rule is that the presence of a defendant is not essential at

preliminary pretrial motions and post-trial motions which involve only issues of law."

---

[41]This right is derived from Art. I, Sec. I, Par. XII of the Georgia Constitution which provides that: "No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." <u>See</u> <u>Huff v. State</u>, 274 Ga. 110, 111 (2001).

Riley v. State, 180 Ga. App. 409, 411 (1986) (internal citations omitted).  For

instance, such things as a jury charge conference, McCulley v. State, 275 Ga. 473, 476

(2002); Huff, 274 Ga. at 111-12, or a pretrial conference in which the trial court

discusses the appointment of counsel, Ferrell v. State, 261 Ga. 115, 122 (1991), have

been found not to be critical stages of the prosecution.  Here, the Petitioner challenges

his absence on two occasions: (1) during witness interviews conducted by the

prosecutor and trial counsel; and (2) during a pretrial conference in which the trial

judge discussed the appointment of a psychiatrist.  The state habeas court determined

that neither of these were stages of the trial at which the Petitioner had a right to be

present.  This was not an unreasonable determination.

The Petitioner challenges his absence at joint witness interviews.  Although part

of the pretrial process, witness interviews are merely fact-finding endeavors.  Neither

the trial court nor the jury was involved.   Such meetings do not implicate a

defendant's rights, defenses, privileges, or substantially affect the outcome of the case.

Consequently, trial counsel were not deficient in failing to demand the Petitioner's

presence.  The Petitioner also alleges that trial counsel were deficient in failing to

demand his presence at an August 19, 1986 hearing during which the appointment of

a psychiatrist was discussed.  Curiously, however, the transcript of that hearing

indicates quite clearly that the Petitioner was indeed present.  (Resp't Ex. 4 at 33.)

Nevertheless, the Petitioner's presence was not required as a review of the record indicates that the pretrial hearing was not a critical stage in the proceedings.  The Petitioner points to the fact that the trial judge discussed the appointment of a psychiatrist.[42]  However, at that point, the court had already authorized the defense to employ a psychiatrist at the state's expense.  The discussion at the hearing concerned only when the psychiatrist would examine the Petitioner and what the total charge would be to the state.  (Id. at 2-6.)  Furthermore, even if he had a constitutional right to be present at the conference, the state habeas court found that the Petitioner could not demonstrate harm from his absence because the trial court granted the request for an independent evaluation.  The decision of the state habeas court was not inconsistent with clearly established federal law and, thus, relief based on this claim is not warranted.

26.   Failure to Request Competency Hearing

The Petitioner argues that a competency hearing was required after he remarked to the trial judge that he understood only about half of what had taken place during a

---

[42]A number of motions were brought up during this hearing, however, most were not specifically addressed or ruled on.  Defense counsel did argue a motion to sever and a motion to bar imposition of the death penalty, both of which were denied. (Resp't Ex. 4 at 9-17.)  The discussions involved purely issues of law and, thus, the Petitioner's presence was not mandated.  See Ferrell, 261 Ga. at 122-23; Riley, 180 Ga. App. at 411.

pretrial hearing.[43]  As discussed in regard to Claim R, the trial court was not required to conduct a competency hearing sua sponte because neither the Petitioner's conduct nor his comment created a bona fide doubt as to his competency or his ability to assist in his defense.   Here, the Petitioner contends that trial counsel were deficient for failing to move for a competency hearing.   Trial counsels' failure to pursue the comment was not deficient for the same reasons that the trial court was not obligated to hold a competency hearing.   Furthermore, the Petitioner cannot show any prejudice stemming from trial counsels' failure to request a competency hearing at that time because approximately one month after the hearing at issue, the Petitioner was evaluated by his appointed psychiatrist who found him to be competent to stand trial. (Resp't Ex. 5 at 2-3.)   This opinion was consistent with that of a psychologist who had previously evaluated the Petitioner.   As a result of these opinions, the Petitioner withdrew his plea of mental incompetency and did not contest the issue at trial.   (Id. at 4; Resp't Ex. 6 at 13-17.)   Having failed to establish either deficient performance or prejudice, the Petitioner's ineffective assistance claim based on trial counsels' failure to request a competency hearing fails.

---

[43]The Petitioner's comment was made at the conclusion of the August 19, 1986 hearing, the same hearing at which the Petitioner now contends, in the immediately preceding claim, that he was not present.

27.   Trial Court's Denial of Funds to Employ Experts and Conduct
Investigations

The Petitioner filed a pretrial motion with the trial court requesting funds to
employ: (1) an expert to assist in challenging venue and conducting voir dire; and (2)
investigators to interview witnesses and examine physical evidence.  (Resp't Ex. 2 at
70-72.)   The Petitioner claims that he was denied effective assistance of counsel
because the trial court denied his motion for funds.  As with his claim regarding the
use of appointed counsel, this claim does not appear to fall within the Strickland
variety of ineffective assistance of counsel claims.  The Court will again presume that
the Petitioner intended to allege per se ineffectiveness under Cronic.[44]  To reiterate,
per se ineffectiveness may be found: (1) where there has been a "complete denial of
counsel"; (2) where the accused is denied the presence of counsel at "a critical stage"
such as arraignment; (3) when "counsel entirely fails to subject the prosecution's case
to meaningful adversarial testing"; and (4) where circumstances are so prejudiced
against the defendant that competent counsel could not render effective assistance.
Cronic, 466 U.S. at 659-61; Conklin, 366 F.3d at 1201.  The Petitioner's claim does
not fall within either of the first two Cronic scenarios.  To the extent the Petitioner

---

[44]The Petitioner asserts this claim in his Amended Petition, however, he chose
not to brief the issue.  As a result, the Court is left to address the merits of the claim
based solely on the one sentence conclusory allegation set forth in the petition.

alleges that the denial of funds resulted in trial counsel failing to subject the prosecution's case to meaningful adversarial testing, the claim fails.  In order to presume prejudice based on a failure to test the prosecution's case, trial counsel's failure must be complete.  Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Cronic, 466 U.S. at 659).  Even if the Petitioner were to allege that trial counsel failed to oppose the prosecution during voir dire or on the issue of physical evidence, a conclusion which the record does not support, discrete errors during certain portions of the case do not amount to a complete failure of meaningful adversarial testing.  See id. at 697.

Finally, the Petitioner has not shown that the trial court's denial of funds placed him in a situation where no competent counsel could render effective assistance.  As set forth in more detail in the Court's discussion of Claim E, the Supreme Court has never held that due process requires the state to provide fees to defendants to hire nonpsychiatric experts.  Conklin, 366 F.3d at 1206.  Although an indigent defendant must be provided with the "basic tools of an adequate defense," the Supreme Court has made clear that this does not require the state to provide an indigent defendant with "all the assistance that his wealthier counterpart might buy."  Ake, 470 U.S. at 70.  Thus, the Petitioner cannot show that the absence of specialized experts to aid in jury selection and to conduct independent tests on physical evidence created a situation where prejudice should be presumed.  Moreover, the state habeas court found

that even if Petitioner had been granted funds for additional testing on the physical evidence, it would not have enhanced the defense evidence presented during either stage of the trial or revealed anything contrary to the testimony proffered during trial. (Resp't Ex. 16 at 40.)  Absent any evidence of prejudice, presumed or otherwise, the Petitioner cannot establish ineffective assistance of counsel caused by the trial court's denial of funds.  The Petitioner's claim for relief is therefore denied.

The state habeas court denied the Petitioner's overall claim of ineffective assistance of counsel.  As discussed above, the state habeas court's holdings relied neither on unreasonable application of federal law nor unreasonable determinations of fact.  Consequently, habeas relief based upon the Petitioner's claim of ineffective assistance of counsel is improper and thereby denied.

U.   Claim U – Cumulative Errors

Lastly, the Petitioner claims that his conviction and sentence are invalid due to cumulative substantive and procedural errors during the guilt-innocence and sentencing stages of his trial.  There is no clearly established Supreme Court precedent requiring states to consider the cumulative effect of alleged constitutional errors in order to determine whether a criminal defendant has received due process of law. Jenkins v. Byrd, 103 F. Supp. 2d 1350, 1382 (S.D. Ga. 2000).  The Eleventh Circuit, however, recognizes a need for cumulative error review.  In Conklin v. Schofield, the

Eleventh Circuit stated that "[a] piecemeal review of each incident does not end our inquiry." Conklin, 366 F.3d at 1210 (quoting United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983)).  Rather, the court "must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, [the Petitioner] received a fair trial as is [his] due under our Constitution." Id.  Regardless of whether cumulative error review is necessary or appropriate, having found no error as to the individual claims, there can be no cumulative error of sufficient magnitude to entitle the Petitioner to habeas relief.  The Petitioner was entitled to and received a fair trial. He does not have a constitutional right to a perfect trial.

## IV.  CONCLUSION

For the reasons set forth above, the Amended Petition for Writ of Habeas Corpus by a Person in State Custody [Doc. 10] is DENIED.

SO ORDERED, this 11 day of May, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge